## UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

**Thurgood Marshall U.S. Courthouse   40 Foley Square, New York, NY 10007 Telephone: 212-857-8500**

### MOTION INFORMATION STATEMENT

**Docket Number(s):** 21-2690, 21-2691 _____    _____ Caption [use short title] _____

**Motion for:** Leave to File Supplemental Appendix

_____

_____

Universitas Education, LLC, et al v. Nova Group, Inc , et al

Set forth below precise, complete statement of relief sought:

Movants/Appellants request leave to file supplemental appendix

containing documents from District Court proceedings.

_____

_____

_____

_____

**MOVING PARTY:** DANIEL E. CARPENTER &  GRIST MILL CAPITAL LLC      **OPPOSING PARTY:** UNIVERSITAS EDUCATION LLC

☐ Plaintiff                      ☐ Defendant

☑ Appellant/Petitioner           ☐ Appellee/Respondent

**MOVING ATTORNEY:** Jeff Sandberg               **OPPOSING ATTORNEY:** Joseph Manson

[name of attorney, with firm, address, phone number and e-mail]

Palmer Lehman Sandberg, PLLC                    Law Offices of Joseph L. Manson, III

8350 N. Central Expressway, Suite 1111, Dallas, TX    600 Cameron St., Fourth Floor, Alexandria VA 22314

75206   214-242-6454   JSandberg@pamlaw.com     202-674-1450   JManson@jmansonlaw.com

**Court- Judge/ Agency appealed from:** Hon. Laura Taylor Swain

**Please check appropriate boxes:**

Has movant notified opposing counsel (required by Local Rule 27.1):

☑ Yes   ☐ No (explain):_____

_____

Opposing counsel's position on motion:

☐ Unopposed   ☐ Opposed ☑ Don't Know

Does opposing counsel intend to file a response:

☐ Yes   ☐ No   ☑ Don't Know

**FOR EMERGENCY MOTIONS, MOTIONS FOR STAYS AND INJUNCTIONS PENDING APPEAL:**

Has this request for relief been made below?   ☐ Yes ☐ No

Has this relief been previously sought in this court?   ☐ Yes ☐ No

Requested return date and explanation of emergency: _____

_____

_____

_____

Is oral argument on motion requested?   ☐ Yes ☑ No (requests for oral argument will not necessarily be granted)

Has argument date of appeal been set?   ☑ Yes ☐ No If yes, enter date: February 8, 2023

**Signature of Moving Attorney:**

/s Jeff Sandberg_____   **Date:** 2/7/2023_____   Service by: ☑ CM/ECF   ☐ Other [Attach proof of service]

# 21-2690(L),

## 21-2691(CON)

## United States Court of Appeals
## for the
## Second Circuit

———————————

UNIVERSITAS EDUCATION, LLC,

*Petitioner-Appellee,*

– v. –

GRIST MILL CAPITAL, LLC,

*Respondent-Appellant,*

NOVA GROUP, INC, as Trustee, Sponsor and Named Fiduciary of The Charter Oak Trust Welfare Benefit Plan, GRIST MILL TRUST WELFARE BENEFIT PLAN, AVON CAPITAL LLC, CHARTER OAK TRUST WELFARE BENEFIT PLAN, PHOENIX CAPITAL MANAGEMENT, LLC, HANOVER TRUST COMPANY, CARPENTER FINANCIAL GROUP, INC.,

*Respondents,*

———————————

*(For Continuation of Caption See Inside Cover)*

———————————

On Appeal from the United States District Court
for the Southern District of New York

**MOTION FOR LEAVE TO FILE
SUPPLEMENTAL APPENDIX**

LAW OFFICE OF JONATHAN J. EINHORN
129 Whitney Avenue, Suite 1
New Haven, Connecticut 06510
(203) 777-3777

*Attorneys for Respondent-Appellant
Grist Mill Capital, LLC and Movant-
Appellant Daniel E. Carpenter*

DANIEL E. CARPENTER,

*Movant-Appellant.*

## AFFIDAVIT OF JEFFREY R. SANDBERG

STATE OF TEXAS                §
                             §
COUNTY OF DALLAS              §

BEFORE ME, the undersigned authority, personally appeared Jeffrey R. Sandberg, who being duly sworn, deposed as follows:

1.      My name is Jeffrey R. Sandberg. I am over eighteen years of age. I have never been convicted of a felony or other crime involving moral turpitude and am fully competent to make this affidavit. I have personal knowledge of the facts stated herein, and they are all true and correct.

2.      I am a licensed attorney by the State Bar of Texas and have held this status since 1994. I am also Board-Certified in Civil Appellate Law in Texas. I am admitted to practice in multiple federal courts, including but not limited to the United State Supreme Court, the Second Circuit Court of Appeals, the Fifth Circuit Court of Appeals and the Tenth Circuit Court of Appeals.

3.      While preparing for oral argument in the Second Circuit Court of Appeals on February 8, 2023 in Case Nos. 21-2690, 21-2691, *Universitas Education, LLC, et al. v. Nova Group, Inc., et al.*, I determined the appendices filed by the parties did not include certain documents located in the District Court's records that the panel may wish to have available to them in the appellate record.

4.      For this reason, I am submitting this affidavit in support of the Motion for Leave to File Supplemental Appendix.

FURTHER AFFIANT SAYETH NOT.

_____

JEFFREY R. SANDBERG, Affiant

STATE OF TEXAS      §
     §
COUNTY OF DALLAS      §

SUBSCRIBED AND SWORN BEFORE ME by Jeffrey R. Sandberg on this 7th day of February 2023, to certify which witness my hand and official seal.



MARIA ISLAS
Notary Public, State of Texas
Notary ID 653224-6
My Commission Exp. 11-04-2025

_____
Notary Public in and for the State of Txhs

**AFFIDAVIT OF JEFFREY R. SANDBERG**
**I:\14184\Ct Dist Ct - PJ (738)\Pleadings\Affidavit. J Sandberg.230207..doc**         **Pag**

EXHIBIT TO MOTION

# 21-2690(L),

## 21-2691(CON)

# United States Court of Appeals
# for the
# Second Circuit

―――――――――

UNIVERSITAS EDUCATION, LLC,

*Petitioner-Appellee,*

– v. –

GRIST MILL CAPITAL, LLC,

*Respondent-Appellant,*

NOVA GROUP, INC, as Trustee, Sponsor and Named Fiduciary of The Charter Oak Trust Welfare Benefit Plan, GRIST MILL TRUST WELFARE BENEFIT PLAN, AVON CAPITAL LLC, CHARTER OAK TRUST WELFARE BENEFIT PLAN, PHOENIX CAPITAL MANAGEMENT, LLC, HANOVER TRUST COMPANY, CARPENTER FINANCIAL GROUP, INC.,

*Respondents,*

―――――――――

*(For Continuation of Caption See Inside Cover)*

―――――――――

On Appeal from the United States District Court
for the Southern District of New York

## **SUPPLEMENTAL APPENDIX**

LAW OFFICE OF JONATHAN J. EINHORN
129 Whitney Avenue, Suite 1
New Haven, Connecticut 06510
(203) 777-3777

*Attorneys for Respondent-Appellant
Grist Mill Capital, LLC and Movant-
Appellant Daniel E. Carpenter*

DANIEL E. CARPENTER,

*Movant-Appellant.*

i

## TABLE OF CONTENTS

**Page**

Notice of Motion, by Judgment Creditor Universitas
Education, LLC, for an Order Directing Turnover
and Permanent Injunction, dated
October 21, 2013 .................................................. SA-1

Memorandum of Law, by Judgment Creditor
Universitas Education, LLC, in Support of
Motion, dated October 9, 2013 ............................ SA-4

Memorandum of Law, by Respondent Daniel
Carpenter, in Opposition to Motion, dated
October 25, 2013 .................................................. SA-37

Reply Memorandum of Law, by Judgment Creditor
Universitas Education, LLC, in Support of
Motion, dated January 24, 2013 ........................... SA-49

Supplemental Memorandum of Law, by Judgment
Creditor Universitas Education, LLC, in Support
of Motion, dated June 15, 2014 ............................ SA-85

Memorandum Opinion and Order of the Honorable
Laura Taylor Swain, dated August 7, 2014............ SA-93

SA-1

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------X
UNIVERSITAS EDUCATION, LLC,

                Judgment Creditor,        :

             -against-           :

NOVA GROUP, INC., as trustee, sponsor and   :
fiduciary of THE CHARTER OAK TRUST
WELFARE BENEFIT PLAN,          :

             Judgment Debtor,   :     Case Nos. 11 CV 1590-LTS-HBP and
                                 11-8726-LTS

             -and-            :

Daniel E. Carpenter, Charter Oak Trust Welfare  :
Benefit Plan, Grist Mill Capital, LLC, Grist Mill
Holdings, LLC, the Grist Mill Trust Welfare    :
Benefit Plan, Avon Capital, LLC, Hanover Trust
Company, Carpenter Financial Group and Phoenix  :
Capital Management, LLC,

             Respondents.
------------------------------------------------------------------X

**NOTICE OF MOTION AND MOTION FOR**

**TURNOVER AND PERMANENT INJUNCTION**

     **PLEASE TAKE NOTICE** that, upon the accompanying Declaration of Michael Barnett,

with Exhibits 1-53, dated October 9, 2013, Petitioner/Judgment Creditor Universitas Education,

LLC, by its attorneys Loeb & Loeb LLP, hereby moves this Court before the Hon. Laura Taylor

Swain, at the United States Courthouse located at 500 Pearl St., New York, NY 10007, for an

Order, pursuant to Fed. R. Civ. P. 69(a)(1) and N.Y. C.P.L.R. § 5225(b):

        a.  Directing Respondents Grist Mill Capital, LLC, Daniel E. Carpenter, Grist Mill

            Holdings, LLC, the Grist Mill Trust Welfare Benefit Plan, Avon Capital, LLC,

            Hanover Trust Company, Carpenter Financial Group and Phoenix Capital

SA-2

Management, LLC to each pay (and/or assign or transfer) to Universitas money and/or assets that were improperly transferred to them, directly or indirectly, from Judgment Debtor Nova Group, Inc. ("Nova") as Trustee of the Charter Oak Trust Welfare Benefit Plan ("Charter Oak Trust"), in the following amounts:

    i.   Grist Mill Capital, LLC – $31,263,842.75

    ii.   Daniel E. Carpenter – $26,776,834.94

    iii.   Grist Mill Holdings, LLC – $21,000,000.00

    iv.   Carpenter Financial Group – $11,140,000.00

    v.   Avon Capital, LLC – $6,710,065.92

    vi.   Phoenix Capital Management, LLC – $5,000,000.00

    vii.   Grist Mill Trust Welfare Benefit Plan – $4,487,007.81

    viii.   Hanover Trust Company – $1,200,000.00

b.  Permanently enjoining further transfers of the assets of Respondents, including the following insurance policies (identified by insured last name, insurance carrier and policy number), until Universitas' judgment is satisfied:

    i.   Collins – PHL Variable Insurance Policy No. 975 279 51

    ii.   Paulsrud – PHL Variable Insurance Policy No. 975 294 11

    iii.   Robertson – PHL Variable Insurance Policy No. 975 295 60

    iv.   Zahner – PHL Variable Insurance Policy No. 975 293 42

    v.   Bolton – Lincoln Life Policy No. JJ7121879

    vi.   Clinard – Lincoln Life Policy No. JJ7105688

    vii.   Lowry – Lincoln Life Policy No. JJ7130995

    viii.   Nordin – Lincoln Life Policy No. JJ7075457;

SA-3

In the event the Respondents have received or will receive any monies or assets in respect of any of these policies (e.g. through a sale or surrender of a policy, or a sale of the beneficial interest in a policy or the Charter Oak Trust), these monies or assets should be turned over to Universitas as property of Nova and the Charter Oak Trust.

c. Directing the retitling of any insurance policies that were previously held by the Charter Oak Trust and improperly transferred to another entity, including the SunLife policy insuring the life of a woman with the last name Amsterdam (Policy Number 020158601); and

d. Directing that Universitas directly receive any monies or assets that PHL Variable Insurance ("PHL") or an affiliated PHL entity may pay to the Charter Oak Trust, or that the Charter Oak Trust or any of its affiliates receive, in respect of the 4 policies that are the subject of litigation between the Charter Oak Trust and PHL in Connecticut Superior Court.

Universitas certifies that it has used its best efforts to resolve informally the matters raised in this motion.

Dated:   New York, New York
             October 21, 2013

LOEB & LOEB LLP

By: /s/ Paula Colbath                    .
       Paula K. Colbath (PC-9895)
       Michael Barnett (MB-7686)
       345 Park Avenue
       New York, New York 10154-1895
       (212) 407-4000

       *Attorneys for*
       *Universitas Education, LLC*

3

SA-4

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
----------------------------------------------------------------X
UNIVERSITAS EDUCATION, LLC,

                    Judgment Creditor,        :

          -against-              :

NOVA GROUP, INC., as trustee, sponsor and   :
fiduciary of THE CHARTER OAK TRUST
WELFARE BENEFIT PLAN,             :

                   Judgment Debtor,       Case Nos. 11 CV 1590-LTS-HBP and
                                            11-8726-LTS

            -and-

Daniel E. Carpenter, Charter Oak Trust Welfare
Benefit Plan, Grist Mill Capital, LLC, Grist Mill
Holdings, LLC, the Grist Mill Trust Welfare
Benefit Plan, Avon Capital, LLC, Hanover Trust
Company, Carpenter Financial Group and Phoenix
Capital Management, LLC,

                    Respondents.
----------------------------------------------------------------X

**UNIVERSITAS EDUCATION, LLC'S MEMORANDUM OF LAW IN SUPPORT**
**OF ITS MOTION FOR A PRELIMINARY INJUNCTION, PERMANENT**
**INJUNCTION AND TURNOVER**

SA-5

**TABLE OF CONTENTS**

**Page(s)**

TABLE OF AUTHORITIES ..........................................................................................ii

I.      PRELIMINARY STATEMENT ...........................................................................1

II.     STATEMENT OF FACTS ...................................................................................6

        a.      Background ............................................................................................6

        b.      Transfer of trust funds to entities controlled by Mr. Carpenter ...........10

        c.      Nova efforts to transfer insurance policies to Grist Mill Capital following the
                entry of judgment ................................................................................14

        d.      Nova assets subject to other litigation...............................................15

III.    ARGUMENT .....................................................................................................15

        a.      Applicable background law .................................................................15

        b.      Charter Oak Trust assets held by Mr. Carpenter's entities and Mr. Carpenter
                should be turned over to Universitas..................................................17

        c.      This Court should permanently enjoin Respondents from further transfers of
                assets ...................................................................................................22

        d.      This Court should preliminarily enjoin Mr. Carpenter from further money
                transfers of assets of any kind .............................................................25

        e.      Any payments related to the policies subject to the Connecticut litigation should
                be paid over to Universitas...................................................................27

IV.     CONCLUSION ..................................................................................................27

i

SA-6

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

325 Bleecker, Inc. v. Local Union No. 747, United Bhd. of Carpenters & Joiners of Am.,
    500 F. Supp. 2d 110 (N.D.N.Y. 2007) .............................................................................23-24

Bergesen d.y. v. Lindholm,
    760 F. Supp. 976 (D. Conn. 1991) ....................................................................................... 22

Cartier v. Symbolix, Inc.,
    454 F. Supp. 2d 175 (S.D.N.Y. 2006).................................................................................. 23

Cordius Trust v. Kummerfeld,
    153 F. App'x 761 (2d Cir. 2005) ................................................................................... 16, 22

D. Klein & Son, Inc. v. Good Decision, Inc.,
    147 F. App'x 195 (2d Cir. 2005) ......................................................................................... 17

Fannie Mae v. Olympia Mortg. Corp.,
    Case No. 04-4971-NG, 2006 U.S. Dist. LEXIS 70175 (E.D.N.Y. Sept. 28, 2006)............... 19

Iantosca v. Step Plan Servs.,
    604 F.3d 24 (1st Cir. 2010) ............................................................................................. 8, 21

Jones v. Dana,
    06 Civ. 0159-RPP, 2006 U.S. Dist. LEXIS 25293 (S.D.N.Y. May 3, 2006)......................... 24

JW Oilfield Equip., LLC v. Commerzbank, AG,
    764 F. Supp. 2d 587 (S.D.N.Y. 2011) .................................................................................. 16

Miramax Film Corp. v. Abraham,
    Case No. 01-5202-GBD, 2003 U.S. Dist. LEXIS 21346 (S.D.N.Y. Nov. 24, 2003) ............. 17

Northern Mariana Islands v. Millard,
    845 F. Supp. 2d 579 (S.D.N.Y. 2012).................................................................................. 16

Ognibene v. Parkes,
    671 F.3d 174 (2d Cir. 2011)............................................................................................22-23

Salinger v. Colting,
    607 F.3d 68 (2d Cir. 2010)................................................................................................... 26

SEC v. Colonial Inv. Mgmt. LLC,
    No. 07 Civ. 8849, 2010 U.S. Dist. LEXIS 108063 (S.D.N.Y. Oct. 6, 2010)........................ 16

SEC v. Softpoint, Inc.,
    Case No. 95-2951, 2012 U.S. Dist. LEXIS 187142 (S.D.N.Y. May 8, 2012) ...................... 17

Skiff-Murray v. Murray,
    17 A.D.3d 807 (3d Dep't 2005) ................................................................................... 10, 19

United States SBA v. Haukedahl Found.,
    Case No. 04-1744-JSR, 2004 U.S. Dist. LEXIS 9654 (S.D.N.Y. May 27, 2004) ................ 27

United States v. Evseroff,
    270 F. App'x 75 (2d Cir. 2008) ................................................................................... 18, 20

**Statutes**

N.Y. C.P.L.R. § 302(a)(3)(ii) ................................................................................................ 17

N.Y. C.P.L.R. § 5222 ............................................................................................................ 25

N.Y. Debt. & Cred. Law § 275 .............................................................................................. 17

N.Y. Debt. & Cred. Law § 276 ......................................................................................... 18, 20

**Other Authorities**

Fed. R. Civ. P. 65 and 69 ..................................................................................................... 25

Fed. R. Civ. P. 69(a)(1) ........................................................................................................ 16

SA-8

Universitas Education, LLC ("Universitas"), by its counsel Loeb & Loeb LLP, respectfully submits this memorandum of law in support of its motion, brought pursuant to Fed. R. Civ. Pro. 69(a)(1) and N.Y. CPLR § 5225(b), seeking the turnover of fraudulently conveyed monies and assets belonging to Judgment Debtor Nova Group, Inc.

This motion is brought against Daniel E. Carpenter and the following entities – Nova Group, Inc. ("Nova"), the Charter Oak Trust Welfare Benefit Plan (the "Charter Oak Trust" and "Charter Oak Trust 2009"), Grist Mill Capital, LLC ("Grist Mill Capital"), Grist Mill Holdings, LLC ("Grist Mill Holdings"), the Grist Mill Trust Welfare Benefit Plan ("Grist Mill Trust"), Avon Capital, LLC ("Avon Capital"), Hanover Trust Company ("Hanover"), Carpenter Financial Group ("Carpenter Financial") and Phoenix Capital Management, LLC ("Phoenix Capital") (collectively the "Respondents").  In addition, Universitas requests that the Court make the turnover Order applicable to all subsequent transferees of the Respondents that are controlled, directly or indirectly, by Mr. Carpenter.  The October 9, 2013 Declaration of Michael Barnett ("10/9/13 Barnett Decl."), with Exhibits 1-53, supports this motion.

## I.    PRELIMINARY STATEMENT

This is a proceeding brought to enforce a judgment entered by this Court on June 7, 2012 in favor of Universitas and against Judgment Debtor Nova in the amount of $30,181,880 (dkt. no. 41).[1]

For more than two and a half years, Nova's principals have defied the January 2011 Arbitration Award (confirmed to judgment in June 2012) that requires Nova to deposit the Award amount into the escrow account of one of its law firms.  3/15/11 Universitas Petition to

_____

[1] Unless otherwise stated, all references to docket entries are for those in Case No. 11-1590-LTS-HBP.

Confirm Arbitration Award, Ex. 14 at 13 (dkt. no. 6).  This Court has now ordered Nova to deposit the judgment amount with the Court by October 4 as a sanction for Nova's litigation tactics – an Order that Nova has failed to comply with.  See Dkt. No. 295; 10/9/13 Barnett Decl., Exhibit 53.

Universitas brings a turnover motion and motion for permanent injunction against all of the Respondents; and, in addition, seeks a preliminary injunction against Daniel E. Carpenter, who misappropriated more than $30 million in trust funds meant for Universitas.  In doing so, Mr. Carpenter purported to act through numerous companies, corporations and trusts, all of which he controls, and all of which primarily exist for the perpetuation of Mr. Carpenter's long-running shell game.  Mr. Carpenter is a suspended attorney who has twice been found guilty of multiple counts of mail and wire fraud (both times the trial judge overturned the verdicts).  He has a well-documented history of hiding behind sham entities.

Universitas is proceeding by Order to Show Cause against Mr. Carpenter, against whom it seeks a preliminary injunction, a permanent injunction, and turnover Order.  Universitas is proceeding by Notice of Motion against the remaining Respondents, against which it seeks permanent, but not preliminary, injunctions, and turnover Orders.

Universitas is the beneficiary of the Charter Oak Trust in relation to two life insurance policies placed into the Trust by the late Sash A. Spencer, formerly CEO of Holding Capital Group, Inc. ("Holding Capital"), who died in June 2008.  10/9/13 Barnett Decl., ¶34.  In May 2009, Lincoln National Life Insurance Company ("Lincoln Life"), the issuer of the two Spencer life insurance policies, paid Wayne H. Bursey, the President of Nova and a purported Trustee of the Charter Oak Trust, more than $30 million so that the Charter Oak Trust could pay Universitas.  Id., ¶36, Exs. 12 and 16.

2

But once Mr. Bursey had the money from Lincoln Life, he and other individuals, especially Mr. Carpenter – who at the time was awaiting sentencing after being found guilty on federal fraud charges –  improperly transferred it to entities in Mr. Carpenter's control.  The transfers of this money, from the Charter Oak Trust to entities that Mr. Carpenter controls, were made without consideration, and have no valid basis, particularly since Mr. Bursey and Mr. Carpenter were supposed to be holding this money in trust for Universitas and instead orchestrated all of the subject transfers across numerous entities.

Despite Mr. Carpenter's creation of the Charter Oak Trust for the ostensible sole purpose of providing death benefits to the designated beneficiaries of high-level business executives, the truth is that no one besides Mr. Carpenter and his affiliates has benefitted from the Charter Oak Trust.

This fact is evident from this turnover motion, in which the key issue is where the Lincoln Life money went after Mr. Bursey deposited it into an account standing in the Charter Oak Trust's name.  Documents produced by third parties (namely, TD Bank) indicate that within 6 months of the May 2009 payment by Lincoln Life to the Charter Oak Trust, Nova Chairman Mr. Carpenter and Nova President Mr. Bursey transferred almost all of Universitas' money to entities entirely in Mr. Carpenter's control.  See 10/9/13 Barnett Decl., ¶¶42-64.  All of these entities share the same business address as Nova (100 Grist Mill Road in Simsbury, Connecticut).  Id., ¶44-45, Exs. 24-25, 30, 36, 38, 41, 48.  The TD Bank accounts of these entities all have Mr. Carpenter as a signatory, and were opened soon after Lincoln Life's payment of $30.7 million to the Charter Oak Trust for Universitas' benefit.  Id.  Indeed, in testimony given in this action, Mr. Carpenter has admitted to being the only person affiliated with most of these entities; he even referred to one of them as his "alter ego."  Id., ¶72.

SA-11

Just last week, Nova's counsel, responding to the Court's Order that Nova deposit the judgment amount into the Court no later than October 4, claimed that neither Nova nor the Charter Oak Trust had the assets necessary to comply with the Order; and that the Carpenter-controlled entities to which Mr. Carpenter transferred Universitas' money in 2009 no longer have the money.  10/9/13 Barnett Decl., Ex. 53 ("Such cash and assets are no longer under the control of the judgment debtor or of the transferee entities").  These disclosures reinforce Mr. Carpenter's liability as an alter ego of the transferee entities and the necessity of a preliminary injunction enjoining the transfer of all assets controlled directly or indirectly by Mr. Carpenter, through a shell entity or otherwise.

By this motion, Universitas requests an Order directing the Respondents to each pay (and/or transfer) to Universitas money and/or assets that were improperly transferred to them from Nova/the Charter Oak Trust.  For the reasons set forth below, Universitas requests that the Respondents be ordered to turn over monies or other assets in the following amounts[2]:

- Grist Mill Capital – $31,263,842.75

- Daniel E. Carpenter – $26,776,834.94[3]

- Grist Mill Holdings – $21,000,000.00

- Carpenter Financial – $11,140,000.00

- Avon Capital – $6,710,065.92

---

[2] The total amount actually turned over would of course be limited to Universitas' judgment amount.

[3] The amount sought from Mr. Carpenter is the total amount siphoned from Nova as Trustee of the Charter Oak Trust ($31,263,842.75), less the amount of this money that was improperly transferred to the Grist Mill Trust ($4,487,007.81).  Universitas does not at this time claim that Mr. Carpenter is an alter ego of the Grist Mill Trust, although the transfers of Charter Oak Trust funds to Grist Mill Trust were improper and should result in a turnover Order against the Grist Mill Trust in the amount of $4,487,007.81.

SA-12

- Phoenix – $5,000,000.00

- Grist Mill Trust – $4,487,007.81

- Hanover – $1,200,000.00

Universitas also seeks a preliminary injunction against Mr. Carpenter, enjoining him from, directly or indirectly, causing, making, permitting or suffering any sale, assignment or transfer of, or any interference with, any asset or property of his, and any asset or property of any company, corporation or entity (including any trusts) in which he has a direct or indirect interest or control; provided that Mr. Carpenter be permitted to expend and/or transfer up to $20,000.00 per month for ordinary expenses of his or one of his entities, with any such payments or transfers to be reported, in writing, with supporting documentation, to Universitas' counsel within seven (7) days of such payment/transfer being made.

Additionally, Universitas seeks a permanent injunction prohibiting further transfers of assets of the Respondents – including any asset or property of Mr. Carpenter's, and any asset or property of any company, corporation or entity (including any trusts) in which he has a direct or indirect interest or control – until Universitas' judgment is satisfied in full.  These assets include the following life insurance policies owned or held by the Charter Oak Trust (identifiable by insured last name, insurance carrier and policy number):

- Collins – PHL Variable Insurance Policy No. 975 279 51

- Paulsrud – PHL Variable Insurance Policy No. 975 294 11

- Robertson – PHL Variable Insurance Policy No. 975 295 60

- Zahner – PHL Variable Insurance Policy No. 975 293 42

- Bolton – Lincoln Life Policy No. JJ7121879

- Clinard – Lincoln Life Policy No. JJ7105688

5

SA-13

- Lowry – Lincoln Life Policy No. JJ7130995

- Nordin – Lincoln Life Policy No. JJ7075457

The Charter Oak Trust owns (or once owned) policies insuring the lives of several hundred individuals.  These policies are assets of the Charter Oak Trust that can be used to satisfy Universitas' judgment against Nova.  Universitas therefore also seeks an Order directing the retitling of any insurance policies that were previously held by the Charter Oak Trust but improperly transferred to Mr. Carpenter or one of his entities.  One such policy is a policy issued by Sun Life Financial insuring the life of a woman with the last name Amsterdam (Policy Number 020158601).

Finally, as discussed below, there are four (4) Charter Oak Trust policies that were issued by PHL Variable Insurance Company ("PHL") and are the subject of litigation between the Charter Oak Trust and PHL.  Universitas seeks an Order directing that Universitas directly receive any monies or assets that PHL may pay to the Charter Oak Trust, or that the Charter Oak Trust or any of its affiliates receive, in respect of these 4 policies.

## II.      STATEMENT OF FACTS

### a.      *Background*

Nova Chairman Daniel Edgar Carpenter, of West Simsbury, Connecticut, is a suspended attorney who has twice been found guilty of mail and wire fraud for misappropriating money belonging to his clients. He has twice successfully petitioned the District of Massachusetts judge in his case to overturn the guilty verdicts.  (The government is presently appealing the overturning of the second guilty verdict to the First Circuit, with the appeal scheduled for oral argument on November 7.)  10/9/13 Barnett Decl., ¶¶21-22, Ex. 7.

Separately, Mr. Carpenter is a target of a federal grand jury investigation in Connecticut,

6

arising from the activities of the Charter Oak Trust.  10/9/13 Barnett Decl. ¶23, Ex. 8.  Although

Mr. Carpenter in this action once asserted the Fifth Amendment in response to questions about

the Charter Oak Trust, Nova and Grist Mill Capital (10/9/13 Barnett Decl., ¶72), he has also

subsequently given substantive testimony and has acknowledged  controlling most of the entities

to which Universitas' money was ultimately transferred, going so far as to call one of them, Grist

Mill Holdings, his "alter ego."  10/9/13 Barnett Decl., ¶72, Ex. 47 (April 17 Tr. at 47:15-18).

Mr. Carpenter has also admitted to "easily" setting up at least 200 bank accounts over the last

few years.  Id., Ex. 47 (April 17 Tr. at 23:13-16).  He has formed, or arranged for the formation

of, scores if not hundreds of entities.  Id., ¶29.

   Mr. Carpenter has operated like this for quite some time.  After his first guilty verdict on

multiple mail and wire fraud counts in the District of Massachusetts, in 2005, the U.S. Probation

Office submitted a sentencing memorandum accusing Mr. Carpenter of falsely claiming a net

worth of $129,000, and taking improper measures to evade the enforcement of civil judgments

against him and his companies:

> When in April, 2004, the plaintiffs [in another case] finally located and obtained a
> writ of execution against property held by Carpenter in Florida, Carpenter
> promptly conveyed the land to his sister for $0, following which she proceeded to
> encumber it with mortgages held by various Carpenter-controlled businesses,
> presumably in an effort to so dissipate the value that the plaintiffs would
> effectively recover nothing.

10/9/13 Barnett Decl., ¶28, Ex. 9.  Mr. Carpenter has readily acknowledged doing something

similar in this case, arranging for one of his companies, Moonstone Partners, LLC, to give a

mortgage on property it owned to another one of his companies, Hanover, 15 months after the

property was purchased.  Id., ¶72, Ex. 47.  See also Iantosca v. Step Plan Servs., 604 F.3d 24, 27-

28 (1st Cir. 2010) (noting that in 2003, a Massachusetts state court found five entities to be alter

egos of Mr. Carpenter).

7

SA-15

Mr. Carpenter is an incorrigible evader of judgments who will likely succeed in his efforts to further victimize Universitas unless the Court enters a turnover Order against him and any entity he directly or indirectly controls.  He is already the subject of a July 12, 2013 report by Magistrate Judge Pitman recommending contempt for his failure to comply with a post-judgment discovery Order (dkt. no. 278).

Universitas is the sole, irrevocable beneficiary of proceeds payable under two Lincoln Life policies totaling $30 million.  10/9/13 Barnett Decl., ¶34; 6/5/12 Court Order at 1-2 (dkt. no. 40).  These policies insured the life of Sash A. Spencer, who placed the policies into the Charter Oak Trust and named Universitas his irrevocable beneficiary under the Trust.  Id.
(As will be discussed, the Charter Oak Trust also owns policies that insure the lives of other individuals.)

Nova is the corporate trustee and fiduciary of the Charter Oak Trust.  6/5/12 Court Order at 1.  As Mr. Carpenter recently acknowledged, Nova is a shell corporation. 10/9/13 Barnett Decl., ¶72, Ex. 47.  Mr. Carpenter is Nova's Chairman.  Id., Ex. 14.  Mr. Bursey, who is married to Ms. Carpenter's sister, is Nova's President.  Id., Ex. 13.  See also Id., Ex. 15 (July 12, 2013 Report and Recommendation, issued by Magistrate Judge Pitman, finding Mr. Bursey and Mr. Carpenter to both be officers and/or managers of Nova and recommending that they be held in contempt for Nova's violation of a Court Order on discovery).

In May 2009, following Mr. Spencer's death in June 2008, Lincoln Life paid more than $30 million (including interest on the Spencer policy proceeds) to Mr. Bursey in Mr. Bursey's capacity as Nova President and Trustee of the Charter Oak Trust.  10/9/13 Barnett Decl., ¶36; 6/5/12 Court Order at 2.  Yet following Lincoln Life's payment, Nova refused to pay any part of the trust funds to Universitas.  6/5/12 Court Order at 2.

SA-16

By Arbitration Award dated January 24, 2011, Arbitrator Peter L. Altieri, Esq. found that Nova breached its fiduciary duties to Universitas, and held Nova liable to Universitas for a total of $26,525,535.88.  6/5/12 Court Order at 2.  The Award required Nova to deposit this amount in the escrow account of its then-lead law firm, Updike Kelly & Spellacy, P.C.; Nova failed to do so. 10/9/13 Barnett Decl., ¶39.

This Court confirmed the Arbitration Award on June 5, 2012 (dkt. no. 40), awarding Universitas pre-judgment interest at an annual rate of ten percent (10%) and entering judgment on June 7 for Universitas in the amount of $30,181,880.30 (dkt. no. 41).  On October 5, 2012, this Court granted Universitas an additional $268,810.01 in attorneys' fees (dkt. no. 162).

To date, Nova has not paid any money it owes on the judgment, even though, as this Court has found, "there is no question" that the trust funds, totaling about $30.7 million, "previously were in Nova Group's possession."  11/21/12 Order at 1-2 (dkt. no. 176).  In addition, as will be discussed, Nova, the Charter Oak Trust and Grist Mill Capital have violated the post-judgment Restraining Notices served upon them by, among other things, attempting to arrange for Nova/Charter Oak Trust assets to be transferred to Grist Mill Capital, a company that Mr. Carpenter controls.  See 10/9/13 Barnett Decl., Exs. 1-2 (copies of Restraining Notices).

As Magistrate Judge Pitman has noted, Nova has "resisted all efforts" to enforce Universitas' judgment in this action, and Nova's principals and attorneys have improperly threatened third parties from which Universitas has sought discovery.  11/21/12 Order at 1-2, 8 (dkt. no. 176).  Mr. Carpenter, for one, wrote  a letter to TD Bank on Sept. 28, 2012, claiming that the bank would be committing a crime if it responded to Universitas' subpoena, which sought information about Grist Mill Capital.  10/9/13 Barnett Decl., Ex. 44.  In addition, Mr. Carpenter has freely admitted to arranging for the transfer of millions of dollars out of the

9

SA-17

Charter Oak Trust to Grist Mill Capital, an entity he controls, and arranging for a "mortgage" between two other companies he controls – a transaction that is fraudulent as a matter of law. 10/9/13 Barnett Decl., ¶72, Ex. 47.  See, e.g., Skiff-Murray v. Murray, 17 A.D.3d 807, 808-09 (3d Dep't 2005) (noting that mortgage is void where mortgagee and/or mortgagor knew of prior fraudulent conveyance).

> b.    *Transfer of trust funds to entities controlled by Mr. Carpenter*

Documents produced by TD Bank establish that Mr. Bursey, the President of Nova, initially deposited the $30.7 million into a TD Bank account standing in the name of the Charter Oak Trust (Account No. 424 277 4548); the deposit occurred on or about May 18, 2009.  10/9/13 Barnett Decl., ¶42, Ex. 17.  Mr. Bursey was the only signatory on this account standing in the Charter Oak Trust's name.  Id.

Although Mr. Bursey was the only signatory on the Charter Oak Trust account, Mr. Carpenter either arranged for that account to be opened at TD Bank, or asked Mr. Bursey to open it.  This fact is established by, among other things, e-mails exchanged in May 2009 between Mr. Carpenter and an official at Bank of America, in which Mr. Carpenter withdrew his request to open a Charter Oak Trust account at Bank of America after a Bank of America official requested various information from Mr. Carpenter about the inter-relationships of his numerous companies. See 10/9/13 Barnett Decl., ¶43, Ex. 18.

Within 6 months of the May 2009 deposit at TD Bank of the $30 million paid by Lincoln Life, Mr. Carpenter transferred all of Universitas' money to TD Bank accounts standing in the names of entities in Mr. Carpenter's control, including Grist Mill Capital, Grist Mill Holdings, Hanover, Carpenter Financial, and Phoenix Capital.  10/9/13 Barnett Decl., ¶¶44, 48-65.  These other entities share the same business address as Nova (100 Grist Mill Road in Simsbury, Connecticut).  Id., ¶¶44-45, Exs. 24-25, 30, 36, 38, 41, 48.  The opening of these myriad accounts

10

SA-18

in the names of different shell companies (all of which Mr. Carpenter controls) allowed Mr. Carpenter to widely disperse Universitas' money after Mr. Carpenter received that money from Mr. Bursey.  During a deposition in this action on April 17, 2013 Mr. Carpenter gave testimony that establishes his control of the following entities:

- Carpenter Financial, of which Mr. Carpenter is the only officer and director;

- Grist Mill Holdings, which Mr. Carpenter described as his "alter ego";

- Grist Mill Capital, whose sole members are Grist Mill Holdings and Caroline Financial, both of which Mr. Carpenter controls;

- Hanover, of which Mr. Carpenter is the sole officer/director; and

- Phoenix, of which Mr. Carpenter is the sole officer/director.

10/9/13 Barnett Decl., ¶72, Ex. 47.  Additionally, Mr. Carpenter controls Respondent Avon Capital through his ownership and control of Grist Mill Capital; and Mr. Carpenter, his wife Molly Carpenter and Mr. Bursey are trustees of the Grist Mill Trust.  Id., ¶¶73-75, Exs. 36, 48-49.

The key transactions, which collectively involved the transfer of Universitas' money from the Charter Oak Trust to companies controlled by Mr. Carpenter, were as follows[4]:

| Date | Transferor | Transferee | Amount | Citation to Declaration and Exhibit(s) |
|---|---|---|---|---|
| May 21, 2009 | Charter Oak Trust (TD Bank Account No. 424 277 4548) | Grist Mill Capital (TD Bank Account No. 424 277 4712) | $8,677,276.75 | 10/9/13 Barnett Decl.,¶48, Ex. 21 |

---

[4] These transfers add up to more than $30.7 million because Mr. Carpenter dispersed Universitas' money among his entities and then made multiple transfers of this money in various increments.

SA-19

| Date | Transferor | Transferee | Amount | Citation to Declaration and Exhibit(s) |
|---|---|---|---|---|
| May 22, 2009 | Grist Mill Capital (TD Bank Account No. 424 277 4712) | Grist Mill Holdings (TD Bank Account No. 424 261 7136) | $2,100,000.00 | 10/9/13 Barnett Decl., ¶51, Ex. 25 |
| May 26, 2009 | Charter Oak Trust (TD Bank Account No. 424 277 4548) | Grist Mill Capital (TD Bank Account No. 424 277 4712) | $2,186,566.00 | 10/9/13 Barnett Decl., ¶49, Ex. 22 |
| June 9, 2009 | Grist Mill Capital (TD Bank Account No. 424 277 4712) | Grist Mill Trust (JP Morgan Account No. 904 393 305) | $2,833,568.64 | 10/9/13 Barnett Decl., ¶52, Ex. 27 |
| June 9, 2009 | Grist Mill Capital (TD Bank Account No. 424 277 4712) | Grist Mill Trust (JP Morgan Account No. 904 393 305) | $965,314.17 | 10/9/13 Barnett Decl., ¶53, Ex. 28 |
| July 15, 2009 | Grist Mill Holdings (TD Bank Account No. 424 261 7136) | Hanover (TD Bank Account No. 4725 632 940) | $1,200,000.00 | 10/9/13 Barnett Decl., ¶55, Ex. 29 |
| October 27, 2009 | Charter Oak Trust (TD Bank Account No. 424 277 4548) | Grist Mill Capital (TD Bank Account No. 424 277 4712) | $19,800,000.00 | 10/9/13 Barnett Decl., ¶56, Ex. 31 |
| October 28, 2009 | Grist Mill Capital (TD Bank Account No. 424 277 4712) | Grist Mill Holdings (TD Bank Account No. 424 261 7136) | $19,000,000.00 | 10/9/13 Barnett Decl., ¶58, Ex. 34 |
| November 12, 2009 | Grist Mill Capital (TD Bank Account No. 424 277 4712) | Avon Capital (TD Bank Account No. 424 277 4689) | $6,710,065.92 | 10/9/13 Barnett Decl., ¶59, Ex. 35 |

**SA-20**

| Date | Transferor | Transferee | Amount | Citation to Declaration and Exhibit(s) |
|---|---|---|---|---|
| November 12, 2009 | Grist Mill Holdings (TD Bank Account No. 424 261 7136) | Carpenter Financial (TD Bank Account No. 424 277 4697) | $4,140,000.00 | 10/9/13 Barnett Decl., ¶60, Ex. 37 |
| December 3, 2009 | Grist Mill Holdings (TD Bank Account No. 424 261 7136) | Carpenter Financial (TD Bank Account No. 424 277 4697) | $7,000,000.00 | 10/9/13 Barnett Decl.,¶61, Ex. 39 |
| December 3, 2009 | Carpenter Financial (TD Bank Account No. 424 277 4697) | Phoenix Capital (TD Bank Account No. 424 277 4671) | $5,000,000.00 | 10/9/13 Barnett Decl.,¶62, Ex. 40 |
| December 3, 2009 | Grist Mill Capital (TD Bank Account No. 424 277 4712) | Grist Mill Trust (JP Morgan Account No. 904 028 488) | $510,000.00 | 10/9/13 Barnett Decl.,¶63, Ex. 42 |
| December 3, 2009 | Grist Mill Capital (TD Bank Account No. 424 277 4712) | Grist Mill Trust (JP Morgan Account No. 904 952 088) | $178,125.00 | 10/9/13 Barnett Decl., ¶64, Ex. 43 |

And in other instances, Mr. Carpenter arranged for monies belonging to the Charter Oak Trust to bypass the Charter Oak Trust entirely. For instance, in June 2011, the Charter Oak Trust settled a lawsuit that the Penn Mutual Life Insurance Company ("Penn Mutual") brought against it to rescind a life insurance policy. As part of the settlement, Penn Mutual agreed to pay $600,000 in connection with settling its action against the Charter Oak Trust. However, when Penn Mutual issued the $600,000 check, Mr. Carpenter arranged for that check to be made out to his company Grist Mill Capital, even though Grist Mill Capital was not a party to the litigation being settled. 10/9/13 Barnett Decl., ¶78, Exs. 51-52.

SA-21

Mr. Bursey and Mr. Carpenter made these transfers of Universitas' money, even though they, as Nova's President and Nova's Chairman, respectively, were supposed to be holding this money in trust for Universitas.  By this motion, Universitas seeks a return of the funds that Mr. Bursey and Mr. Carpenter improperly diverted from Nova and the Charter Oak Trust.

> c.   *Nova efforts to transfer insurance policies to Grist Mill Capital following the entry of judgment*

In recent months, following Universitas' effort to cause the turnover of insurance monies payable for damage to a Rhode Island home that was purchased with Universitas' money (see dkt. no. 219), Nova's principals, at Mr. Carpenter's direction, have attempted to transfer to Grist Mill Capital (a company controlled by Mr. Carpenter) insurance policies that are owned by the Charter Oak Trust and, as Trust assets, could be used to satisfy Universitas' judgment against Nova.

For instance, on March 29, 2013, several weeks after this Court issued an Order to Show Cause on Universitas' turnover motion, a Nova representative wrote to Sun Life Financial seeking to change the owner and beneficiary of a Sun Life policy (insuring the life of a woman with the last name Amsterdam), from the Charter Oak Trust to Grist Mill Capital.  10/9/13 Barnett Decl., ¶17, Ex. 3.

On May 16, 2013, a week after the Court held the first day of hearings on Universitas' turnover motion with respect to the Rhode Island property insurance proceeds, Mr. Bursey wrote to Lincoln Life seeking to change the owner and beneficiaries of four Lincoln Life policies, from the Charter Oak Trust to Grist Mill Capital.  10/9/13 Barnett Decl. at ¶18, Ex. 4.  Mr. Bursey was purporting to act on behalf of Nova and the Charter Oak Trust even though Nova had previously represented that Mr. Bursey had resigned his position with Nova and the Charter Oak Trust.  Id., Ex. 5.  Mr. Bursey, although subpoenaed by Universitas to testify at the May 9 hearing, was

14

permitted to appear by letter sent by his attorney, and asserted his Fifth Amendment right against

self-incrimination with regard to all matters pertaining to Nova, the Charter Oak Trust, Grist Mill

Capital and the Grist Mill Trust.[5] Id., Ex. 6.

> d.      *Nova assets subject to other litigation*

In addition to the assets identified above that Nova has attempted to transfer to Grist Mill

Capital, there are four life insurance policies that are the subject of litigation in Connecticut state

court.  These policies are owned by the Charter Oak Trust, issued by PHL Variable Insurance

Company and are identifiable by the following insured last name and policy number:

- Collins – Policy No. 975 279 51

- Paulsrud – Policy No. 975 294 11

- Robertson – Policy No. 975 295 60

- Zahner – Policy No. 975 293 42

10/9/13 Barnett Decl., ¶9.  As part of this turnover motion, Universitas seeks an injunction

prohibiting Respondents from transferring the Charter Oak Trust's ownership or beneficial

interest in these policies.  In addition, any proceeds or payments related to these policies should

be turned over directly to Universitas.

## III.    ARGUMENT

> a.      *Applicable background law*

A judgment creditor with a federal judgment may bring a proceeding in federal court

under N.Y. CPLR § 5225(b) by motion and need not institute a separate plenary action. The

Federal Rules of Civil Procedure provide that "[t]he procedure on execution – and in proceedings

---

[5] Based on the July 30, 2013 letter from Lincoln Life to Mr. Bursey (see 10/9/13 Barnett Decl., Ex. 4), we believe that Mr. Bursey was unsuccessful in his attempt to effect a transfer of the policies to Grist Mill Capital.

SA-23

supplementary to and in aid of judgment or execution – must accord with the procedure of the state where the court is located. . . ."  Fed. R. Civ. P. 69(a)(1).

Section 5225(b) of the N.Y. CPLR says in pertinent part:

> Upon a special proceeding commenced by the judgment creditor, against a person in possession or custody of money or other personal property in which the judgment debtor has an interest…the court shall require such person to pay the money, or so much of it as is sufficient to satisfy the judgment, to the judgment creditor….

A special proceeding in New York state court is akin to a motion in federal court.  JW Oilfield Equip., LLC v. Commerzbank, AG, 764 F. Supp. 2d 587, 591 (S.D.N.Y. 2011) ("Like an action, it ends in a judgment, but the procedure is similar to that on a motion.  Speed, economy and efficiency are the hallmark of this procedure") (quotation omitted).  In federal court, a motion brought pursuant to Fed. R. Civ. P. 69 is a proper means by which to seek a turnover order.  See, e.g., Cordius Trust v. Kummerfeld, 153 F. App'x 761, 762 (2d Cir. 2005) ("veil-piercing actions may be initiated as supplementary special proceedings under New York Civil Practice Law and Rules (CPLR) § 5225(b), rather than as plenary actions"); Northern Mariana Islands v. Millard, 845 F. Supp. 2d 579, 581 (S.D.N.Y. 2012) ("Nearly every court in this Circuit to consider the issue has held that parties can bring a motion under FRCP 69(a), rather than instituting a special proceeding under the New York state law"); SEC v. Colonial Inv. Mgmt. LLC, No. 07 Civ. 8849, 2010 U.S. Dist. LEXIS 108063, at *6 (S.D.N.Y. Oct. 6, 2010) ("a judgment creditor proceeding under N.Y. CPLR section 5225(b) may proceed by motion, and need not institute a separate action") (citation omitted).

Personal jurisdiction exists because each of the Respondents, by engaging in the improper transfer of trust funds, has committed a tort against Universitas.  N.Y. C.P.L.R. § 302(a)(3)(ii).  Additionally, since personal jurisdiction exists over Mr. Carpenter (who has

appeared in this action), and all of the other Respondents are his alter egos or controlled by him, personal jurisdiction exists over all of the Respondents.  See D. Klein & Son, Inc. v. Good Decision, Inc., 147 F. App'x 195, 196-97 (2d Cir. 2005) (personal jurisdiction can be established through veil-piercing); SEC v. Softpoint, Inc., Case No. 95-2951-JSR, 2012 U.S. Dist. LEXIS 187142, at *7-8 (S.D.N.Y. May 8, 2012) (in turnover action, finding personal jurisdiction over corporate entity through reverse veil-piercing); Miramax Film Corp. v. Abraham, Case No. 01-5202-GBD, 2003 U.S. Dist. LEXIS 21346, at *20-23 (S.D.N.Y. Nov. 24, 2003) (also applying reverse veil-piercing to assert jurisdiction over corporate defendant).

      *b.*       ***Charter Oak Trust assets held by Mr. Carpenter's entities and Mr. Carpenter should be turned over to Universitas***

      The life insurance proceeds that were paid out to the Charter Oak Trust for Universitas' benefit are not being held in an account standing in the name of the Charter Oak Trust.  Instead, as Universitas has shown and Nova has now admitted, these monies, totaling about $30.7 million, were transferred out of a TD Bank account standing in the Charter Oak Trust's name and into accounts standing in the names of other entities that Mr. Carpenter controls.  These entities include Grist Mill Capital, Grist Mill Holdings, Hanover, Avon Capital, Carpenter Financial and Phoenix.  None of these entities has (to Universitas' knowledge) provided any consideration or value in return for the monies it has received from Nova and the Charter Oak Trust.  N.Y. Debt. & Cred. Law §  275 (conveyances made and obligations incurred  "without fair consideration" are fraudulent, as to both present and future creditors, "when the person making the conveyance or entering into the obligation intends or believes that he will incur debts beyond his ability to pay as they mature"); United States v. Everoff, 270 F. App'x 75, 77 (2d Cir. 2008) (noting the non-exclusive factors a District Court may consider when determining pursuant to N.Y. Debt. & Cred. Law § 276 whether there was actual intent to defraud creditors,

17

including "the lack or inadequacy of consideration," "the family, friendship or close associate relationship between the parties," and "the general chronology of the events and transactions under inquiry").

Through three transfers, of $8,677,276.75, $2,186,566.00 and $19,800,000.00, respectively, the Charter Oak Trust transferred all of Universitas' money to Grist Mill Capital. There was no consideration for these transfers, which were carried out by Mr. Carpenter and Mr. Bursey after Mr. Bursey had repeatedly implored Lincoln Life to pay the Spencer insurance proceeds to the Charter Oak Trust so that the Charter Oak Trust could pay Universitas (see 10/9/13 Barnett Decl., Ex. 16).

Peter A. Goldman, an agent of Nova, the Charter Oak Trust and Grist Mill Capital, testified that he could not explain why the Charter Oak Trust was making separate transfers in the amounts of $8,677,276.75, $2,186,566.00 and $19,800,000.00 to Grist Mill Capital in the months following Lincoln Life's payment to the Charter Oak Trust. 10/9/13 Barnett Decl., ¶46, Ex. 19. Mr. Goldman also testified that Grist Mill Capital never loaned the Charter Oak Trust any money for the purposes of making premium payments on the Spencer policies. Id., ¶47, Ex. 20. Therefore, the monies transferred to Grist Mill Capital could not have been repayments on loans that Grist Mill Capital made to finance premium payments for the Spencer policies. And in any event, the total amount sent to Grist Mill Capital in these three transfers, $30,663,842,75, bears no relationship to the total amount of premiums paid in respect of the Spencer policies.

In briefing and testimony on a prior turnover motion, Mr. Carpenter asserted that Grist Mill Capital seized the monies paid out by Lincoln Life because Grist Mill Capital was a secured creditor of Nova/the Charter Oak Trust. But, as Universitas extensively argued on the prior turnover motion pending before the Court, (a) there is no evidence of a "default" on a "loan"

18

SA-26

between Nova/the Charter Oak Trust and Grist Mill Capital; (b) any security interest on Charter

Oak Trust assets that benefits Grist Mill Capital is invalid as a matter of law; (c) the only loan

agreement produced by Mr. Carpenter concerns a loan, ostensibly from Grist Mill Capital, to the

Charter Oak Trust, that has been repaid; (d) any transfer from the Charter Oak Trust to Grist Mill

Capital was a fraudulent conveyance (see dkt. nos. 243, 270, 274).[6]

Since the transfers from the Charter Oak Trust to Grist Mill Capital were improper, all

subsequent transfers by Grist Mill Capital to other Carpenter entities were also improper, as

these transfers merely involved Mr. Carpenter transferring Universitas' money from one hand to

the other.  See, e.g., Skiff-Murray, 17 A.D.3d at 808-09 (a mortgage is void where mortgagee

and/or mortgagor knew of prior fraudulent conveyance); Fannie Mae v. Olympia Mortg. Corp.,

Case No. 04-4971-NG, 2006 U.S. Dist. LEXIS 70175, at *34-36 (E.D.N.Y. Sept. 28, 2006)

(fraudulent transfer claims adequately stated where subsequent transferees were closely affiliated

with the initial transferor and initial transferee).

Although all transfers by Grist Mill Capital to the other Carpenter entities were

fraudulent, the transfers by Grist Mill Capital to the Grist Mill Trust warrant additional

discussion because in numerous communications with Universitas' counsel, counsel for the Grist

Mill Trust has asserted that the transfers of $2,833,568.64 and $965,314.17, respectively, from

Grist Mill Capital to Grist Mill Trust on June 9, 2009, were loan repayments.  Exhibit 45 to the

Barnett Declaration contains materials furnished to Universitas' counsel that purport to be

documentation of two loan agreements (dated August 11, 2006 and October 1, 2007,

respectively) between Grist Mill Capital and the Grist Mill Trust.  Exhibit 45 shows that for each

_____

[6] By citing these prior filings, Universitas is not attempting to incorporate them by
reference.  Rather, Universitas is anticipating an argument that Respondents may make, and
reserving its right to respond to this possible argument in subsequent briefing on this motion.

19

of the two alleged loans, Mr. Carpenter signed on behalf of Grist Mill Capital, and Mr. Bursey signed on behalf of the Grist Mill Trust.  (Tellingly, Mr. Bursey has asserted his Fifth Amendment right against self-incrimination in response to all questions about Nova, the Charter Oak Trust, Grist Mill Capital and the Grist Mill Trust.  10/9/13 Barnett Decl., Ex. 6.)

Counsel for the Grist Mill Trust has also asserted that the transfers of $510,000.00 and $178,125.00, respectively, on December 3, 2009, were also loan repayments by Grist Mill Capital to the Grist Mill Trust.  See 10/9/13 Barnett Decl., Ex. 46 (copies of documents, provided by counsel for the Grist Mill Trust, purporting to be documentation of loans).

With respect to the June and December 2009 transfers of Universitas' money (totaling $4,487,007.81, the amount that Grist Mill Trust should turn over), these transfers were fraudulent and have no valid basis, since they were made by Mr. Bursey and Mr. Carpenter, who were the people who made the initial transfers from the Charter Oak Trust to Grist Mill Capital, and who knew that the money being transferred by Grist Mill Capital to the Grist Mill Trust should have stayed in the Charter Oak Trust for Universitas' benefit.  See Evseroff, 270 F. App'x at 77 (noting the non-exclusive factors a District Court may consider when determining pursuant to N.Y. Debt. & Cred. Law § 276 whether there was actual intent to defraud creditors, including "the lack or inadequacy of consideration," "the family, friendship or close associate relationship between the parties," and "the general chronology of the events and transactions under inquiry").

Even if the Grist Mill Trust did loan money to Grist Mill Capital, and Grist Mill Capital was (via the June 9, 2009 and December 3, 2009 transfers) repaying the Grist Mill Trust, the assumed fact of a valid loan does not make the transfers any less fraudulent, where Mr. Bursey and Mr. Carpenter knew they were using Universitas' money to repay the Grist Mill Trust.  The downstream use of Universitas' money – to repay loans that the Grist Mill Trust allegedly made

20

SA-28

to Grist Mill Capital – does not change the conclusion that Universitas' money was improperly transferred out of the possession of Nova and the Charter Oak Trust. The Grist Mill Trust, as a subsequent transferee of the Charter Oak Trust, received Universitas' money in bad faith and with knowledge of its origin as Nova/Charter Oak Trust funds payable to Universitas.

Accordingly, the Grist Mill Trust's receipt of Nova/Charter Oak Trust monies was fraudulent, and the Court should order it and the other Respondents to turn over all improperly transferred monies to Universitas as a judgment creditor of Nova.

Mr. Carpenter, moreover, dominates the Respondent entities[7] to the point where there should be no legal distinction made between him and them.  Indeed, Mr. Carpenter has been previously adjudicated an alter ego of at least five other companies (see Iantosca, 604 F.3d at 27-28), has admitted that Nova is a "shell corp.," has admitted that Grist Mill Holdings is his "alter ego," and has admitted to controlling Grist Mill Capital through two other companies he dominates.  10/9/13 Barnett Decl., ¶72, Ex. 47.  And Mr. Carpenter is the only officer/director of Carpenter Financial Group, Hanover and Phoenix, all of which received transfers from Grist Mill Capital.  Id.  To reiterate, these transfers were essentially Mr. Carpenter transferring money from his left hand to his right hand, and back again.  Indeed, in a recent letter to the Court, Nova's attorney Ira Kleiman discussed how Universitas' money was transferred first to Grist Mill Capital, and then to Grist Mill Holdings, Avon Capital, Carpenter Financial Group, Phoenix Capital and the Grist Mill Trust.  10/9/13 Barnett Decl., Ex. 53.  Mr. Kleiman represented to the Court that "Mr. Carpenter is not in control of at least one of these entities," and then only discussed how Mr. Carpenter does not control the Grist Mill Trust.  Id.  The upshot is that Mr.

---

[7] Universitas does not at this time claim that the Grist Mill Trust is an alter ego of Mr. Carpenter, although the transfers of Charter Oak Trust funds to Grist Mill Trust were improper and should result in a turnover Order against the Grist Mill Trust in the amount of $4,487,007.81.

21

Carpenter is an alter ego of all of the entities mentioned by Mr. Kleiman, except for the Grist Mill Trust (which Mr. Carpenter nonetheless controls, as a Trustee, along with his wife and Mr. Bursey).

Whether adjudged under New York or Connecticut law, Grist Mill Capital, Grist Mill Holdings, Avon, Hanover, Carpenter Financial and Phoenix are Mr. Carpenter's alter egos, such that this Court should pierce the corporate veil of each of them, and order Mr. Carpenter to turn over $26,776,834.94 that he improperly transferred, or arranged to be transferred, out of the possession of Nova and the Charter Oak Trust.  Cordius Trust, 153 F. App'x at 763 (piercing the corporate veil under New York law "generally requires a showing that: '(1) the owners exercised complete domination of the corporation in respect to the transaction attacked; and (2) that such domination was used to commit a fraud or wrong against the plaintiff which resulted in plaintiff's injury'" (quoting Morris v. N.Y. State Dep't of Taxation & Fin., 82 N.Y.2d 135, 141 (1993)); Bergesen d.y. v. Lindholm, 760 F. Supp. 976 (D. Conn. 1991) (discussing the two paths for alter ego liability in Connecticut, the "instrumentality rule" and "identity rule").

Accordingly, the entities' direct and indirect receipt of Nova/Charter Oak Trust monies, as orchestrated by Mr. Carpenter and his cohort, was fraudulent, and the Court should order these entities and Mr. Carpenter to turn over these monies to Universitas as a judgment creditor of Nova.

     *c.*    ***This Court should permanently enjoin Respondents from further transfers of assets***

A party requesting permanent injunctive relief must show (1) actual success on the merits, and (2) that it faces irreparable harm if injunctive relief is not granted.  Ognibene v. Parkes, 671 F.3d 174, 182 (2d Cir. 2011); Cartier v. Symbolix, Inc., 454 F. Supp. 2d 175, 186 (S.D.N.Y. 2006).

Universitas satisfies both elements.  First, Universitas will succeed on the merits because it has a judgment against Nova and has shown that Mr. Carpenter, instead of holding the Lincoln Life proceeds in trust as Universitas' fiduciary, improperly transferred this money to entities in his exclusive control.

Second, Universitas has demonstrated that it faces irreparable harm absent an injunction, since the principals of Nova, the Charter Oak Trust and Grist Mill Capital, at Mr. Carpenter's direction, have already attempted to transfer assets out of the possession of Nova/the Charter Oak Trust and to Grist Mill Capital following the entry of judgment and service of Restraining Notices, and will continue to make such attempts absent a Court-ordered prohibition.  For more than a year, Nova, the Charter Oak Trust and Grist Mill Capital have been subject to Restraining Notices that should have prevented them from transferring assets that could be used to satisfy Universitas' judgment.  See 10/9/13 Barnett Decl., Exs. 1-2. Yet, as Universitas has shown, representatives of these companies, including Mr. Bursey, have already contacted insurance companies in an attempt to designate Grist Mill Capital (one of Mr. Carpenter's companies) as the owner of policies that are owned by the Charter Oak Trust.  This is a blatant violation of the Restraining Notices that Universitas has issued, and an attempt to frustrate Universitas' judgment against Nova.  Without an injunction, the Charter Oak Trust, having already been looted of at least $30 million in trust funds that were supposed to benefit Universitas, will be deprived of insurance policies that could be used to satisfy Universitas' judgment.  Universitas faces irreparable harm because each diminishment of trust assets increases the likelihood that Universitas will not be able to collect on its judgment.  See, e.g., 325 Bleecker, Inc. v. Local Union No. 747, United Bhd. of Carpenters & Joiners of Am., 500 F. Supp. 2d 110, 124 (N.D.N.Y. 2007) (granting defendant's motion for permanent injunction prohibiting transfers

SA-31

from bank account controlled by plaintiff, finding that "if [the plaintiff] were to dissipate the account balance, any recovery in favor of [the defendant] would be illusory"); Jones v. Dana, 06 Civ. 0159-RPP, 2006 U.S. Dist. LEXIS 25293, at *86-88 (S.D.N.Y. May 3, 2006) (finding defendant liable to plaintiff for fraud, breach of fiduciary duty and conversion, and entering permanent injunction prohibiting defendant from transferring plaintiff's funds, finding "there is a real and substantial risk that those funds will be dissipated and/or transferred out of the country to accounts maintained by [the defendant] in Europe or elsewhere").

Mr. Carpenter, a suspended attorney who has twice been found guilty of federal fraud charges, has a well-documented history, including in this case, of hiding assets to thwart judgment creditors and abusing the corporate form.  Without an injunction, Mr. Carpenter will continue to transfer money among his many sham entities with abandon, requiring Universitas to continue to play his costly shell game.  In fact, in a recent letter to the Court, Nova's attorney acknowledged that the entities to which Mr. Carpenter initially transferred Universitas' money, including Grist Mill Capital, no longer have it.  10/9/13 Barnett Decl., Ex. 53.

Adding to the risk to Universitas if an injunction is not granted, Mr. Carpenter himself faces the risk of the reinstatement of a prior, vacated conviction on fraud charges, as well as a grand jury indictment in the District of Connecticut.  Either of these events could cause Mr. Carpenter to further transfer, expend or conceal money that should be used to satisfy Universitas' judgment.  Also, since Mr. Carpenter has a demonstrable tendency to commingle the assets of his various entities, there is also the possibility that if his overturned conviction in the District of Massachusetts is reinstated, money that should be used to satisfy Universitas' judgment could be seized by the Government for penal or restitutionary purposes.

Accordingly, Mr. Carpenter, should be permanently enjoined, pursuant to Fed. R. Civ. P.

24

65 and 69, as well as N.Y. C.P.L.R. § 5222, from directly or indirectly selling, gifting, assigning,

encumbering or disposing in any way, or otherwise transferring the ownership of, assets in his

control or possession, or in the control or possession of one of his companies, corporations, trusts

or other entities until Universitas' judgment is satisfied in full; provided, however, that Mr.

Carpenter be permitted to expend and/or transfer up to $20,000.00 per month for ordinary

expenses of his or one of his entities, with any such payments or transfers to be reported, in

writing, with supporting documentation, to Universitas' counsel within seven (7) days of such

payment/transfer being made.  And the other Respondents should be similarly permanently

enjoined, pursuant to Fed. R. Civ. P. 65 and 69, as well as N.Y. C.P.L.R. § 5222, from directly or

indirectly selling, gifting, assigning, encumbering or disposing in any way, or otherwise

transferring the ownership of, their respective assets until Universitas' judgment is satisfied in

full.

    *d.*    ***This Court should preliminarily enjoin Mr. Carpenter from further money transfers of assets of any kind***

During the pendency of its motion for a permanent injunction, Universitas requests that

the Court preliminarily enjoin Mr. Carpenter from making further transfers of assets of any kind,

whether controlled or possessed, directly or indirectly, by him or one of his entities; provided,

however, that Mr. Carpenter be permitted to expend and/or transfer up to $20,000.00 per month

for ordinary expenses of his or one of his entities, with any such payments or transfers to be

reported, in writing, with supporting documentation, to Universitas' counsel within seven (7)

days of such payment/transfer being made.

A party requesting a preliminary injunction must show (1) a likelihood of success on the

merits; (2) that the plaintiff is likely to suffer irreparable injury in the absence of an injunction;

(3) that "the balance of hardships" weighs in the plaintiff's favor; and (4) "that the public interest

SA-33

would not be disserved by the issuance of a preliminary injunction."  Salinger v. Colting, 607 F.3d 68, 77-80 (2d Cir. 2010).

Universitas has satisfied the standard for obtaining a preliminary injunction.  First, as discussed, Universitas has shown that it is likely to succeed on the merits of its turnover motion because Mr. Carpenter has been shown to have improperly transferred Universitas' money out of a Charter Oak Trust account, and into bank accounts of shell entities that he dominates.  Also, as discussed in the prior section, Universitas will suffer irreparable injury if Mr. Carpenter is able to continue transferring money among his numerous sham entities, which will have the effect of elongating the money trail that Universitas is following.

Additionally, the balance of hardships weighs in Universitas' favor because Universitas is seeking to effectuate its judgment by halting any further transfers of assets that could be used to satisfy its judgment.  Universitas has already had to incur hundreds of thousands of dollars in attorneys' fees in order to determine the location and disposition of its trust funds, and will incur yet more expenses if a prohibition on additional asset transfers is not issued.  While Mr. Carpenter will undoubtedly claim hardship if he is prohibited from making further asset transfers above $20,000 per month for ordinary expenses, he is also the person who misappropriated Universitas' money, leaving Nova and the Charter Oak Trust unable to satisfy first the Arbitration Award, then this Court's judgment and finally this Court's October 1 Order that Nova deposit the judgment amount with the Clerk of the Court.  By transferring Universitas' money through his thick web of interrelated shell companies, Mr. Carpenter has necessitated any arguable hardship that an injunction would present.  Broad injunctions, moreover, are appropriate where, as here, a single person sits in the center of an elaborate corporate shell game. For instance, in United States SBA v. Haukedahl Found., Case No. 04-1744-JSR, 2004 U.S.

Dist. LEXIS 9654, at *3-4, 9-10 (S.D.N.Y. May 27, 2004), the court preliminary enjoined the transfer of assets belonging to an individual judgment debtor, as well as the transfer of the assets of all entities controlled by the judgment debtor, where there existed a "web of ostensibly independent organizations that were, in actuality, effectively controlled by [the judgment debtor] and used by him not only to further and/or conceal his fraudulent schemes but also to receive fraudulently conveyed funds."

Finally, the public interest would not be disserved by an injunction's issuance because the public has an interest in seeing judgments and Court Orders effectuated, and Universitas only seeks a preliminary injunction in order to preserve assets that can be used to satisfy its judgment.

> ### *e.* ***Any payments related to the policies subject to the Connecticut litigation should be paid over to Universitas***

The four insurance policies that are the subject of the Connecticut litigation between the Charter Oak Trust and PHL are assets of the Charter Oak Trust.  Accordingly, in the event that the Charter Oak Trust or any person or entity affiliated with it (or designated by it or its attorneys) receives a payment in connection with the Connecticut litigation, that payment is an asset of the Charter Oak Trust that should be assigned to and/or paid over directly to Universitas, since Universitas is a creditor of Nova in Nova's capacity as Trustee of the Charter Oak Trust.

## IV.    CONCLUSION

For the foregoing reasons, Universitas respectfully requests that the Court enter an Order:

- Directing the Respondents to each pay (and/or assign) to Universitas money and/or assets that were improperly transferred to them from the Charter Oak Trust, in the following amounts:

  - Grist Mill Capital – $31,263,842.75

  - Daniel E. Carpenter – $26,776,834.94

- o   Grist Mill Holdings – $21,000,000.00

- o   Carpenter Financial – $11,140,000.00

- o   Avon Capital – $6,710,065.92

- o   Phoenix – $5,000,000.00

- o   Grist Mill Trust – $4,487,007.81

- o   Hanover – $1,200,000.00

- Until Universitas' judgment is satisfied, permanently enjoining further transfers of the
  assets of Respondents, including the following insurance policies (identified by
  insured last name, insurance carrier and policy number):

  - o   Collins – PHL Variable Insurance Policy No. 975 279 51

  - o   Paulsrud – PHL Variable Insurance Policy No. 975 294 11

  - o   Robertson – PHL Variable Insurance Policy No. 975 295 60

  - o   Zahner – PHL Variable Insurance Policy No. 975 293 42

  - o   Bolton – Lincoln Life Policy No. JJ7121879

  - o   Clinard – Lincoln Life Policy No. JJ7105688

  - o   Lowry – Lincoln Life Policy No. JJ7130995

  - o   Nordin – Lincoln Life Policy No. JJ7075457;

  In the event the Respondents have received any monies or assets in respect of any of
  these policies (e.g. through a sale or surrender of a policy, or a sale of the beneficial
  interest in a policy), these monies or assets should be turned over to Universitas as
  property of Nova and the Charter Oak Trust;

- Directing the retitling of any insurance policies that were previously held by the
  Charter Oak Trust and improperly transferred to another entity controlled by Mr.

SA-36

Carpenter, including the SunLife policy insuring the life of Ms. Amsterdam (Policy Number 020158601);

- Directing that Universitas directly receive any monies or assets that PHL may pay to the Charter Oak Trust, or that the Charter Oak Trust or any of its affiliates receive, in respect of the 4 policies that are the subject of litigation between the Charter Oak Trust and PHL in Connecticut Superior Court; and

- Preliminarily and permanently enjoining Mr. Carpenter from, directly or indirectly, causing, making, permitting or suffering any sale, assignment or transfer of, or any interference with, any asset or property of his, and any asset or property of any company, corporation or entity (including any trusts) in which he has a direct or indirect interest or control; provided that Mr. Carpenter be permitted to expend and/or transfer up to $20,000.00 per month for ordinary expenses of his or one of his entities, with any such payments or transfers to be reported, in writing, with supporting documentation, to Universitas' counsel within seven (7) days of such payment/transfer being made.

New York, NY
Dated: October 9, 2013

LOEB & LOEB LLP

By: /s/ Paula Colbath          .
Paula K. Colbath (PC-9895)
Michael Barnett (MB-7686)
345 Park Avenue
New York, New York 10154-1895
(212) 407-4000

*Attorneys for Judgment Creditor*
*Universitas Education, LLC*

29

SA-37

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
UNIVERSITAS EDUCATION, LLC,
                                  : Case No.: 11 CV 1590-LTS-HBP

                 Petitioner,         :

                        :

                -v-             :

                        :
NOVA GROUP, INC., as Trustee, Sponsor      :
and Named Fiduciary of the CHARTER OAK    :
TRUST WELFARE BENEFIT PLAN,       :

                        :

                Respondent.    :
----------------------------------------------------------- :
NOVA GROUP, INC., as Trustee, Sponsor      : Case No.: 11 CV 8726-LTS-RLE
and Named Fiduciary of the CHARTER OAK    :
TRUST WELFARE BENEFIT PLAN,       :

                        :

                    Petitioner,         :

                        :

                -v-             :

                        :
UNIVERSITAS EDUCATION, LLC,         :

                        :

                Respondent.    :
-------------------------------------------------------------------X

## MEMORANDUM OF LAW OF RESPONDENT DANIEL E. CARPENTER

     By an Order to Show Cause, signed on October 15, 2103, Universitas Education LLC

("Universitas") (Docket #303) has moved this Court for a preliminary and a permanent

injunction against Daniel E. Carpenter and for a turnover order as to certain specified sums

allegedly held by one or more of the respondents named on the motion, to wit,  to wit,  Daniel E.

Carpenter and the following entities – Nova Group, Inc. ("Nova"), the Charter Oak Trust

Welfare Benefit Plan (the "Charter Oak Trust" and "Charter Oak Trust 2009"), Grist Mill

Capital, LLC ("Grist Mill Capital"), Grist Mill Holdings, LLC ("Grist Mill Holdings"), The Grist

Mill Trust Welfare Benefit Plan ("Grist Mill Trust"), Avon Capital, LLC ("Avon capital"),

Hanover Trust Company ("Hanover"), Carpenter Financial Group ("Carpenter Financial") and

Phoenix Capital Management, LLC ("Phoenix Capital") (collectively the "Respondents").

### Statement of Facts

Respondent Carpenter and Petitioner Universitas have previously submitted to this Court

certain documents as part of a "Statement of Proposed Findings of Fact", dated June 21, 2013,

(Docket # 252). Respondent Carpenter incorporates by reference that submission, as part of

Carpenter's submission on the latest motion by Universitas.   Also submitted with this

memorandum is a Declaration by Daniel E. Carpenter, dated October 25, 2013.

As a participant in the Charter Oak Trust, Sash Spencer was the named insured on two

life insurance policies owned by the Charter Oak Trust, which policies' face amounts totaled

thirty million dollars. (Exhibit [1]D at 1 and 8).

Mr. Spencer paid none of the premiums for the insurance agreements into which he

entered. (Exhibit D, pg. 5 at ¶ 7; Exhibit N at 9 and 11).

The premiums for the Spencer policies were paid by Charter Oak Trust using funds

borrowed from Grist Mill Capital under a Split-Dollar Arrangement. (Exhibit E, at 1-3).

The funding agreement between Grist Mill Capital and Charter Oak Trust with respect to

the Spencer life insurance policies contained a provision whereby Grist Mill Capital (the

"Funder") was given

> a first priority lien and a first priority security interest in and to all properties,
> assets, and rights of the Trust, wherever located, whether now owned or hereafter
> acquired or arising, including, without limitation the Policy (including all

---

[1] References to Exhibits by letter are Respondents' Exhibits in the earlier turnover proceeding
and references to Exhibits by number are Universitas' Exhibits in that earlier proceeding; each
exhibit is specifically referenced in "Respondent's Proposed Findings of Fact" dated June 21,
2013.

2

proceeds thereof, such proceeds to encompass, among other things, the premium refunds, cash value, death proceeds or other payments by the insurer with respect to such Policy or any proceeds from the sale thereof… (Exhibit E at ¶ 7).

On December 27, 2006, Grist Mill Capital recorded a UCC 1 Financing Statement against all assets of the Charter Oak Trust and all proceeds thereof and including after acquired assets. (Exhibit C at # 2431931).

The funding arrangement for the Spencer policies was part of the insurance agreement entered into by Mr. Spencer, in December 2006 and March 2007. (Exhibit D).

When he enrolled in the Charter Oak Trust, Sash Spencer executed a Disclosure, Acknowledgment & Certification Agreement which contained the following provision:

> 9.   The Insured and Agent both understand and agree that the following remittances, fees and expenses shall be due and payable to the Funder upon the maturation, disposition, termination, or change in beneficiary of the Policy:
> (a)      repayment of all premiums and related costs regarding the Policy;
> (b)      an Origination Fee of twenty percent (20%) of the total premiums funded and paid for the Policy in consideration of the funding Arrangement having been implemented;
> (c)      a Premium Funding Fee of three percent (3%) of the face amount of the Policy in consideration for the funding of such premiums;
> (d)      a Termination Fee of one percent (1%) of the face amount of the Policy in consideration of the termination of the Funding Arrangement.
> (Exhibit D at 5 ¶ 9).

When Universitas arbitrated its claim against Nova Group, Inc., the arbitrator determined that $4,020,453.23 was owed and was payable to Grist Mill Capital from the life insurance proceeds.

(Exhibit D, at 3, 9).

Mr. Spencer died on June 10, 2008. (Exhibit 11).

Charter Oak Trust received the proceeds of the Spencer policies from Lincoln Life Insurance Co. in two checks:  one dated May 15, 2009, in the sum of $10,225,758.92 and a second, dated May 15, 2009, in the sum of $ 20,451,517.83. (Exhibit 1 at 1 and G at 1-2).

3

Charter Oak Trust disbursed sums of $ 8,677,276.75 on May 21, 2009, and
$ 2,186,566.00 on May 26, 2009, to Grist Mill Capital Inc., a total sum of $10,863,842.75.
(Exhibit 1 at 0348-0349 and Exhibit H, # 0357).

As of the time these two sums were disbursed, Grist Mill Capital was a secured creditor
of Charter Oak Trust (Exhibit C, # 2431931).

Grist Mill Capital provided funding to Charter Oak Trust for the Spencer insurance
policies and for many other policies owned by the Charter Oak Trust, approximately 85 policies
in all. (Exhibit 22, at 74).

Under various funding agreements between Grist Mill Capital and the Charter Oak Trust,
Charter Oak Trust became indebted to Grist Mill Capital in the amount of approximately sixty
million dollars. (Exhibit 34, pp. 101,102).

Charter Oak Trust disbursed the total sum of $10,863,842.75, to Grist Mill Capital in
partial repayment of Charter Oak Trust's indebtedness to Grist Mill Capital. (Exhibit 34, pp. 90-
104).

Before the disbursement of $10,863,842.75 to Grist Mill Capital, Charter Oak Trust had
borrowed well in excess of that sum from Grist Mill Capital. (Exhibit 34, pp. 90-104).

Grist Mill Capital had, in turn, a financing agreement with Ridgewood Finance, Inc.
whereby Ridgewood advanced to Grist Mill Capital funds which Grist Mill Capital then used to
make loans to the Charter Oak Trust under a Split-Dollar Arrangement. (Exhibit 34, pp. 90-104).

Ridgewood Finance, Inc. was a secured creditor of Grist Mill Capital. (Exhibit C, #
2431927).

Among the insurance policies so funded were the Spencer policies. (Exhibit D).

4

Grist Mill Capital, after receiving on May 21, 2009 and May 26, 2009, the sums described, paid various of its creditors, during the period May 2009 through October 2009. Carpenter Declaration, dated October 25, 2013,

The October payment of $19.8 million made to GMC was based on a collateral assignment extant in 2009.  At that time, Charter Oak Trust owed GMC over $50 million and GMC had both a collateral assignment interest in each policy and a UCC filing on all assets of the Charter Oak Trust.  See Carpenter Declaration, ¶¶ 11-12.

SA-42

**Argument**

**I**

**This Court Does not Have Subject Matter Jurisdiciton to Resolve the Claims Asserted Now by Universitas as to Carpenter and the So-called "Alter-ego Entities".**

Federal courts are universally recognized as courts of limited jurisdiction. The Supreme

Court has held that this Court lacks subject matter jurisdiction to resolve the latest claims made

by Universitas.

In <u>Peacock v. Thomas</u>, 516 U.S. 349 (1996), the Supreme Court held that federal courts

do not possess ancillary jurisdiction "over new actions in which a federal judgment creditor

seeks to impose liability for a money judgment on a person not otherwise liable for the

judgment." <u>Peacock,</u> 516 U.S. at 351, 116 S.Ct. 862.

Writing for the 8-1 majority, Judge Thomas further stated:

> The court must have jurisdiction over a case or controversy before it may assert
> jurisdiction over ancillary claims.  See <u>United Mine Workers v. Gibbs</u>, 383 U.S.
> 715, 715, 86 S.Ct. 1130, 1138 16 L.Ed. 2d 218 (1966) In a subsequent lawsuit
> involving claims with no independent basis for jurisdiction, a federal court lacks
> the threshold jurisdictional power that exists when ancillary claims are asserted in
> the same proceeding as the claims conferring federal jurisdiction. *See* <u>Kokkonen</u>
> <u>v. Guardian Life Ins. Co.,</u> 511 U.S. 375, 114 S.Ct. 1673, 128 L.Ed.2d 391 (1994)
> ] at 380-381, 114 S.Ct., at 1677; <u>H.C. Cook Co. V. Beecher</u>, 217 U.S. 497, 498-
> 499, 30 S.Ct. 601, 601-602, 54 L.Ed. 855 (1910). Consequently, claims alleged to
> be factually interdependent with and, hence, ancillary to claims brought in an
> earlier federal lawsuit will not support federal jurisdiction over a subsequent
> lawsuit. The basis of the doctrine of ancillary jurisdiction is the practical need "to
> protect legal rights or effectively to resolve an entire, logically entwined lawsuit."
> [<u>Owen Equipment and Erection Co. v. Kroger</u>, 437 U.S. 365, 376, 98 S.Ct. 2396,
> 2404, 57 L.Ed.2d 274 (1978)], 437 U.S., at 377, 98 S.Ct. at 2404. But once
> judgment was entered in the original ERISA suit, the ability to resolve
> simultaneously factually intertwined issues vanished…"

<u>Peacock v. Thomas</u>, 516 U.S. at 355, 166 S.Ct. at 867, 116 L.Ed.2d at 825.

Judge Thomas succinctly disposes of Universitas' claims, when he wrote:

6

"We have never authorized the exercise of ancillary jurisdiction in a
subsequent lawsuit to impose an obligation to pay an existing federal judgment on
a person not already liable for that judgment. Indeed, we rejected an attempt to do
so in *H.C. Cook Co. v. Beecher*, 217 U.S. 497, 30 S.Ct. 601, 54 L.Ed. 855
(1910)."

Peacock v. Thomas, 516 U.S. at 358 (1996).

Every transaction complained of in the current motion seeks to make recovery against

persons or parties that were not part of the arbitration proceeding and are not named in the action

to confirm before this Court.

With the exception of a single piece of correspondence cited by Universitas, all events

complained of occurred prior to the Universitas-Nova arbitration commencing.  None of the

claims now being made were any part of either the arbitration or of the action to confirm the

award, which was commenced before this Court.

In addition, none of the transactions identified by Universitas in its moving papers is

alleged to have occurred after the entry of judgment in this action.  Indeed, none of the monetary

transfers as yet identified by Universitas even occurred after the arbitration proceeding had

commenced, no less been determined.


## II

**Universitas has not proven that Carpenter or the "Carpenter alter-ego entities" is now or
was ever in possession or custody of money or other personal property in which the
judgment debtor has an interest.**

The Section 5225 proceeding may be brought by motion in federal court under FRCP

69(a), rather than instituting a special proceeding under the New York state law.  See Northern

Marianas v. Millard, 845 F.Supp. 579 (S.D.N.Y. 2012), S.E.C. v. Colonial Inv. Management

LLC, No. 07 Civ. 8849, 2010, WL 4159276, at *2 (S.D.N.Y. Oct. 6, 2011); Mitchell v. Lyons

*582 Professional Services, Inc., 727 F.Supp.2d 120, 122-23 (E.D.N.Y. 2010). A turnover

proceeding seeks to gain possession of property in which the judgment debtor has a possessory

right at the time the Section 5225 proceeding is undertaken.

The relevant state law procedure to be applied by the District Court is found in N.Y.

C.P.L.R. § 5225(b).  That statute provides that:

> Upon a special proceeding commenced by the judgment creditor, against a person
> in possession or custody of money or other personal property in which the
> judgment debtor has an interest, or against a person who is a transferee of money
> or other personal property from the judgment debtor, where it is shown that the
> judgment debtor is entitled to the possession of such property or that the judgment
> creditor's rights to the property are superior to those of the transferee, the court
> shall require such person to pay the money, or so much of it as is sufficient to
> satisfy the judgment, to deliver any other personal property, or so much of it as is
> of sufficient value to satisfy the judgment to a designated sheriff…The Court may
> permit the judgment debtor to intervene in the proceeding.

On the merits, the Second Circuit has set forth a two-step process for cases in which a

judgment creditor alleges that property belongs to a judgment debtor but is in the hands of a third

party. See Beauvais v. Allegiance Sec., Inc., 942 F.2d 838, 841 (2d Cir.1991).

In order for the creditor to prevail under §5225:

> First, it must be shown that the judgment debtor "has an interest" in the property
> the creditor seeks to reach.  Where this first step is satisfied, the trial court must,
> second, then make one of two findings: it must find either that the judgment
> debtor is "entitled to the possession of such property," or it must find that "the
> judgment creditor's rights to the property are superior" to those of the party in
> whose possession it is.

Id. at 840-41. See also Baker v. Power Securities Corp., 948 F.Supp. 255 (W.D.N.Y.

1996).

Only after both parts of the analysis are proved by the judgment-creditor may a trial court

order the transferee to turn over the property to the judgment creditor, here Universitas.  See Key

Lease Corp. v. Manufacturers Hanover Trust Co., 117 A.D.2d 560, 561-62, 499 N.Y.S.2d 66,68

(1st Dep't 1986).

8

SA-45

Nothing in the papers submitted by Universitas in its latest motion proves either element of Section 5225 as to Mr. Carpenter or as to the companies which Universitas alleges he controls.

### III

**New York Debtor Creditor Law Sections 275 and 276 do not apply to the Transactions Identified by Universitas in the Present Motion.**

In addition to its reliance on § 5225, Universitas seeks to rely on two provisions of New York substantive law, to wit., New York Debtor-Creditor Law §275 and §276.

New York Debtor Creditor Law §275 provides:

"Every conveyance made and every obligation incurred without fair consideration when the person making the conveyance or entering into the obligation intends or believes that he will incur debts beyond his ability to pay as they mature, is fraudulent as to both present and future creditors. "

New York Debtor Creditor Law §276 provides:

"Every conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud either present or future creditors, is fraudulent as to both present and future creditors."

Case law in the Second Circuit allows this Court to use CPLR § 5225 as an enforcement device, in the exercise of ancillary jurisdiction.  None of the cases or statutes cited by Universitas permit this Court to exercise subject matter jurisdiction to execute New York substantive law, particularly NY DCL§§ 275 and 276, in an ancillary proceeding to determine purported fraudulent conveyances.

To the contrary, the claims Universitas now makes are entirely new state law claims.  On the facts presented in the moving papers, Universitas' claims do not lie under New York law. Sandlin v. Corporate Interiors, Inc., 972 F.2d 1212, 1214, 23 Fed. R. Serv. 3d 943 (10th Cir. 1992).

The transactions complained of by Universitas occurred in Connecticut, among persons and entities that were citizens of Delaware and of Connecticut.   None of the transactions complained of by Universitas is alleged to have occurred in New York.  None of the respondents was or is a citizen of New York.  All the respondent entities were and are incorporated in states other than New York.

Respondent Carpenter is a domiciliary of Connecticut.

Universitas itself is an entity incorporated in Delaware.

Subsequent suits to enforce judgments must have their own source of federal jurisdiction when they involve new theories of liability, such as fraudulent conveyances. Williams v. Pfeffer, 117 F.Supp.2d 331 (U.S.D.C., S.D.N.Y. 2000).

Peacock foreclosed the view that ancillary enforcement jurisdiction exists in a subsequent action based on state law claims to enforce a prior federal judgment against non-diverse third parties. Knox v. Orascom Telecom Holding S.A.E., 477 F.Supp.2d 642, 648 (S.D.N.Y. Mar. 12, 2007) (finding no ancillary jurisdiction over a turnover action against a third party who owed money to the judgment debtor), motion for recon. denied, 242 F.R.D. 251 (S.D.N.Y. Apr. 19, 2007); Williams v. Pfeffer, 117 F.Supp.2d 331, 335 (S.D.N.Y. 2000) (finding no ancillary jurisdiction over subsequent action to recover state law fraudulent conveyances when there was no diversity and jurisdiction in original action for looting of company was based on diversity).. 2000) . In re Transcolor Corp. v. Lapides, et al., 2007 WL 2916408, Not Reported in B.R. (2007).

Counsel for Universitas recognizes the fact that the latest claims are, in reality, a new action.  They have re-captioned the original action to now include a litany of entities that were not in the original action and ignore the fact that the underlying case before this Court is closed.

However much plastic surgery Universitas does to the caption in their original case, the most recent motion is a new action against new parties.

That new action, however disguised, does not belong in this District Court.

## CONCLUSION

Based on the foregoing, the motion of Universitas for a turnover order should be denied and the entire proceeding on this motion should be dismissed.

Dated: October 25, 2013
       White Plains, New York

                                        Respectfully submitted,


                                        __s/Anthony J. Siano_____
                                        Anthony J. Siano, Esq. (AS8842)
                                        Anthony J. Siano Esq. PLLC
                                        *Attorney for Daniel E. Carpenter. Phoenix Capital*
                                        *and Carpenter Financial Group*
                                        300 Westchester Avenue, Suite 302
                                        White Plains, New York 10604


To:

Paula K. Colbath,Esq
Michael Barnett, Esq.
Loeb & Loeb
345 Park Avenue
New York, New York 10154

Matthew Brief, Esq.
Ira Kleiman, Esq.
Brief, Carmen, Kleiman, LLP
805 Third Avenue - 12th Floor
New York New York
United States of America 10022

SA-48

Carole Bernstein, Esq.
41 Maple Avenue North
Westport, Connecticut 06880

Glenn A. Duhl, Esq.
Siegel, O'Connor, O'Donnell & Beck, P.C.
150 Trumbull Street
Hartford, CT 06103

SA-49

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------X

UNIVERSITAS EDUCATION, LLC,

                  Judgment Creditor,

      -against-

NOVA GROUP, INC., as trustee, sponsor and
fiduciary of THE CHARTER OAK TRUST
WELFARE BENEFIT PLAN,

                  Judgment Debtor,

      -and-

Daniel E. Carpenter, Charter Oak Trust Welfare
Benefit Plan, Grist Mill Capital, LLC, Grist Mill
Holdings, LLC, the Grist Mill Trust Welfare
Benefit Plan, Avon Capital, LLC, Hanover Trust
Company, Carpenter Financial Group and Phoenix
Capital Management, LLC,

                  Respondents.
-----------------------------------------------------------------X

Case Nos. 11 CV 1590-LTS-HBP and
11-8726-LTS

 

**UNIVERSITAS EDUCATION, LLC'S REPLY MEMORANDUM IN FURTHER**
<u>**SUPPORT OF MOTION FOR TURNOVER AND PERMANENT INJUNCTION**</u>

 

                                   LOEB & LOEB LLP
                                   345 Park Avenue
                                   New York, New York 10154-1895
                                   (212) 407-4000

                                   *Attorneys for Judgment Creditor*
                                   *Universitas Education, LLC*

SA-50

## TABLE OF CONTENTS

**Page**

**INTRODUCTION**................................................................................................ 1

**I.   FACTUAL STATEMENT AND PROCEDURAL BACKGROUND** ............................. 5

   a.   Mr. Carpenter controls the GM Trust ............................................. 5

   b.   The GM Trust, in the form of Ms. Kehoe, has no knowledge concerning the transactions at issue.................................................................................................. 6

**II.  ARGUMENT** ...................................................................................... 9

   a.   This action may be brought by motion .......................................... 9

   b.   Respondents are subject to jurisdiction in this Court....................... 12

      i.    Respondents' tortious acts caused injury in New York ............... 13

      ii.   Respondents are also subject to jurisdiction as Mr. Carpenter's alter egos ................. 16

      iii.  Respondents should have reasonably expected to be sued in New York ............... 17

      iv.   Jurisdiction over Respondents comports with constitutional due process.................... 18

   c.   Universitas has timely turnover claims under New York and Connecticut law .............. 19

      i.    New York's statute of limitations applies to Universitas' claims................................ 19

      ii.   Universitas has timely claims under Connecticut law ................................. 22

   d.   Universitas is entitled to a turnover Order and damages judgments against all Respondents ................................................................................ 24

   e.   Universitas is further entitled to permanent injunctive relief against all Respondents..... 28

i

**TABLE OF AUTHORITIES**

Page(s)

**Cases**

325 Bleecker, Inc. v. Local Union No. 747, United Bhd. of Carpenters & Joiners
  of Am.,
  500 F. Supp. 2d 110 (N.D.N.Y. 2007)......................................................................................29

Alliance Bond Fund, Inc. v. Grupo Mexicano de Desarrollo, S.A.,
  190 F.3d 16 (2d Cir. 1999)......................................................................................................10

Atlanta Shipping Corp. v. Chemical Bank,
  818 F.2d 240 (2d Cir. 1987)....................................................................................................26

Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez,
  171 F.3d 779 (2d Cir. 1999)..............................................................................................14, 16

Bank of Commc'ns v. Ocean Dev. Am., Inc.,
  No. 07-4628, 2010 U.S. Dist. LEXIS 21061 (S.D.N.Y. March 8, 2010) ................................14

Beck v. Levering,
  947 F.2d 639 (2d Cir. 1991)......................................................................................................1

In re Bernard L. Madoff Inv. Sec. LLC,
  No. 08-01789, 2012 Bankr. LEXIS 1088 (Bankr. S.D.N.Y. Mar. 14, 2012) .........................27

Cadle Co. v. Ogalin,
  495 F. Supp. 2d 278 (D. Conn. 2007)......................................................................................22

Carney v. Lopez,
  933 F. Supp. 2d 365 (D. Conn. 2013)......................................................................................24

Chloe v. Queen Bee of Beverly Hills, LLC,
  616 F.3d 158 (2d Cir. 2010).....................................................................................................18

CNN, L.P. v. GoSMS.com, Inc.,
  No. 00-4812, 2000 U.S. Dist. LEXIS 16156 (S.D.N.Y. Nov. 6, 2000)...................................18

Connell v. Colwell,
  214 Conn. 242 (Conn. 1990)....................................................................................................23

Cordius Trust v. Kummerfeld,
  No. 99-3200, 2004 U.S. Dist. LEXIS 5027 (S.D.N.Y. Mar. 30, 2004), aff'd by
  summary order, 153 F. App'x 761 (2d Cir. 2005)..............................................................9, 10

D. Klein & Son, Inc. v. Good Decision, Inc.,
  147 F. App'x 195 (2d Cir. 2005) .............................................................................................16

**SA-52**

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

Eclaire Advisor Ltd. v. Daewoo Eng'g & Constr. Co.,
   375 F. Supp. 2d 257 (S.D.N.Y. 2005).................................................................20

Epperson v. Entm't Express, Inc.,
   338 F. Supp. 2d 328 (D. Conn. 2004), aff'd, 159 F. Appx. 249 (2d Cir. 2005) ............... 22-23

FDIC v. Conte,
   204 A.D.2d 845 (3d Dep't 1994) ...............................................................4

FDIC v. Heilbrun,
   167 A.D.2d 294 (1st Dep't 1990) ................................................................4

In re Gaming Lottery Secs. Litig.,
   No. 96-5567, 2000 U.S. Dist. LEXIS 17537 (S.D.N.Y. Dec. 5, 2000) ..................................11

Geron v. Seyfarth Shaw LLP,
   736 F.3d 213 (2d Cir. 2013).............................................................19, 20, 21

GFL Advantage Fund, Ltd. v. Colkitt,
   No. 03 Civ. 1256, 2003 U.S. Dist. LEXIS 10643 (S.D.N.Y. June 23, 2003)..........................21

Global Fin. Corp. v. Triarc Corp.,
   715 N.E.2d 482 (N.Y. 1999)....................................................................20

Globalnet Financial.com, Inc. v. Frank Crystal & Co.,
   449 F.3d 377 (2d Cir. 2006)...................................................................21

Hargrave v. Oki Nursery, Inc.,
   636 F.2d 897 (2d Cir. 1980)...................................................................15

HBE Leasing Corp. v. Frank,
   48 F.3d 623 (2d Cir. 1995)..................................................................1, 26

HSH Nordbank AG N.Y. Branch v. Street,
   No. 11-9405, 2012 U.S. Dist. LEXIS 99830 (S.D.N.Y. July 18, 2012) ........................... 17-18

Jones v. Dana,
   06 Civ. 0159, 2006 U.S. Dist. LEXIS 25293 (S.D.N.Y. May 3, 2006)...................................29

JSC Foreign Econ. Ass'n Technostroyexport v. Int'l Dev. & Trade Servs.,
   295 F. Supp. 2d 366 (S.D.N.Y. 2003).........................................................20

Kelly v. MD Buyline, Inc.,
   2 F. Supp. 2d 420 (S.D.N.Y. 1998) ......................................................... 15-16

Kernan v. Kurz-Hastings, Inc.,
   175 F.3d 236 (2d Cir. 1999)...................................................................18

iii

SA-53

## TABLE OF AUTHORITIES

**Page(s)**

LaMarca v. Pak-Mor Mfg. Co.,
    95 N.Y.2d 210 (2000) ...........................................................................................................13

Levisohn v. Med. Taping Sys.,
    10 F. Supp. 2d 334 (S.D.N.Y. 1998) ......................................................................................15

Lyman Commerce Solutions, Inc. v. Lung,
    No. 12-4398, 2013 U.S. Dist. LEXIS 124689 (S.D.N.Y. Aug. 30, 2013) ..............................20

Mareno v. Rowe,
    910 F.2d 1043 (2d Cir. 1990) .................................................................................................16

Miramax Film Corp. v. Abraham,
    No. 01-5202-GBD, 2003 U.S. Dist. LEXIS 21346 (S.D.N.Y. Nov. 24, 2003) ......................17

Mitchell v. Lyons Prof'l Servs.,
    727 F. Supp. 2d 120 (E.D.N.Y. 2010) ...................................................................................12

Neshewat v. Salem,
    365 F. Supp. 2d 508 (S.D.N.Y. 2005), aff'd, 194 F. App'x 24 (2d Cir. 2006) .........................4

Northern Mariana Islands v. Millard,
    845 F. Supp. 2d 579 (S.D.N.Y. 2012) ................................................................................9, 10

Nova Grp., Inc. v. Universitas Educ., LLC,
    No. 3:11CV342, 2011 U.S. Dist. LEXIS 132028 (D. Conn. Nov. 16, 2011) ..........................13

Padula v. Lilarn Props. Corp.,
    84 N.Y.2d 519 (1994) ............................................................................................................22

Patterson v. Bushkin,
    No. 99-3449, 1999 U.S. Dist. LEXIS 19604 (S.D.N.Y. Dec. 20, 1999) ...........................15, 17

Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC,
    446 F. Supp. 2d 163 (S.D.N.Y. 2006) ..............................................................................20-21

Robinson v. Coughlin,
    266 Conn. 1 (Conn. 2003) .......................................................................................................4

Runaway Dev. Grp. v. Pentagen Technologies Int'l Ltd.,
    396 F. Supp. 2d 471 (S.D.N.Y. 2005) ................................................................................9, 10

Saregama India, Ltd. v. Mosley,
    Leading Case No. 12-mc-45-P1, 2012 U.S. Dist. LEXIS 39322 (S.D.N.Y.
    Mar. 20, 2012) .......................................................................................................................11

iv

**SA-54**

## TABLE OF AUTHORITIES

**Page(s)**

SEC v. Colonial Inv. Mgmt. LLC,
   No. 07 Civ. 8849, 2010 U.S. Dist. LEXIS 108063 (S.D.N.Y. Oct. 6, 2010) ....................9-10

SEC v. Softpoint, Inc.,
   No. 95-2951-JSR, 2012 U.S. Dist. LEXIS 187142 (S.D.N.Y. May 8, 2012)...................16-17

Stuart v. Stuart,
   112 Conn. App. 160 (Conn. App. Ct. 2009), partially reversed on other
   grounds by, 297 Conn. 26 (Conn. 2010)...................................................................................4

Sunrise Indus. Joint Venture v. Ditric Optics,
   873 F. Supp. 765 (S.D.N.Y. 1995) .............................................................................14, 17

TLC Merch. Bankers, Inc. v. Brauser,
   No. 01-3044-GEL, 2003 U.S. Dist. LEXIS 3564 (S.D.N.Y. Mar. 6, 2003) ...........................4

U.S. v. Carpenter and Bursey,
   Case No. 13-CR-226-RNC (D. Conn.) ...................................................................................2

United Feature Syndicate, Inc. v. Miller Features Syndicate, Inc.,
   216 F. Supp. 2d 198 (S.D.N.Y. 2002)................................................................................ 21-22

United States v. Henshaw,
   388 F.3d 738 (10th Cir. 2004) .................................................................................................27

Universitas Educ., LLC v. Nova Grp., Inc.,
   Nos. 11 Civ. 1590 & 8726, 2013 U.S. Dist. LEXIS 165803 (S.D.N.Y. Nov.
   20, 2013) ......................................................................................................................... passim

Universitas Educ., LLC v. Nova Grp., Inc., Nos. 11 Civ. 1590 & 8726, 2014 U.S.
   Dist. LEXIS 3983 (S.D.N.Y. Jan. 13, 2014).......................................................................4-5

Wasserman Media Grp., LLC v. Bender,
   10 Civ. 8783, 2012 U.S. Dist. LEXIS 60844 (S.D.N.Y. Apr. 26, 2012)....................10, 11, 12

**Statutes & Rules**

Rule 69(a)(1) ...............................................................................................................................9

Conn. Gen. Stat. 52-552e(a)(1)...................................................................................................24

Conn. Gen. Stat. 52-552j.......................................................................................................22, 23, 24

Conn. Gen. Stat. § 52-552i(b) ......................................................................................................4

Conn. Gen. Stat. §52-595 ....................................................................................................... 22-23

CPLR § 302(a)(3)(ii)........................................................................................................... passim

SA-55

### TABLE OF AUTHORITIES

**Page(s)**

CPLR §5225(b)......................................................................................................9-10

NY CLS Dr & Cr § 276............................................................................................26

Local Civil Rule 1.6.................................................................................................12

Local Division of Business Rule 13(a)(1) and (a)(2)(B) ...............................................12

SA-56

Petitioner/Judgment Creditor Universitas Education, LLC ("Universitas"), through its counsel Loeb & Loeb LLP, respectfully submits the following reply brief in further support of its motion for turnover and a permanent injunction against each of the Respondents.  With Respondents' consent, Universitas respectfully seeks the Court's leave to file this single, 29-page reply brief, in lieu of filing multiple 10-page reply briefs in response to the eight Respondents' overlapping arguments.  The Supplemental Declaration of Michael Barnett, dated January 24, 2014 ("1/24/14 Barnett Decl."), with Exhibits 62-76, further supports Universitas' motion.

## **INTRODUCTION**

Universitas brings this motion to compel the turnover of assets that belong to Judgment Debtor Nova Group, Inc. ("Nova") as Trustee of the Charter Oak Trust Welfare Benefit Plan ("Charter Oak Trust").  Daniel E. Carpenter, and others acting with him, transferred these assets to other entities in Mr. Carpenter's control, including the Respondent entities to this motion.  Many of the facts pertinent to this motion have already been aired during two prior evidentiary hearings.  There are no disputes of material fact, and this Court may decide Universitas' motion for turnover and permanent injunction as a matter of law.  HBE Leasing Corp. v. Frank, 48 F.3d 623, 633 (2d Cir. 1995); Beck v. Levering, 947 F.2d 639, 641-42 (2d Cir. 1991).[1]

In their opposition briefs (dkt. nos. 337 and 339), Respondents mainly raise procedural and jurisdictional defenses.  These defenses, which Universitas addresses below, can be decided as a matter of law: (1) this turnover action may be litigated as a motion in this case, (2) this Court has personal jurisdiction over all Respondents, and (3) Universitas' claims are not time-barred regardless of whether New York or Connecticut law applies.

In addition to there being no disputes of material fact, Respondents have barely adduced

---

[1] Universitas would likely not oppose a request by any Respondent for oral argument and/or an evidentiary hearing, although no such request has been made.

SA-57

any facts at all.  Their affiants are Daniel E. Carpenter and Kathy Kehoe, neither of whom is a competent witness.

The Court is familiar with Mr. Carpenter. On December 12, 2013, Mr. Carpenter and Wayne H. Bursey were indicted in the District of Connecticut on multiple counts of mail and wire fraud, in connection with insurance policies procured through the Charter Oak Trust (although not the policies insuring the life of Sash A. Spencer).  See U.S. v. Carpenter and Bursey, Case No. 13-CR-226-RNC (D. Conn.)  Mr. Carpenter and Mr. Bursey were arraigned and made bail on January 17.

Apparently as a result of these developments, Mr. Carpenter decided, on January 22, to re-assert his Fifth Amendment right against self-incrimination rather than submitting to a substantive deposition on this motion.  1/24/14 Barnett Decl., Ex. 62.  Mr. Carpenter started these judgment enforcement proceedings by asserting the Fifth Amendment, only to provide substantive testimony at a deposition and two evidentiary hearings, and has now come back, full circle, to the Fifth Amendment.  See, e.g., Universitas Educ., LLC v. Nova Grp., Inc., 2013 U.S. Dist. LEXIS 165803, at *8-9 n. 1 (S.D.N.Y. Nov. 20, 2013) (noting that Mr. Carpenter had agreed to testify as to certain issues "in an apparent attempt to assert fabricated defenses to the paper trail that [Universitas] had uncovered").  Since the claims in Mr. Carpenter's affidavit cannot be tested through deposition or (presumably) cross-examination at hearing, his affidavit is likely not competent testimony (he was cross-examined on it on November 22).  In any event, his testimony is false, and incredible, as this Court has found in two Opinions after twice hearing Mr. Carpenter's live testimony on issues relevant to this motion.

Ms. Kehoe was Grist Mill Trust Welfare Benefit Plan's ("GM Trust") sole designee pursuant to a Rule 30(b)(6) subpoena that Universitas served on it.  She testified in this action

2

SA-58

once before, as a Rule 30(b)(6) designee for Grist Mill Capital, LLC ("GMC") – an entity Mr. Carpenter controls.  1/24/14 Barnett Decl., Ex. 63 (excerpt of transcription of Ms. Kehoe's April 30, 2013 deposition in this matter); 2013 U.S. Dist. LEXIS 165803, at *8 (finding Mr. Carpenter to control GMC).

Ms. Kehoe's Declaration in opposition to this motion (dkt. no. 234-3, "Kehoe Decl.") is inadequate.  For instance, it fails to even mention a significant transfer that shows Mr. Carpenter's control of GM Trust – a $2.7 million transfer from the GM Trust to Phoenix Capital Management, LLC ("Phoenix") on June 12, 2009.  This transfer also goes unmentioned in the Respondents' two opposition briefs, even though GM Trust produced the $2.7 million "loan document" (1/24/14 Barnett Decl., Ex. 71), and this alleged loan was at the center of the May 9, 2013 evidentiary hearing on a prior turnover motion.

Further, at her deposition, Ms. Kehoe, GM Trust's only designee, confirmed that she – and by extension, GM Trust – does not know anything about any of the "loans" to Mr. Carpenter's entities asserted in the opposition brief submitted by GM Trust's attorneys.  In fact, prior to being named GM Trust's sole designee for deposition, Ms. Kehoe – who has helped administer the GM Trust for years, and since well before all of the transfers at issue – had not even known that the GM Trust had loaned any money to anyone, ever.   She further stated that any "loans" were disbursed solely by Molly Carpenter, Mr. Carpenter's wife.  The GM Trust "loans" claimed by Respondents are, at most, "loans" on paper only, and intended solely to conceal Mr. Carpenter's control of the GM Trust as well as his use of that Trust as his personal piggy bank.

The thrust of GM Trust's arguments is that since it has real participants and beneficiaries it is somehow insulated from Universitas' turnover motion.  Of course, the caselaw on fraudulent

3

transfers is filled with turnover orders, and sometimes damages judgments, entered against entities with some legitimate operations. Whether GM Trust has any legitimate operations is not the issue. The issue is whether Mr. Carpenter and Mr. Bursey used GM Trust in a way that caused it to be a link in a chain of transfers that were made either with the actual intent of defrauding Universitas, or that were constructively fraudulent. The fact that (a) Mr. Bursey received more than $30 million in life insurance proceeds intended to benefit Universitas; yet (b) with Mr. Carpenter, arranged for these proceeds to be transferred to other entities, including the GM Trust (of which he is the Trustee); and (c) is now taking the Fifth Amendment as to his and Mr. Carpenter's actions with respect to Universitas, the Charter Oak Trust and GM Trust, is enough on its own to justify a turnover Order against GM Trust.

Respondents make the flawed suggestion – and without any documentary evidence – that their not having sufficient funds to pay Universitas is a reason to deny Universitas' turnover motion. See, e.g., Carpenter et al. Br. at 9 (dkt. no. 339). This Court has already noted that damages judgments can be entered on a turnover motion (2014 U.S. Dist. LEXIS 3983, *21, (S.D.N.Y. Jan. 13, 2014)), and New York and Connecticut law give the Court the authority to do just that when a fraudulent transferee is found or appears to have disposed of the property targeted by a turnover motion. See, e.g., Conn. Gen. Stat. § 52-552i(b); Neshewat v. Salem, 365 F. Supp. 2d 508, 521-22 (S.D.N.Y. 2005), aff'd, 194 F. App'x 24 (2d Cir. 2006); TLC Merch. Bankers, Inc. v. Brauser, No. 01-3044-GEL, 2003 U.S. Dist. LEXIS 3564, at *9 (S.D.N.Y. Mar. 6, 2003); FDIC v. Conte, 204 A.D.2d 845, 846 (3d Dep't 1994); FDIC v. Heilbrun, 167 A.D.2d 294, 294 (1st Dep't 1990); Robinson v. Coughlin, 266 Conn. 1, 8-9 (Conn. 2003); Stuart v. Stuart, 112 Conn. App. 160, 179-80 (Conn. App. Ct. 2009), partially reversed on other grounds by, 297 Conn. 26 (Conn. 2010).

4

SA-60

### I.   FACTUAL STATEMENT AND PROCEDURAL BACKGROUND

Universitas incorporates by reference the Declaration of Michael Barnett, dated October 9, 2013, with exhibits thereto ("10/9/13 Barnett Decl."), submitted in support of this motion.  On reply, Universitas draws the Court's attention to additional facts pertaining to Mr. Carpenter and Ms. Kehoe, which Respondents' oppositions and affidavits put into issue.  Mr. Carpenter's control over the entity Respondents is not in dispute except as to GM Trust.

#### a.   Mr. Carpenter controls the GM Trust

The uncontroverted documentary evidence shows, and this Court has already found, that Mr. Carpenter controlled the GM Trust at the time of the 2009 transfers at issue.  2013 U.S. Dist. LEXIS 165803, at *14; 2014 U.S. Dist. LEXIS 3983, at *8.  Additional uncontroverted evidence establishes that Mr. Carpenter continues to control the GM Trust.  For instance, in June 2010, Mr. Carpenter opened a bank account at People's United Bank, in the name of "GMT," and using the GM Trust's unique Taxpayer Identification Number ("TIN").  1/24/14 Barnett Decl., Ex. 64 (account opening document), Ex. 65 at 89-92 (Ms. Kehoe's testimony confirming Mr. Carpenter used GM Trust's TIN in opening the account).  The account opening document identifies Mr. Carpenter as GM Trust's owner and chairman; Mr. Bursey also signed the account opening document, as GM Trust's ostensible Trustee.  Id., Ex. 64 at COT_PEOPLES0000200. This account was still open as of April 30, 2013 (see id., Ex. 66), and is likely still open today. Mr. Carpenter appears to use the account to pay GM Trust's legal bills and possibly other expenses.  Id., Ex. 64 at COT_PEOPLES0000214, 218 and 219  (showing payments to the Halloran & Sage law firm); Ex. 65 at 96:6:15.

Further, by an office memorandum dated October 20, 2010 (and signed by Molly Carpenter), Amanda Rossi, Mr. Carpenter's assistant, asked the GM Trust to transfer more than $1 million to a Carpenter-controlled entity called Audit Risk Indemnity Association ("ARIA"),

SA-61

as "reimbursement" for "legal fees."  1/24/14 Barnett Decl., Ex. 67.  GM Trust made this payment.  Id. at 3.

Ms. Kehoe's Declaration identifies Nova Benefit Plans, LLC as the trustee and plan sponsor of the GM Trust.  Kehoe Decl., ¶¶ 3, 8.  What it does not say is that Mr. Carpenter is the Chairman of Nova Benefit Plans' managing member, and thereby controls it, as demonstrated by an engagement letter he signed, on that entity's behalf, in September 2011 with the law firm of Smith Gambrell & Russell LLP.   1/24/14 Barnett Decl., Ex. 68.

Ms. Kehoe herself is not a Trustee of GM Trust, and in fact works for another company located at 100 Grist Mill Road in Simsbury – Benistar Admin. Services, Inc., of which Molly Carpenter is the chairperson and Ms. Kehoe's supervisor.  1/24/14 Barnett Decl., Ex. 65 at 5:1-8, 96:6-15; Ex. 69 at 9, 11.  Mr. Bursey is the only other person Ms. Kehoe identifies as being associated with GM Trust; but he is identified merely as "the signatory trustee of Nova Benefit Plans" (Kehoe Decl., ¶ 8), without explaining what a "signatory trustee" does, or whether Mr. Bursey has any authority as a "signatory trustee" of Nova Benefit Plans, a company that Mr. Carpenter controls.  In response to being subpoenaed to testify regarding this motion, Mr. Bursey has asserted his Fifth Amendment right against self-incrimination in response to all questions regarding, among other things, his and Mr. Carpenter's involvement in the GM Trust.  1/24/14 Barnett Decl., Ex. 70.  Based on the evidence before this Court, the only conclusion can be that Mr. Carpenter, having already been found to control GM Trust in 2009, controls GM Trust to this day.

### b.  The GM Trust, in the form of Ms. Kehoe, has no knowledge concerning the transactions at issue

The inescapable conclusion that Mr. Carpenter controls the GM Trust is reinforced by the

SA-62

fact that Ms. Kehoe, GM Trust's only Rule 30(b)(6) deposition designee in response to Universitas' deposition notice, knew nothing about the issues and events implicated by Universitas' motion.

Prior to being named a designee about two months ago, Ms. Kehoe did not know that the GM Trust had made any loans to anyone, ever.  1/24/14 Barnett Decl., Ex. 65 at 109-110 and 116-117.  And she only found out about the "loans" when talking to GM Trust's attorneys, or to Mr. Carpenter's wife, Molly, who approved the "loans" to her husband.  See id. at 12, 22-25 (only preparation Ms. Kehoe did for her deposition was to speak with counsel and Ms. Carpenter).  But GM Trust did not designate Ms. Carpenter as a Rule 30(b)(6) designee, and this Court has already found Ms. Carpenter's testimony on other issues to be "wholly self-serving and unreliable."  Universitas Educ., LLC, 2013 U.S. Dist. LEXIS 165803, at *8  n. 1.

Ms. Kehoe could not testify about the nature of the funds drawn on by GM Trust to make "loans."  1/24/14 Barnett Decl., Ex. 142:25, 143:1-3.  She could not say who negotiated the loans on behalf of GM Trust, whether Mr. Carpenter had to fill out any loan applications, whether a Carpenter entity had ever been turned down for a loan request, whether GM Trust conducted criminal history and/or credit checks on Mr. Carpenter prior to loaning money to one of his companies, why GM Trust was loaning money only to Mr. Carpenter and no one else, whether GM Trust considered any other uses of the money loaned to Mr. Carpenter, or whether GM Trust disclosed the loans to its employer participants.  Id. at 119-124 and 143-145.

In other words, the GM Trust, testifying solely through Ms. Kehoe, knew nothing about the things it was supposed to know.   And nothing about these loans makes sense – for instance, why a trust in June 2009 would lend millions of dollars to a man who the year before had been convicted of mail and wire fraud, and who was at the time of a June 2009 "loan" awaiting

7

SA-63

sentencing on these convictions; or why GM Trust would permit one Carpenter company (GMC) to "repay," 16 months early, a $2.5 million "loan" accruing 8% annual interest, only to "loan" another Carpenter company (Phoenix) $2.7 million, at 6% annual interest, a mere three days later.  Compare Kehoe Decl., Ex. P at GMT-000134 (8% interest) to 1/24/14 Barnett Decl., Ex. 71 at 1 (6% interest).

Ms. Kehoe's Declaration does not even mention the $2.7 million "loan" to Phoenix in June 2009.  At her deposition, Ms. Kehoe disclaimed any knowledge about the $2.7 million transfer from GM Trust to Phoenix, and when asked why her Declaration did not address it, asserted attorney-client privilege instead of answering the question.  1/24/14 Barnett Decl., Ex. 65.

Ms. Kehoe claims that Mr. Carpenter had no involvement with the GM Trust, yet could not explain why Mr. Carpenter, in 2010, opened a bank account in GMT's name, with GMT's Taxpayer Identification Number, and signed as the entity's "owner" and "chairman."  1/24/14 Barnett Decl., Ex. 65 at 89-95; compare Ex. 64.  She did not know about this particular GM Trust bank account until two months ago, when Mr. Bursey asked her to testify on GM Trust's behalf.  Id. at 82-83.  She did not know why the GM Trust paid more than $1 million as alleged reimbursement for legal fees supposedly incurred by ARIA, one of Mr. Carpenter's many companies.  Id. at 88.

Ms. Kehoe identified Donna Dawson as someone who would be knowledgeable about all of the transfers into and out of the GM Trust, including all loans.  See, e.g., 1/24/14 Barnett Decl., Ex. 65 at 111-12.  Yet, inexplicably, Ms. Kehoe did not speak to Ms. Dawson in preparation for her deposition (even though she is Ms. Dawson's supervisor, see id), and GM Trust did not designate Ms. Dawson as a deponent.  In sum, the GM Trust has been unable to

8

SA-64

explain the transactions at issue in this motion, and it certainly has not offered any evidence, documentary or testimonial, to refute the considerable documentary evidence establishing that Mr. Carpenter controls the GM Trust, notwithstanding his claims that he does not.

## II. ARGUMENT

### a. This action may be brought by motion

Respondents argue that New York procedural law requires Universitas to start a new proceeding against several of them, including the GM Trust. See, e.g., GM Trust Br. at 4-5 (dkt. no. 337). This argument is wrong, and ignores Circuit precedent and the vast majority of district court decisions on this issue. Further, this Court has already decided a post-judgment turnover motion in this case, rather than requiring Universitas to file a new case. See Universitas Educ., LLC, 2013 U.S. Dist. LEXIS 165803.

CPLR §5225(b) talks about a "special proceeding," which does not exist at the federal level. Rule 69(a)(1) states that in proceedings "in aid of judgment," the procedural law of the forum state governs, "but a federal statute governs to the extent it applies." As federal procedural law does not permit "special proceedings" (see Rule 2), but does permit a prevailing party to enforce its federal judgment in federal court, the predominant rule is that a court may hear a §5225(b) application as part of post-judgment proceedings.[2] See, e.g., Cordius Trust v. Kummerfeld, No. 99-3200, 2004 U.S. Dist. LEXIS 5027 (S.D.N.Y. Mar. 30, 2004), aff'd by summary order, 153 F. App'x 761, 762 (2d Cir. 2005) ("veil-piercing actions may be initiated as supplementary special proceedings under New York Civil Practice Law and Rules (CPLR) § 5225(b), **rather than as plenary actions**") (emphasis added); Northern Mariana Islands v. Millard, 845 F. Supp. 2d 579, 581 (S.D.N.Y. 2012); SEC v. Colonial Inv. Mgmt. LLC, No. 07

---

[2] Alternatively, this Court could hold that "proceedings supplementary to and in aid of judgment or execution" (Fed. R. Civ. P. 69(a)) qualify as "special proceedings" under §5225(b). See Universitas, 2013 U.S. Dist. LEXIS 165803, at *24.

Civ. 8849, 2010 U.S. Dist. LEXIS 108063, at *6 (S.D.N.Y. Oct. 6, 2010).

Respondents do not discuss any of these cases – all of which are cited in Universitas'

moving brief – and instead cite primarily to Runaway Dev. Grp. v. Pentagen Technologies Int'l

Ltd., 396 F. Supp. 2d 471 (S.D.N.Y. 2005) for the proposition that Universitas must commence a

new proceeding against several of the Respondents.   To be sure, Runaway supports

Respondents' position, but, respectfully, its erroneous conclusion appears to be driven entirely

by the circumstances in which the turnover motion in that case arose – namely, that the party

seeking turnover was enjoined, as a vexatious litigant, from filing further litigation without the

Court's permission.  In response, in 2005, the enjoined party filed a turnover motion in a case it

won in 1993.   The court in Runaway was justifiably concerned that the party was improperly

trying to circumvent the injunction against it by trying to revive an action decided 12 years prior.

These facts are far afield from this case, and also Runaway is at odds with "[n]early every court

in this Circuit[.]"  Northern Mariana Islands, 845 F. Supp. 2d at 581, 582 n. 1 (further noting that

"the court in Runaway did not provide any explanation for its decision on this issue").

Alliance Bond Fund, Inc. v. Grupo Mexicano de Desarrollo, S.A., 190 F.3d 16 (2d Cir.

1999), which Runaway and Respondents cite, does not go against this current.   Alliance, in

which a §5225(b) motion was not even at issue, notes in passing that "[u]nder §5225(b), a

judgment creditor pursuing property in the possession of someone other than the judgment

debtor must commence an action against the person in possession." Id. at 21.  This merely

paraphrases §5225(b), substituting "action" for "special proceeding"; it does not answer the

question of how an action or special proceeding should be commenced when §5225(b) is being

used in federal court.   Compare Cordius Trust, 153 F. App'x at 762.

The third and final case that Respondents cite, Wasserman Media Grp., LLC v. Bender,

10

SA-66

10 Civ. 8783, 2012 U.S. Dist. LEXIS 60844 (S.D.N.Y. Apr. 26, 2012), indeed holds that when personal jurisdiction over a transferee is at issue, a new case must be commenced.  But this case cites no law for its conclusion, and does not explain why a new action is needed in order to acquire personal jurisdiction over a transferee.  If there was a reason that a new case had to be commenced in <u>Wasserman</u>, the court did not disclose it.   Whatever that reason could be, it is not implicated here.  There is no rule that a "separate proceeding" must be commenced in order for jurisdiction to obtain; pursuant to Rules 14 and 15(a), for instance, a party can be added to a case years after it has started.  <u>Wasserman Media Grp.</u> also ignores that other courts have determined personal jurisdiction issues in the course of deciding turnover motions brought in the case in which judgment has been entered.  <u>See</u>, <u>e.g.</u>, <u>Saregama India, Ltd. v. Mosley</u>, Leading Case No. 12-mc-45-P1, 2012 U.S. Dist. LEXIS 39322 (S.D.N.Y. Mar. 20, 2012) (noting that judgment creditor had no choice but to bring a turnover motion in the action in which judgment was entered, and finding that there had been insufficient service of process).

In re Gaming Lottery Secs. Litig. is particularly instructive.  In that case, in a post-judgment turnover proceeding similar to this one, the Court first concluded that it needed to hold a hearing in order to decide whether it had personal jurisdiction over a transferee.  <u>In re Gaming Lottery Secs. Litig.</u>, No. 96-5567, 2000 U.S. Dist. LEXIS 17537, at *14-15 (S.D.N.Y. Dec. 5, 2000).  While there is no subsequent decision discussing whether such a hearing took place, the Court took the correct approach in permitting a turnover motion to be brought against a transferee in the case in which judgment was entered, while allowing the transferee to challenge personal jurisdiction.   In this case, there has also been discovery, including jurisdictional discovery, which distinguishes <u>Wasserman Media Grp.</u> and shows that its conclusion is premised on the erroneous belief that personal jurisdiction issues cannot be determined in a motion such as

11

SA-67

the instant one.

Respondents have not been prejudiced by the instant motion, nor have they claimed prejudice.  Respondents, including GM Trust, have made their respective personal jurisdiction arguments, and if they want they can seek oral argument and/or an evidentiary hearing on this issue – which would be their options had a new case been commenced against them.  At bottom, Respondents' argument is pure formalism.  See Mitchell v. Lyons Prof'l Servs., 727 F. Supp. 2d 120, 125 (E.D.N.Y. 2010) (noting that no party contested jurisdiction, but also that no party claimed prejudice and "other than the generation of an additional filing fee for the commencement of a separate proceeding in this Court, there seems no reason to compel plaintiffs to start over when there is a vehicle for relief presently pending").  Respondents want Universitas to start a new case in this Court, so that it can make the same personal jurisdiction argument they have already made.  Any new case, moreover, would be closely connected to this one, would be presumed to be related, and the Court could accept it as a related case.[3]  See Local Division of Business Rule 13(a)(1) and (a)(2)(B).  In fact, were Universitas to file a new case, its counsel would be required to disclose this case as related, or risk sanctions.  See Local Civil Rule 1.6. Respondents' argument is wrong as a matter of law, and wrong as a matter of logic.

b.  **Respondents are subject to jurisdiction in this Court**

Respondents are subject to long-arm jurisdiction pursuant to CPLR § 302(a)(3)(ii), which provides that a person is subject to jurisdiction when it:

> commits a tortious act without the state causing injury to person or property within the state. … if he … (ii) expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce[.]

---

[3] The court in Wasserman informed the judgment creditor that it could mark its new case as related, 2012 U.S. Dist. LEXIS 60844, at *8 n. 20.

12

SA-68

This is precisely what Respondents have done here – they orchestrated fraudulent conveyances, in Connecticut, with the knowledge, expectation and intent that these torts would cause injury to Universitas in New York.

CPLR § 302(a)(3)(ii)'s standard is generally divided into the five following elements: (1) commission of a tortious act outside the state; (2) a cause of action arising from that act; (3) injury to a person or property within the state as a result of that act; (4) the tortfeasor expected or should have reasonably expected its act to have consequences in the state; and (5) the tortfeasor derives substantial revenue from interstate or international commerce.  LaMarca v. Pak-Mor Mfg. Co., 95 N.Y.2d 210, 214 (2000).  Respondents only contest whether their conduct establishes elements three and four, and whether it satisfies the independent but related requirement of "minimum contacts."  See, e.g., GM Trust Br. at 5-8.

### i.  *Respondents' tortious acts caused injury in New York*

Respondents' attempts to skirt the statute's plain language are unavailing.  Their principal argument is that their tortious acts did not injure a person or property in New York.  They claim that Universitas' injury occurred in Connecticut.  As a matter of common sense, this assertion is implausible – Universitas is based in New York, has no offices outside of New York and has no investments or business interests in Connecticut.  Respondents, in the course of engaging in a metaphysical inquiry into the site of Universitas' injury, do not offer a single fact supporting its contention that Universitas was injured in Connecticut.  See also Nova Grp., Inc. v. Universitas Educ., LLC, No. 3:11CV342, 2011 U.S. Dist. LEXIS 132028, at *5-6 (D. Conn. Nov. 16, 2011) (ordering case transferred to this Court, in part because "the locus of operative facts" was in New York, not Connecticut).

The site of tortious injury was New York.  The torts at issue are fraudulent conveyances.

13

See Bank of Commc'ns v. Ocean Dev. Am., Inc., No. 07-4628, 2010 U.S. Dist. LEXIS 21061, at

*9 (S.D.N.Y. March 8, 2010) ("A cause of action for fraudulent conveyance is a species of

tort."); Sunrise Indus. Joint Venture v. Ditric Optics, 873 F. Supp. 765, 770 (S.D.N.Y. 1995)

(same).  The fraudulent conveyances can be presumed to have been executed in Connecticut.

The resulting injury to Universitas occurred entirely in New York.  Universitas is based in New

York, and the arbitration, at Mr. Bursey and Mr. Carpenter's insistence (and as per the Charter

Oak Trust instrument), took place in New York.  See 3/15/11 Petition to Confirm Arbitration

Award, Ex. 1 at §8.02(d) (dkt. no. 6).  The fraudulent conveyances had the effect, and intent, of

harming Universitas in New York, and of undermining any award that Universitas would obtain

in the New York arbitration, which Nova told Universitas it must initiate if Universitas would

have any chance of receiving any money.  In July 30, 2009, for instance, Mr. Bursey informed

Universitas that it could pursue arbitration if it was unhappy that Nova had rejected Universitas

as a beneficiary – even though, by this time, Mr. Bursey and Mr. Carpenter had already

transferred more than $11 million of the Spencer proceeds out of the Charter Oak Trust.  1/24/14

Barnett Decl., Ex. 76 at 2.  Universitas commenced arbitration in June 2010 – at which point,

Respondents had transferred all of the Spencer proceeds out of the Charter Oak Trust.  See

10/9/13 Barnett Decl., ¶¶42-56.

        Respondents correctly note that this Court should not find the injury to have occurred in

New York solely because Universitas is located here.  They ask the court to apply "a situs-of-

injury test, which asks [courts] to locate … the original event which caused the injury … This

original event is, however, generally distinguished not only from the initial tort but from the final

economic injury and the felt consequences of the tort."  GM Trust Br. at 6 (quotations omitted,

citing Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez, 171 F.3d 779, 792 (2d Cir.

SA-70

1999)).

The situs of the injury is New York, for the reasons stated above; but this quest for finding the "original event which caused the injury" is beside the point where Respondents engaged in fraudulent transfers intending and knowing that they were injuring Universitas in New York – and thus, "commit[ing] a tortious act without the state causing injury to person or property within the state."   CPLR § 302(a)(3)(ii).

The Second Circuit established this principle more than 30 years ago, in <u>Hargrave v. Oki Nursery, Inc.</u>, 636 F.2d 897 (2d Cir. 1980).  <u>Hargrave</u>, the Second Circuit noted, was not a case where jurisdiction is predicated on the plaintiff "fortuitously" being located in the forum state.  <u>Id</u>. at 900.  Instead, jurisdiction was based on the "immediate consequence[s]" of the defendant's acts, which it was aware would occur in New York.  <u>Id</u>.  Nothing, the court held, could be a "'closer' or more 'direct' result" from the defendant's actions in another state.  <u>Id</u>.

The <u>Hargrave</u> holding is straightforward – where a defendant knows or intends that its tortious conduct will take place in New York, that is more than sufficient to establish that the situs of injury is New York, and/or that CPLR § 302(a)(3)(ii) is satisfied.  <u>See</u> <u>Patterson v. Bushkin</u>, No. 99-3449, 1999 U.S. Dist. LEXIS 19604, at *2-3 (S.D.N.Y. Dec. 20, 1999) (finding personal jurisdiction adequately pled where, among other things, "plaintiff has alleged that defendant's tortious actions were directed at and intended to avoid an obligation to plaintiff, a New York entity"); <u>Levisohn v. Med. Taping Sys.</u>, 10 F. Supp. 2d 334, 342-43 (S.D.N.Y. 1998) (same holding where plaintiff alleged that "the individual defendants' tortious conduct was intended to avoid an obligation to a New York entity … [t]he tortious conduct was therefore designed to injure LLBL in New York"); <u>Kelly v. MD Buyline, Inc.</u>, 2 F. Supp. 2d 420, 437 (S.D.N.Y. 1998) (it "was evident at the time of the alleged fraud that the injury to [plaintiff] …

15

would be felt here if anywhere").

The cases that Respondents cite do not hold to the contrary.  First, these cases address situations where the plaintiff was fortuitously located in New York and there was not much of a New York connection to the tort.   Their principal case, Bank Brussels Lambert, 171 F.3d at 792, ultimately found jurisdiction to exist and, in so doing, held that the site of an injury was "where the first effect of the tort was located that ultimately produced the final economic injury."  Here, the only effects of the tort occurred in New York.   Respondents' other case, Mareno v. Rowe, 910 F.2d 1043, 1046 (2d Cir. 1990), has the same holding.  The plaintiff in Moreno was fired from his job in New Jersey, and suffered consequences in New York because he happened to live there.  "[T]he exercise of personal jurisdiction," the Second Circuit held, "must be based on a more direct injury within the state and a closer expectation of consequences within the state than the type of indirect financial loss alleged" by the defendant.  Mareno, 910 F.2d at 1046. Here, there is much more – the first effect of the fraudulent transfers was to prevent Nova and the Charter Oak Trust from satisfying an arbitration award rendered in New York, following a hearing in New York, which injured Universitas, an entity in New York.  This is not a case where the tort's only connection to New York is the injured party's residence here.

>    ii.   *Respondents are also subject to jurisdiction as Mr. Carpenter's alter egos*

Since personal jurisdiction exists over Mr. Carpenter (who has appeared in this action and does not contest personal jurisdiction), and Respondents are his alter egos, personal jurisdiction exists over them as well.  See D. Klein & Son, Inc. v. Good Decision, Inc., 147 F. App'x 195, 196-97 (2d Cir. 2005) (personal jurisdiction can be established through veil-piercing); SEC v. Softpoint, Inc., No. 95-2951-JSR, 2012 U.S. Dist. LEXIS 187142, at *7-8 (S.D.N.Y. May 8,

16

2012) (in turnover action, finding personal jurisdiction over corporate entity through reverse veil-piercing); Miramax Film Corp. v. Abraham, No. 01-5202-GBD, 2003 U.S. Dist. LEXIS 21346, at *20-23 (S.D.N.Y. Nov. 24, 2003) (personal jurisdiction can be established through reverse veil-piercing).

### iii. Respondents should have reasonably expected to be sued in New York

Respondents dubiously argue that their being sued in New York was not reasonably foreseeable.  One could argue that Respondents, had they foreseen a lawsuit, could have only reasonably foreseen a New York lawsuit.  But one need not go that far; it is enough that Respondents executed fraudulent conveyances with the intent and knowledge that the conveyances would harm Universitas, an entity based in New York known as of May 2008 to be Mr. Spencer's irrevocable beneficiary.   11/20/13 Carpenter Aff., Ex. F (dkt. no. 235-6). Universitas' location in New York is not merely incidental to the question of whether Respondents could have reasonably anticipated being sued here; since Respondents knew that their transactions would harm Universitas, they should have anticipated that harm to occur in New York, the site of the arbitration that Nova demanded take place.  See, e.g., Patterson, 1999 U.S. Dist. LEXIS 19604, at *3 ("by allegedly engaging in fraudulent conveyances, defendant knew that its actions were directed at avoiding a financial obligation and judgment owed to a New York entity, and either expected or should have reasonably expected that its actions would have consequences in New York"); Sunrise Indus. Joint Venture, 873 F. Supp. at 770-71 (same).

The only case that Respondents cite, HSH Nordbank AG N.Y. Branch v. Street, No. 11-9405, 2012 U.S. Dist. LEXIS 99830 (S.D.N.Y. July 18, 2012), holds no different, and notes that at the time of the fraudulent conveyances at issue in that case, the defendants could not have anticipated that their fraudulent conveyances would undermine a New York judgment in a case

17

that had not even been commenced at the time of the transfers. Here, the facts are different –
there was no judgment at the time of the transfers, but Mr. Carpenter and Mr. Bursey knew that
the money they were transferring was payable to Universitas under the Charter Oak Trust and
per Mr. Spencer's directive, and that the effect of the transfers would be to make it difficult, if
not impossible, for Universitas to receive this money.

### iv.  Jurisdiction over Respondents comports with constitutional due process

The Constitution's Due Process Clause, as applied to personal jurisdiction, requires a
party to have had "minimum contacts" with the forum state and that the exercise of jurisdiction
be reasonable under the circumstances. Chloe v. Queen Bee of Beverly Hills, LLC, 616 F.3d
158, 171 (2d Cir. 2010). Respondents have minimum contacts with New York for the same
reasons they are subject to long-arm jurisdiction under C.P.L.R. § 302(a)(3)(ii) – they engaged in
fraudulent transfers that caused injury solely in New York, and which they knew and intended to
have effects in New York. See Kernan v. Kurz-Hastings, Inc., 175 F.3d 236, 243 (2d Cir. 1999)
(satisfaction of C.P.L.R. § 302(a)(3)(ii) also establishes "minimum contacts"); CNN, L.P. v.
GoSMS.com, Inc., No. 00-4812, 2000 U.S. Dist. LEXIS 16156, at *14-16 (S.D.N.Y. Nov. 6,
2000) (same).

Further, the exercise of jurisdiction over Respondents is reasonable, and does not offend
notions of "fair play and substantial justice." Respondents do not claim any burden specific to
litigating in New York (as opposed to next-door Connecticut), and they have proven themselves
perfectly capable of litigating in this court. Indeed, lawyers for all of the Respondents appeared
at the November 22, 2013 hearing on Universitas' preliminary injunction motion, even though
the motion was brought against Mr. Carpenter. 1/24/14 Barnett Decl., Ex. 72. And GM Trust
requires arbitration in New York for a dispute with a beneficiary or participant. Kehoe Decl.,

18

SA-74

Ex. C at § 8.02(d).  This Court, moreover, has a strong interest in effectuating its judgment, which Mr. Carpenter and Mr. Bursey have sought to undermine by improperly transferring funds to the GM Trust and other Carpenter-controlled entities.

### c.  Universitas has timely turnover claims under New York and Connecticut law

Respondents seek the application of Connecticut law for the sole purpose of availing themselves of that state's four-year statute of limitations ("SOL") on fraudulent conveyances (as compared to New York's six-year SOL).[4]  They do not assert any other difference between the states' respective fraudulent transfer laws.  See, e.g., GM Trust Br. at 8-11.  Accordingly, in this section (c), Universitas will explain why its claims are timely under either state's law.  In the next section (d), it will address the merits of its claims under New York law only.

#### i.  New York's statute of limitations applies to Universitas' claims

New York law applies to Universitas' claims for two reasons.[5]  First, it is the agreement between Mr. Spencer and GMC that – according to Mr. Carpenter – gave GMC the right to seize the entirety of the Spencer proceeds, which it then transferred to the other Respondents.  11/20/13 Carpenter Aff., Ex. G at p. 3 ¶ 19.  New York law governs this agreement (id.), and it therefore governs the propriety of Mr. Carpenter's transfers to and from the various Respondents.  This Court, moreover, has already applied New York law to determine the validity of many of these transfers.  Universitas Educ., LLC, 2013 U.S. Dist. LEXIS 165803, at *25 n.6.

The contractual provision for New York law is dispositive.  The application of New York law is also mandated by a choice of law analysis.  The court should apply New York's interest-analysis test to determine which state's law should apply to Universitas' fraudulent conveyance

---

[4] Connecticut's time limit for asserting fraudulent transfers is often referred to as a statute of repose.

[5] Universitas assumes that Connecticut's SOL is substantive law and not procedural.

19

claims.  Geron v. Seyfarth Shaw LLP, 736 F.3d 213, 219 (2d Cir. 2013).  "Under this

formulation,  the significant contacts are, almost exclusively, the parties' domiciles and the locus

of the tort."  Id. at 219-20 (internal quotations and citation omitted).  Further, for conduct-

regulating laws such as those regarding fraudulent conveyances, the law of the state in which the

tort occurred will generally apply.  Id. at 220.  "For claims based on fraud, **the locus of the tort**

**is generally deemed to be the place where the injury was inflicted**, **rather than where the**

**fraudulent act originated**."  Id. (emphasis added).  Injury was inflicted on Universitas in New

York, and nowhere else.  Since the parties are domiciled in New York and Connecticut,

respectively, the New York locus of the tort mandates the application of New York's SOL.  See

also Lyman Commerce Solutions, Inc. v. Lung, No. 12-4398, 2013 U.S. Dist. LEXIS 124689, at

*9-10 (S.D.N.Y. Aug. 30, 2013) (applying New York law to fraudulent conveyance claims,

because "[a] tort occurs in the place where the injury was inflicted, which is generally where the

plaintiffs are located"); Eclaire Advisor Ltd. v. Daewoo Eng'g & Constr. Co., 375 F. Supp. 2d

257, 267-68 (S.D.N.Y. 2005) (applying New York law to fraudulent conveyance claims, as New

York was the situs of injury, and "it is established that New York has an especially strong

interest in applying its law when one of its domiciliaries alleges that it has been defrauded," even

when the debtor is situated in another state) (internal citation, quotations omitted);  JSC Foreign

Econ. Ass'n Technostroyexport v. Int'l Dev. & Trade Servs., 295 F. Supp. 2d 366, 381-82

(S.D.N.Y. 2003) (finding that Russian law applied to constructive fraud claims because that was

"where the plaintiff resides and incurred the economic injury"); Global Fin. Corp. v. Triarc

Corp., 715 N.E.2d 482, 485 (N.Y. 1999) (applying same principle).

    In asserting that Connecticut law applies, Respondents first cite to Pension Comm. of the

Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC, 446 F. Supp. 2d 163, 192 (S.D.N.Y.

SA-76

2006), which says that the law governing a tort is that of "the place where the injury was inflicted, which is generally where the plaintiffs are located" (internal quotations, citation omitted).  This supports Universitas' argument that New York law applies.  Their next substantive citation is to Globalnet Financial.com, Inc. v. Frank Crystal & Co., 449 F.3d 377, 384-85 (2d Cir. 2006), which affirmed the district court's application of New York law to a tort claim of professional negligence, finding that the tort occurred in New York.  Again, this supports Universitas' position, where, as established by the Second Circuit's recent decision in Geron, 736 F.3d at 219, as well as a host of other cases, the tort of fraudulent conveyance occurred in New York because that is where injury was inflicted; where a professional negligence tort occurs is irrelevant to this case.  Respondents cite GFL Advantage Fund, Ltd. v. Colkitt, No. 03 Civ. 1256, 2003 U.S. Dist. LEXIS 10643, at *9-10 (S.D.N.Y. June 23, 2003), for the proposition that "parties … have a reasonable expectation that their activities would be governed by the law of the state in which they are located and reside."  But this, standing alone, is not helpful since Universitas and Respondents reside in different states.  GFL Advantage Fund, moreover, applied Pennsylvania law where the fraudulent conveyance occurred in Pennsylvania, and the only other option was to apply the law of the British Virgin Islands or the Netherland Antilles, where the petitioner was domiciled, and which seemed to have no relationship to the claims at issue.  To the extent GFL Advantage Fund goes against the weight of caselaw holding that "the locus of the tort is generally deemed to be the place where the injury was inflicted, rather than where the fraudulent act originated," it has been superseded by the Second Circuit's recent holding in Geron, 736 F.3d at 219.  Geron should also drain any import from Respondents' final citation, to United Feature Syndicate, Inc. v. Miller Features Syndicate, Inc., 216 F. Supp. 2d 198, 215-16 (S.D.N.Y. 2002), which found Canadian law to apply to

21

SA-77

fraudulent transfers executed in Canada but causing injury in New York.

The application of New York law can come as no surprise to Respondents, since (1) New York law governed the agreement between Mr. Spencer and GMC (which Mr. Carpenter claims gave him the right to seize the Spencer proceeds), and (2) Respondents were knowingly and intentionally causing injury to a New York-based entity.  In fact, given that Mr. Carpenter claims that GMC's agreement with Mr. Spencer sanctioned the transfers at issue, it would be an injustice to apply any other state's law since Mr. Carpenter has purported to rely on New York law to govern his conduct.  Padula v. Lilarn Props. Corp., 84 N.Y.2d 519, 522 (1994).

### ii.  Universitas has timely claims under Connecticut law

Even if Connecticut law applied, Universitas would have timely claims, for two independent reasons that Respondents do not even address in their briefs.  First, even if Connecticut's time limit on filing fraudulent transfer claims is four years, that limit is tolled where a fraudulent conveyance has been fraudulently concealed; in such a case, the time period in which a plaintiff/petitioner must file a claim only begins to run when it discovers the transfer.  This is statutory law:

> If any person, liable to an action by another, fraudulently conceals from him the existence of the cause of such action, such cause of action shall be deemed to accrue against such person so liable therefor at the time when the person entitled to sue thereon first discovers its existence.

Conn. Gen. Stat. §52-595.  This statutory provision has been applied to the statute of repose for fraudulent transfers, at Conn. Gen. Stat. 52-552j.  See, e.g., Cadle Co. v. Ogalin, 495 F. Supp. 2d 278, 287, 289 (D. Conn. 2007) (upholding jury verdict applying fraudulent concealment statute to the fraudulent conveyance statute);  Epperson v. Entm't Express, Inc., 338 F. Supp. 2d 328, 345 (D. Conn. 2004) (dismissing fraudulent transfer claims, while noting that "[g]iven the Connecticut Supreme Court's reluctance to draw a distinction between statutes of repose and

22

statutes of limitation …, and its mandate to broadly apply Section 52-595, the court finds that plaintiffs may request the relief afforded by Section 52-595 despite the fact that Section 52-552j is a statute of repose"), aff'd, 159 F. Appx. 249 (2d Cir. 2005); see also Connell v. Colwell, 214 Conn. 242, 246 (Conn. 1990) (applying fraudulent concealment statute to toll a statute of repose).

Mr. Carpenter and Mr. Bursey went to great lengths to conceal the fraudulent transfers of Universitas' money for years. See, e.g., 10/9/13 Barnett Decl. at ¶¶42-65. This was accomplished by fraud – for example, by the submission of sworn statements in the underlying arbitration, by Mr. Bursey and Jack E. Robinson, in November 2010, in which they swore that Nova had assets sufficient to satisfy an award of at least $30 million. 1/24/14 Barnett Decl., Exs. 73-74. Further, as this Court has found in two Opinions (dkt. nos. 340 and 366), Mr. Carpenter orchestrated an elaborate shell game in order to fraudulently divert Universitas' money to himself, and then perpetuated the fraud by concealing these transfers.

Universitas did not even begin to discover the fraudulent transfers until November 30, 2012, when TD Bank made a document production following a Court Order dated November 21 that found that Nova had "resisted all efforts" to enforce Universitas' judgment in this action, and Nova's principals and attorneys had improperly threatened third parties from which Universitas had sought discovery. 11/21/12 Order at 1-2, 8 (dkt. no. 176). See also 1/24/14 Barnett Decl. Ex. 75 (November 30, 2012 letter from TD Bank attorney indicating transmission to Universitas' counsel of documents showing the transfers of a total of $30.7 from the Charter Oak Trust to GMC). Since Universitas only began to uncover the fraudulent transfers in November 2012 at the earliest, its' turnover motion, made in October 2013, falls well within the four-year time limit prescribed by Conn. Gen. Stat. 52-552j.

23

**SA-79**

The Connecticut statute of repose for fraudulent conveyances provides a second and independent reason why Universitas' claims are not time-barred even if Connecticut law applies. Section 52-552j provides that where a transfer is made with actual intent to defraud (and thus falls within Conn. Gen. Stat. 52-552e(a)(1)), the time limitation is either "four years after the transfer was made or the obligation was incurred **or, if later, within one year after the transfer or obligation was or could have reasonably have been discovered by the claimant**" (emphasis added).   See also Carney v. Lopez, 933 F. Supp. 2d 365, 386 (D. Conn. 2013) (denying defendant's motion to dismiss actual fraud claim brought in 2012, within one year of discovery of a fraudulent transfer that occurred in 2008).

As Universitas has demonstrated, and as this Court has found, Mr. Carpenter transferred funds with the actual intent to defraud Universitas.  2013 U.S. Dist. LEXIS 165803, at * 28-34. Further, as already discussed in this brief, Universitas could have only reasonably discovered the transfers at the time it actually discovered the transfers, in November 2012,  when – over Mr. Carpenter's vociferous objections and attempts to stop it – TD Bank produced documents that allowed Universitas to begin to uncover what Mr. Carpenter had done.  Since Universitas filed this motion in October 2013 (less than a year from November 30, 2012), and the transfers in question were made with actual intent to defraud Universitas, this action complies with the time limit prescribed by Section 52-552j.

> **d.  Universitas is entitled to a turnover Order and damages judgments against all Respondents**

Tellingly, Respondents spend much of their briefs arguing for the dismissal of Universitas' motion on baseless procedural and jurisdictional grounds.  They pay scant attention to the transfers at issue.  To the extent the merits are addressed, Respondents mainly rehash

24

SA-80

arguments the Court has already rejected.

**Respondents' "$4 million transfer" argument**.  Respondents argue that the fact that the Arbitrator found GMC to have validly received about $4 million from the Spencer proceeds means that Respondents somehow cannot be made liable for any of the money – totaling more than $30 million – transferred to them.  See, e.g., GM Trust Br. at 12-13.  The Court rejected this argument at the May 9, 2013 hearing in this action, and reiterated that rejection in its November 20, 2013 Order.  Universitas Educ., LLC, 2013 U.S. Dist. LEXIS 165803, at *38 (describing this argument as "illogical").

**Respondents' "antecedent debt" argument**.  Respondents assert that the Charter Oak Trust owed GMC $50 million or $60 million at the time the Trust received the Spencer proceeds (Carpenter et al. Br. at 7, dkt. no. 339), but offer no evidence to (a) support a debt in any amount (other than $4 million owed to GMC, which the Trust repaid) or (b) to establish that the Spencer proceeds were validly transferred to GMC in consideration of this "debt."  The Court has rejected Mr. Carpenter's "antecedent debt" argument before (see, e.g., 2013 U.S. Dist. LEXIS 165803, at * 37-38), and, respectfully, should do so again.

**GM Trust's "antecedent debt" argument**.  GM Trust argues that since it "loaned" money to GMC in 2006 and 2007 (before Mr. Spencer died), GMC's transfers of money to GM Trust in 2009 were valid repayments of antecedent debts.  GM Trust Br. at 14-15.  This argument ignores what Universitas has said all along about any alleged loans – that even if there were repayments of real debts, the money used to repay these debts was stolen from Nova and the Charter Oak Trust, and both GMC (aka Mr. Carpenter) and the GM Trust (aka Mr. Carpenter and Mr. Bursey) obviously knew it at the time of the "loan repayments."  See, e.g., 10/9/13 Barnett Decl. at ¶¶ 66-70.

25

SA-81

A conveyance of improperly transferred funds is not insulated from attack simply because the funds are subsequently used to pay an antecedent debt.  Conveyances made with actual intent to defraud, for instance, are fraudulent regardless of whether a conveyance was supported by consideration in the form of an antecedent debt.  See NY CLS Dr & Cr § 276; HBE Leasing, 48 F.3d at 633-34.

Additionally, GM Trust has failed to establish that any of the transfers between it and Mr. Carpenter's various entities were legitimate and, as such, support a finding of fair consideration. It is obvious that all of these transfers (even the ones in 2006 and 2007), while papered as "loans," were in actuality unlawful transfers to and from Mr. Carpenter, from and to Ms. Carpenter.  1/24/14 Barnett Decl., Ex. 65 at 12 (only Ms. Carpenter's approval was needed for GM Trust wire transfers).  Since Mr. Carpenter was an insider of GM Trust and GMC, any "loans" to GMC cannot qualify as antecedent debts and therefore cannot support a finding of "fair consideration."  GM Trust even cites a case that supports this conclusion.  See Atlanta Shipping Corp. v. Chemical Bank, 818 F.2d 240, 248-49 (2d Cir. 1987) ("[i]n general, repayment of an antecedent debt constitutes fair consideration unless the transferee is an officer, director, or major shareholder of the transferor").

**GM Trust's "other funds" argument**.  GM Trust argues that since GMC had received funds from other sources by December 2009, when GMC transferred $688,125.00 to GM Trust, that money cannot be definitively said to have come from Nova and/or the Charter Oak Trust. GM Trust Br. at 15.  This argument is unsupported by factual assertions, let alone evidence – GM Trust does not identify the other funds it is talking about – and in any event ignores the standards for money-tracing when funds are commingled.   The commingling of misappropriated monies with funds that may have legitimate sources does not "clean" the former, and cannot

26

SA-82

defeat a creditor's tracing of misappropriated monies.  See United States v. Henshaw, 388 F.3d 738, 741 (10th Cir. 2004); In re Bernard L. Madoff Inv. Sec. LLC, No. 08-01789, 2012 Bankr. LEXIS 1088, at *8 (Bankr. S.D.N.Y. Mar. 14, 2012).

**Universitas has established Respondents' fraudulent intent.**  GM Trust argues that "Universitas has not adduced any evidence that Grist Mill Capital retained control over the funds once they were transferred to Grist Mill Trust."  GM Trust Br. at 15.  This is incorrect.  For instance, after GMC (aka Mr. Carpenter) made a $3.8 million "loan repayment" to GM Trust on June 9, 2009, GM Trust made another "loan," of $2.7 million, to Phoenix (Mr. Carpenter) on June 12, with Phoenix, in turn, sending $2.5 million of this "loan" right back to GMC (aka Mr. Carpenter).  See 2013 U.S. Dist. LEXIS 165803, at *15-16.

This is, of course, the $2.7 million "loan" to Phoenix that enabled Mr. Carpenter to purchase a $1.1 million vacation property in Rhode Island.  See 2013 U.S. Dist. LEXIS 165803, *15-16.  Tellingly, this $2.7 million "loan" is not mentioned in Ms. Kehoe's Declaration, nor in GM Trust's opposition brief, nor in the other Respondents' brief.  This is just one example of how Mr. Carpenter – whether he's called GMC, Phoenix, etc. – retained control over Universitas' money at all times, including when the Grist Mill Trust received part of it.

Beyond these facts, the badges of actual fraud are many, and Universitas has also established that the transfers to Respondents, as orchestrated by Mr. Carpenter and Mr. Bursey, were constructively fraudulent.   The transfers of the Spencer insurance proceeds that Mr. Carpenter orchestrated, which initially were transfers from the Charter Oak Trust to GMC, were made without any consideration being provided to Nova and/or the Charter Oak Trust.  2013 U.S. Dist. LEXIS 165803, *18.  And neither Mr. Carpenter nor anyone else has offered any legitimate rationale for these transfers.  Id. at 9.  Mr. Carpenter asserts that he (acting through

27

SA-83

GMC) validly seized the entirety of the Spencer life insurance proceeds ($30.7 million paid by Lincoln Life) pursuant to a security interest that GMC purportedly held on all of Nova and the Charter Oak Trust's assets. Yet Mr. Carpenter has not established that GMC loaned any amount to the Charter Oak Trust that has gone unpaid, especially as of May 2009 and October 2009, when he seized the Spencer insurance proceeds.  2013 U.S. Dist. LEXIS 165803, at *37.

Respondents' assertions do not hold up to even superficial scrutiny.  For instance, Respondents claim that "[o]n or about May 22, 2009, GMC transferred $2.1 million to GMH "to repay some of the money owed by GMC to Grist Mill Holdings."  Carpenter et al. Br. at 6 (dkt. no. 339).  Yet Mr. Carpenter has testified to controlling both of these entities, going so far as to say GMH is his alter ego.  Universitas Educ., LLC, 2013 U.S. Dist. LEXIS 165803, at *11-12. Respondents do not explain how Mr. Carpenter could owe money to himself, and their blithe assertion that GMC (aka Mr. Carpenter) repaid GMH (aka Mr. Carpenter) is troubling.

**e.  Universitas is further entitled to permanent injunctive relief against all Respondents**

If this case has established anything, it is that, unfortunately, a monetary judgment cannot adequately compensate Universitas where Mr. Carpenter has sought to undermine that judgment at every juncture.  Universitas already has a monetary judgment, against Nova, and yet Nova itself has not paid a dime of the judgment, and Universitas has demonstrated how Mr. Carpenter defrauded Universitas by transferring trust funds to other entities, including to GM Trust and the other Respondents.  As Mr. Carpenter has dispersed Nova's assets to Respondents and to parts unknown, has shown no willingness to stop frustrating Universitas' judgment enforcement efforts (see, e.g., 10/9/13 Barnett Decl. at ¶¶12-20), and is awaiting sentencing in one criminal case and has just been indicted in another, Universitas faces irreparable harm in that its existing

28

judgment, and any other damages judgment it receives, may never be satisfied unless Mr.

Carpenter and the other Respondents are permanently enjoined from further transfers of assets.

See, e.g., <u>325 Bleecker, Inc. v. Local Union No. 747, United Bhd. of Carpenters & Joiners of</u>

<u>Am.</u>, 500 F. Supp. 2d 110, 124 (N.D.N.Y. 2007); <u>Jones v. Dana</u>, 06 Civ. 0159, 2006 U.S. Dist.

LEXIS 25293, at *86-88 (S.D.N.Y. May 3, 2006).

There are no prospective or theoretical injuries here.  The injuries are well-documented.

Mr. Carpenter has already undermined this Court's judgment, and the judgment will be further

undermined unless (a) a turnover Order and damages judgment is entered against all

Respondents, <u>and</u> (b) a permanent injunction Order is issued against all Respondents.


Dated: January 24, 2013
New York, New York


LOEB & LOEB LLP


By: /s/ Michael Barnett                    .
    Paula K. Colbath (PC-9895)
    Michael Barnett (MB-7686)
    345 Park Avenue
    New York, New York 10154-1895
    (212) 407-4000

    *Attorneys for Judgment Creditor*
    *Universitas Education, LLC*

29

SA-85

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
---------------------------------------------------------------X

UNIVERSITAS EDUCATION, LLC,

                        Judgment Creditor,

          -against-

NOVA GROUP, INC., as trustee, sponsor and
fiduciary of THE CHARTER OAK TRUST
WELFARE BENEFIT PLAN,

                        Judgment Debtor,

          -and-

Daniel E. Carpenter, Charter Oak Trust Welfare
Benefit Plan, Grist Mill Capital, LLC, Grist Mill
Holdings, LLC, the Grist Mill Trust Welfare
Benefit Plan, Avon Capital, LLC, Hanover Trust
Company, Carpenter Financial Group and Phoenix
Capital Management, LLC,

                        Respondents.
---------------------------------------------------------------X

Case Nos. 11 CV 1590-LTS-HBP and
11-8726-LTS

 

**PETITIONER'S SUPPLEMENTAL MEMORANDUM IN SUPPORT OF ITS**

**APPLICATION FOR TURNOVER AND PERMANENT INJUNCTION**

 

LOEB & LOEB LLP
345 Park Avenue
New York, New York 10154-1895
(212) 407-4000

*Attorneys for Judgment Creditor*
*Universitas Education, LLC*

Petitioner/Judgment Creditor Universitas Education, LLC ("Universitas"), through its
attorneys Loeb & Loeb LLP, submits this supplemental memorandum in further support of its
motion for a turnover and permanent injunction against the Respondents.  Universitas submits
this memorandum pursuant to the Court's Order dated May 23 (Dkt. No. 441).

## A.  UNIVERSITAS HAS MET THE STANDARD FOR A PERMANENT

## INJUNCTION

The standards for a preliminary injunction and a permanent injunction, respectively, are
the same, except that a party requesting permanent injunctive relief must show actual success on
the merits.  Entergy Nuclear Vt. Yankee, LLC v. Shumlin, 733 F.3d 393, 422-423 (2d Cir. 2013);
Ognibene v. Parkes, 671 F.3d 174, 182 (2d Cir. 2011), cert. denied, 133 S. Ct. 28 (2012).  That
is, in addition to showing actual success, a petitioner for a permanent injunction must show that
it has or is likely to suffer irreparable injury absent injunctive relief, that monetary damages are
consequently inadequate, and that the balance of equities and the public interest favor, or do not
weigh against, an injunction.  See Entergy Nuclear Vt. Yankee, 733 F.3d at 422-423.

Universitas satisfies all elements.  Universitas first assumes for the purposes of this brief
that it has succeeded on the merits of its turnover claims.  Second, as the Court already found in
granting Universitas's preliminary injunction motion, Universitas has shown that it will suffer
irreparable harm absent injunctive relief.  Universitas Educ., LLC v. Nova Group, Inc., 2014
U.S. Dist. LEXIS 3983, at *23-26 (S.D.N.Y. Jan. 13, 2014).  This Court found that Respondent
Daniel E. Carpenter has, through the Respondent entities, "received fraudulent conveyances of
the Life Insurance Proceeds," "has taken great pains to hide the funds," and "has offered no
credible evidence to overcome the strong inference that he is further dissipating these funds, or
their proceeds, to defeat Petitioner's efforts to satisfy the Judgment."  Id.  at *24-25.  These same

findings, made less than five months ago, support the entry of a permanent injunction, as there has been no abatement in Mr. Carpenter's persistent efforts to frustrate Universitas.  See NML Capital, Ltd. v. Republic of Arg., 699 F.3d 246, 262 (2d Cir. 2012) (affirming entry of permanent injunction and order of specific performance, noting that an award of monetary damages is inadequate where "a party[ ] [engages in] persistent efforts to frustrate the collection of money judgments") (citing Pashaian v. Eccelston Props., Ltd., 88 F.3d 77, 87 (2d Cir. 1996)).[1]

If anything, Mr. Carpenter's efforts to frustrate Universitas have increased since the Court entered its January 13, 2014 Preliminary Injunction Order ("PI Order"), for which Mr. Carpenter has repeatedly shown contempt.

In February, the Court was compelled to hold an emergency hearing because Mr. Carpenter, acting through his entity Grist Mill Partners, LLC ("GMP"), initially refused to consent to the submission and entry of a proposed Order modifying the PI Order so that certain monies paid by Curaleaf, LLC ("Curaleaf") to GMP could be secured during the pendency of Universitas's permanent injunction and turnover motion.  See Dkt. No. 375.  In fact, it was Curaleaf that first sought the Court's approval of the transaction, having fortuitously found out about the PI Order (and not from Mr. Carpenter).  See Dkt. No. 260 at 5 in Case No. 11-8726 ("Late on February 5, 2014, Curaleaf learned for the first time of the Injunction issued on January 13, 2014").  It is apparent that Mr. Carpenter would have completed the Curaleaf

---

[1] The Supreme Court's decision in Grupo Mexicano, which was inapplicable to Universitas's preliminary injunction motion, is also inapplicable to an application for a permanent injunction.  In fact, in that case, the Supreme Court appeared to endorse the use of a permanent injunction (as opposed to a preliminary injunction) to secure payment of a money judgment.  See Grupo Mexicano De Desarrollo v. Alliance Bond Fund, Inc., 527 U.S. 308, 317-318 (1999) ("Petitioners do not contest the District Court's power to issue a permanent injunction after rendering a money judgment against them,  but they do contest its power to issue a preliminary injunction, and they do so on a ground that has nothing to do with the validity of the permanent injunction").

SA-88

transaction – in which Curaleaf has now received, with the Court's permission, an exclusive option to purchase a commercial building worth millions – without mentioning the PI Order to it, or informing the Court or Universitas.

Also in February, one of Mr. Carpenter's many companies (the Boston Property Exchange Transfer Company, or "BPETCO") received a monetary settlement in a litigation with Merrill Lynch. Merrill Lynch issued a check to BPETCO and sent it to BPETCO's attorney, Joseph M. Pastore. Notwithstanding the PI Order, Mr. Carpenter immediately pressed Mr. Pastore to transfer the check to him, even though he could not demonstrate that a bank account in BPETCO's name even existed. In response to Mr. Pastore's application to transfer the check to Mr. Carpenter (which Universitas opposed), the Court found that the settlement amount payable to BPETCO was subject to the PI Order, and ordered Mr. Pastore to maintain custody of the check and to confer with Universitas regarding where the check should be deposited. Dkt. No. 400.

Then in April, another Carpenter entity, Carpenter Financial Group, Inc. ("CFG"), petitioned the Court to release $900,000 from the BPETCO-Merrill settlement proceeds so that Mr. Carpenter could pay for attorneys to represent him in various criminal and civil litigations. Dkt. No. 409. This petition (which is *sub judice*) was itself further evidence of the PI Order's necessity, as it showed Mr. Carpenter to still be playing shell games by having CFG ask the Court to release an injunction on the transfer of monies payable to BPETCO, so that BPETCO can presumably transfer money to Mr. Carpenter, so that Mr. Carpenter can defend himself in several criminal and civil litigations.

The strong likelihood of irreparable harm is bolstered by Mr. Carpenter's criminal troubles. Mr. Carpenter is scheduled to report to a minimum-security prison this month to begin

a three-year sentence on fraud convictions.  See Exhibit A to the June 15, 2014 Declaration of

Michael Barnett ("6/15/14 Barnett Decl.").   He has also been indicted on 57 counts in an

insurance fraud case in the District of Connecticut – including for acts committed in this case.

According to a May 14, 2014 superseding indictment, Mr. Carpenter and his brother-in-law

Wayne H. Bursey face the following charges for acts committed in this case – one count of

conspiracy to commit money laundering, 10 counts of money laundering, and 13 counts of illegal

monetary transactions.  See 6/11/14 Barnett Decl. Ex. B (showing counts 34 through 57 of the

indictment, all relating to this case).

There is thus the likelihood that Mr. Carpenter will not be sufficiently deterred from

frustrating Universitas's judgment(s), as he will already be in prison, and faces the possibility of

being there for many years to come as a result of, among other things, his misappropriation of

Universitas's money.

With success assumed and Universitas having demonstrated a strong likelihood of

irreparable harm, the balance of equities and the public interest also strongly favor a permanent

injunction.  As to the equities, Mr. Carpenter has fraudulently transferred money payable to

Universitas, and continues to seek to undermine Court Orders and Universitas's efforts to

recover money.  Any arguable hardship to Mr. Carpenter results from his own conduct, which is

now the subject of an indictment.  The public interest, moreover, favors the satisfaction of

judgments and the effectuation of Court Orders.

While permanent injunctions are not granted as a matter of course, an injunction is

available and warranted where, as here, the judgment debtor to-be has committed himself to

defrauding creditors and/or has a track record of taking actions to frustrate judgments.  See, e.g.,

NML Capital, 699 F.3d 246 at 262 (citing Pashaian, 88 F.3d at 87); Yukos Capital S.A.R.L. v.

Samaraneftegaz, Case No. 10-6147-PAC, 2014 U.S. Dist. LEXIS 2831, at *9-11 (S.D.N.Y. Jan. 9, 2014) (entering restraining order pursuant to N.Y. C.P.L.R. § 5222 and a permanent injunction);[2] Global Naps v. Verizon New Eng., 706 F.3d 8, 11-14 (1st Cir. 2013) (affirming issuance of permanent injunction where, among other things, the principal person sought to be restrained  had "[o]ver the past decade … repeatedly … employed nefarious tactics to avoid meeting his responsibilities to others").

For the foregoing reasons, and for those stated in Universitas's moving and reply briefs, this Court should enter a permanent injunction against Mr. Carpenter and all entities that he controls or owns, directly or indirectly; such entities include but are not limited to all Respondent entities.

## B. RESPONDENTS SHOULD BE ORDERED TO RETITLE ANY INSURANCE POLICIES IMPROPERLY TRANSFERRED OUT OF THE TRUST

Universitas has asked the Court to:

> Direct[ ] the retitling of any insurance policies that were previously held by the Charter Oak Trust and improperly transferred to another entity, including the SunLife policy insuring the life of a woman with the last name Amsterdam (Policy Number 020158601).

Dkt. No. 308.

To be clear, Universitas asks the Court to direct the retitling of improperly or fraudulently transferred insurance policies to the extent any of these policies is active and now nominally owned by another Respondent.  As of the date of its motion papers, Universitas had identified

---

[2] As Yukos Capital demonstrates, Universitas's application for a permanent injunction is equivalent to a court's enforcement or upholding of a restraining notice.  See also Motorola Credit Corp. v. Uzan, No. 02 Civ. 666 (JSR), 2013 U.S. Dist. LEXIS 118882, at *27-29 (S.D.N.Y. Aug. 1, 2013) (under N.Y. C.P.L.R. § 5222, the judgment creditor was entitled to an injunction against the release of the judgment debtors' assets pending appeal of a third-party restraint issue).

one such policy, issued by Sun Life Financial insuring the life of a woman with the last name Amsterdam (Policy Number 020158601).

As Universitas has documented, and as the Court has found, this policy was transferred to Respondent Grist Mill Capital, LLC ("GMC") in March 2013, nine months after Universitas obtained a judgment against Nova in its capacity as trustee of the Charter Oak Trust, and after Universitas had served restraining notices on Nova, the Charter Oak Trust and GMC. Universitas, 2014 U.S. Dist. LEXIS 3983, at *14-15. Accordingly, the Charter Oak Trust and Grist Mill Capital should be ordered to retitle the Amsterdam policy – assuming it is still active – back into the name of the Trust. (If Universitas discovers an additional policy that requires retitling, it will bring any such policy to the Court's attention.)

## C. UNIVERSITAS IS ENTITLED TO PROCEEDS THAT THE TRUST RECEIVES IN ANY LITIGATION IN WHICH THE TRUST IS A PARTY

Universitas has also identified a pending Connecticut litigation – comprised of four related cases, each involving a separate insurance policy – in which the Charter Oak Trust is a defendant. The four insurance policies that are the subject of the Connecticut litigation between the Charter Oak Trust and PHL Variable Insurance Company are assets of the Charter Oak Trust. Accordingly, in the event that the Charter Oak Trust or any person or entity affiliated with it (or designated by it or its attorneys) receives a payment in connection with a settlement of the Connecticut litigation, that payment is an asset of the Charter Oak Trust that should be assigned to and/or paid over directly to Universitas, as any settlement monies are likely to be transferred out of the Trust by Mr. Carpenter or someone acting in concert with him. Accordingly, the Charter Oak Trust should be ordered to assign to Universitas its interest in any monies or assets the Trust receives in connection with any of the following actions pending in Connecticut

SA-92

Superior Court (Hartford County):

- PHL Variable Insurance Company v. Charter Oak Trust, Case No. 10-6009432

- PHL Variable Insurance Company v. Charter Oak Trust, Case No. 10-6010842

- PHL Variable Insurance Company v. Charter Oak Trust, Case No. 10-6011360

- PHL Variable Insurance Company v. Charter Oak Trust, Case No. 10-6012621


Dated: June 15, 2014
New York, New York

LOEB & LOEB LLP


By: /s/ Michael Barnett            .
    Paula K. Colbath (PC-9895)
    Michael Barnett (MB-7686)
    345 Park Avenue
    New York, New York 10154-1895
    (212) 407-4000

    *Attorneys for Judgment Creditor*
    *Universitas Education, LLC*

SA-93

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------x

UNIVERSITAS EDUCATION, LLC,

        Petitioner,

     -v-                                Nos.   11CV1590-LTS-HBP
                                              and
                                     11CV8726-LTS-HBP

NOVA GROUP, INC., as trustee, sponsor and
fiduciary of THE CHARTER OAK TRUST
WELFARE BENEFIT PLAN,

        Respondent.

--------------------------------------------------------x

<u>MEMORANDUM OPINION AND ORDER</u>

        Following entry of judgment in its favor in the above captioned-actions,

Universitas Education, LLC ("Petitioner") seeks, pursuant to New York Civil Practice Law and

Rules ("C.P.L.R.") section 5225(b) and Federal Rule of Civil Procedure 69, the turnover of

assets by respondent Daniel E. Carpenter and his affiliated entities Grist Mill Capital, LLC, Grist

Mill Holdings, LLC, the Grist Mill Trust Welfare Benefit Plan, Avon Capital, LLC, Hanover

Trust Company, Carpenter Financial Group and Phoenix Capital Management, LLC (with

Carpenter, the "Turnover Respondents"), as well as permanent injunctive relief barring the

transfer by the Turnover Respondents of money and assets, including certain specified insurance

policies, until Petitioner's judgment against Nova Group, Inc., has been satisfied.  (Docket entry

no. 308.)[1]

---

      [1]        Docket entry numbers in this Memorandum Opinion and Order refer exclusively to
those in case number 11 Civ. 1590.

The Court has jurisdiction of these proceedings pursuant to 28 U.S.C. §§ 1331, 1332(a)(1), 1441 and 1367.

Petitioner filed this motion for turnover against the Turnover Respondents on October 21, 2013.  The Court held an evidentiary hearing on November 22, 2013.  The Court heard oral argument regarding Petitioner's request for permanent injunctive relief on June 18, 2014.  Post-hearing submissions were completed on July 11, 2014.

On January 13, 2014, the Court granted Petitioner's related motion for a preliminary injunction barring Mr. Carpenter, his controlled entities, his entities' officers, agents, servants, employees, and attorneys, and other persons who are in active concert or participation with them, pending resolution of Petitioner's turnover motion, from directly or indirectly causing, making, permitting or suffering any sale, assignment or transfer of, or any interference with, any asset or property of Mr. Carpenter, and any asset or property of any company, corporation or other entity (including any trusts) in which Mr. Carpenter has a direct or indirect interest or control; provided that Mr. Carpenter is permitted to expend or transfer up to an aggregate amount of $20,000.00 per month solely for ordinary expenses of himself and all of the entities that are subject to the preliminary injunction.[2]  (Docket entry no. 366 (the "January Order").)

The Court has considered carefully all of the submissions and arguments of the parties, the documentary evidence, including transcripts of deposition testimony, and the courtroom testimony.  In accordance with Federal Rule of Civil Procedure 52(a), this Memorandum Opinion constitutes the Court's findings of fact and conclusions of law.  To the

---

[2]  Mr. Carpenter and certain third parties have moved to modify this temporary injunction to allow transactions between themselves and certain of the Turnover Respondents.  (See docket entry nos. 409, 412, and 448.)

SA-95

extent any finding of fact includes conclusions of law it is deemed a conclusion of law, and vice versa.  For the following reasons, Petitioner's motion is granted in part.

### FINDINGS OF FACT

This proceeding is the second turnover motion in the extensive litigation over the disposition of proceeds of two insurance policies on the life of the late Sash A. Spencer, who was the Chief Executive Officer of Holding Capital Group, Inc.  The Court's Memorandum Opinion and Order resolving Petitioner's first turnover motion (docket entry no. 341, the "November Order") discusses the underlying facts in this case in detail, familiarity with which is presumed.

Mr. Spencer named Petitioner the sole, irrevocable beneficiary of a Charter Oak Trust death benefit comprising the proceeds payable under the two life insurance policies, whose face values totaled more than $30 million (the "Insurance Proceeds").  Under the confirmed arbitration award upon which judgment against Nova (in its capacity as trustee of the Charter Oak Trust) has been entered, all but $4.02 million of the Insurance Proceeds are owed to Petitioner.  The Insurance Proceeds were paid to Charter Oak Trust and then removed from the Charter Oak Trust through a series of fourteen fraudulent transfers to other entities controlled, at all relevant times, by Mr. Carpenter.  (See November Order at 6.)

Control of the Turnover Respondent Entities

In the November Order, the Court found that Mr. Carpenter controlled, during the periods relevant to the transactions discussed therein (May 2009 to October 2010), Nova Group, Inc. ("Nova"), Charter Oak Trust ("Charter Oak"), Grist Mill Capital, LLC ("Grist Mill"), Grist Mill Trust Welfare Benefit Plan ("GM Trust"), Grist Mill Holdings, LLC ("GM Holdings"), Phoenix Capital Management, LLC ("Phoenix"), and Caroline Financial Group, Inc. ("Caroline

Financial"), as well as hundreds of other related entities.  The Court found that Mr. Carpenter

had used these shell entities to hide assets from Petitioner, Nova's judgment creditor.  Among

other things, the Court found that Wayne Bursey, who was President of Nova and Trustee of the

Charter Oak Trust, was Mr. Carpenter's confederate in the fraudulent transfers found in the

November Order.  The Court noted that, "[d]espite the fact that Mr. Bursey had earlier

acknowledged a fiduciary duty to pay Petitioner the trust funds, he proceeded to transfer the

entire amount of the Insurance Proceeds to Grist Mill over a period of six months while wrongly

denying Petitioner's claims."  (November Order at 18.)  The Court further found that this

transfer was designed to fraudulently benefit Mr. Carpenter.

        Mr. Bursey is also affiliated with GM Trust.  In a submission in opposition to the

instant motion practice, GM Trust asserts that it was not controlled by Mr. Carpenter during the

relevant period, proffering testimony by one Kathy Kehoe.  Ms. Kehoe, a member of the Trust

Department of Benistar Admin Services, Inc., which was the third-party administrator of GM

Trust, testified that Wayne H. Bursey is signatory trustee of Nova Benefit Plans, LLC, which is

the trustee and plan sponsor of GM Trust.  GM Trust argues that "the familial relationship

between Wayne H. Bursey and Dan Carpenter, standing alone, is not itself determinative of

fraud."  (Docket entry no. 337, pg. 23.)  The Court has reconsidered de novo the question of

control of GM Trust in light of the augmented record and concludes that GM Trust was under

Mr. Carpenter's control at all relevant times, notwithstanding Mr. Bursey's titular authority.  The

record as a whole, including but not limited to the nature and timing of Mr. Bursey's actions in

his various capacities, Mr. Carpenter's failure to offer credible justifications for the transfers,

and Mr. Bursey's failure to proffer any explanations at all, proves by a preponderance of the

evidence that GM Trust was under Mr. Carpenter's control at the time of the challenged transfers

of Insurance Proceeds.  Ms. Kehoe's testimony, which presents no facts inconsistent with actual

control by Mr. Carpenter, is insufficient to overcome Petitioner's proof.

   The credible evidence of record also proves that the remaining Turnover

Respondents, Avon Capital, LLC ("Avon") and Carpenter Financial Group ("CFG"), were also

under Mr. Carpenter's control during the relevant transactions.  Mr. Carpenter controlled CFG,

serving as Chairman and Secretary during the relevant period.  (Docket entry no. 338, pg. 9.)

Avon was controlled by its managing member, Grist Mill, which is wholly owned by its

members Grist Mill Holdings and Caroline Financial Group, Inc., both of which were wholly

owned by Mr. Carpenter.  (See May 9, 2013 Tr. at 25:2-4; Docket entry no. 223 at Ex. 22 at

47:15-18 ("[GM Holdings] is my alter ego for collecting commissions.").)

   None of the entities controlled by Mr. Carpenter are New York entities.  Each

Turnover Respondent has waived the service requirements under Federal Rule of Civil

Procedure 4 and accepted service of the motion for turnover via e-mail.  (See docket entry no.

466.)

Fraudulent Conveyances to Mr. Carpenter's Entities

   In May 2009, the insurer paid Charter Oak Trust $30.67 million in Insurance

Proceeds, including interest, and Wayne H. Bursey signed for the deposit as trustee.  (November

Order at 3.)  In its November Order, the Court further found that Mr. Carpenter had fraudulently

transferred $8,677,276.75 and $2,186,566 (a total of $10.8 million) from Charter Oak Trust to

Grist Mill in May 2009 for his own benefit.  The Court found that, of these funds, $3.79 million

was then transferred from Grist Mill to GM Trust, $2.7 million was transferred from GM Trust

to Phoenix, $2.5 million was then transferred from GM Trust back to Grist Mill, $2.2 million

was transferred to GM Holdings, and that GM Holdings then transferred $1.2 million to

Hanover.  The Court held that each of these transfers was fraudulent under New York law.  The

Court has reconsidered <u>de novo</u> its findings with respect to these fraudulent transfers in light of

the record presented, and the additional arguments and evidence proffered by the Turnover

Respondents, and finds that Petitioner has proven by clear and convincing evidence that each of

these transfers was fraudulent.

       Petitioner has also proven that the following additional transfers were fraudulent.

On October 27, 2009, Mr. Carpenter caused $19.8 million to be transferred from the Charter Oak

Trust to Grist Mill's account.  (Nov. 22, 2013 Tr. at 27:8-24; Barnett Decl. Oct. 21, 2013 ¶ 56,

Ex. 31.)  Mr. Carpenter then caused $19 million to be transferred from Grist Mill to GM

Holdings the next day, on October 28, 2009.  (Barnett Decl. Oct. 21, 2013 ¶ 59, Ex. 35; Nov. 22,

2013 Tr. at 70:10-17.)  Grist Mill also transferred $6,710,065.92 to Avon on November 11,

2009, at the direction of Mr. Carpenter.  (Barnett Decl. Oct. 21, 2013 ¶ 59, Ex. 35.)  On

November 12, 2009, Mr. Carpenter caused GM Holdings to transfer $4,140,000 to CFG.

(Barnett Decl. Oct. 21, 2013 ¶ 60, Ex. 37; Nov. 22 Tr. 70:10-17.)  GM Holdings transferred an

additional $7 million to CFG on December 3, 2009.  (Barnett Decl. Oct. 21, 2013  ¶ 62, Ex. 40.)

On December 3, 2009, CFG transferred $5 million to Phoenix at the direction of Mr. Carpenter.

(Barnett Decl. Oct. 21, 2013 ¶ 62, Ex. 40.)  That same day, Grist Mill made two transfers to GM

Trust, in the amounts of $510,000 and $178,125.  (Barnett Decl. ¶¶ 63 and 64, Ex. 43.)  These

transfers were without documentation or consideration, a clear sign of fraud.  The haste and

rapid succession of the transfers is also indicative of fraudulent intent by the Turnover

Respondents.  Furthermore, Nova and Mr. Carpenter resisted all discovery efforts to determine

SA-99

the whereabouts of the Insurance Proceeds after the transfers, and such secrecy further indicates a fraudulent intent.  The Court finds that Petitioner has demonstrated by clear and convincing evidence that these transfers among Mr. Carpenter's entities were fraudulent.

No credible explanation for these transfers has been offered by the Turnover Respondents.  The Turnover Respondents offered Mr. Carpenter's testimony to explain the purpose of the series of transfers.  Mr. Carpenter's testimony largely mirrored the testimony that the Court had rejected as incredible in the November Order.  At the November 22, 2013, hearing in connection with the preliminary injunction and turnover motion practice, Mr. Carpenter again testified that certain pre-existing debts and security interests allowed Grist Mill to retain the benefit of the Spencer life insurance policies.  Mr. Carpenter testified, among other things, that Charter Oak Trust owed Grist Mill $60 million before the transfers of money it received in May and October 2009.  Carpenter's testimony in this regard was neither consistent with the documents of record nor credible.  Mr. Carpenter also testified incredibly that the transfer of $19.8 million from Charter Oak to Grist Mill was legal because of a "confidential settlement indemnity agreement" that, he alleged, allowed Grist Mill to retain the remaining proceeds of the Spencer policies.  (Nov. 22 Tr. 23:20-24.)  In the underlying arbitration proceeding in which Nova's liability to Petitioner for the Insurance Proceeds was initially determined, the arbitrator had rejected similar contentions advanced by Nova, and held, in the confirmed arbitration award, that the total amount payable to Grist Mill from the Insurance Proceeds was only $4.02 million, and that the remainder of the Insurance Proceeds, plus interest, were payable to Petitioner.

Mr. Carpenter asserted that the subsequent transfers, after Grist Mill received the Insurance Proceeds, among his other entities were made because the funds were required to pay

SA-100

life insurance premiums on policies held by Avon and GM Trust, and to ensure "tax-free receipt" of the Insurance Proceeds.  While there is no doubt that some of the funds eventually were applied in this fashion, neither the "tax free receipt" of the funds, nor the need to pay life insurance premiums, provides a justification for Mr. Carpenter's usurpation of the Insurance Proceeds.  These explanations, furthermore, do not demonstrate that the Insurance Proceeds were properly in possession of any of his entities other than the Charter Oak Trust, which was obligated to pay them to Petitioner.

Mr. Carpenter also asserted that the two transfers made from Grist Mill to GM Trust on December 3, 2009, totaling $688,125, were repayments of an antecedent debt, specifically stating that GM Trust had made certain payments to the IRS for a client of Grist Mill.  (Carpenter Aff. ¶ 39.)  The Court found in the January Order that these assertions were not credible.  GM Trust submitted the affidavit of Kathy Kehoe in support of the existence of these antecedent debts.  Ms. Kehoe's affidavit does not attempt to explain all of the transfers of GM Trust, as it does not explain the $2.7 million loan allegedly made from GM Trust to Phoenix in June 2009.  Nor does the affidavit demonstrate that Ms. Kehoe has personal knowledge of any facts regarding the transfers.  The affidavit appears to be based on the assertions of Mr. Carpenter and his wife.  At her deposition on January 7, 2014, Ms. Kehoe admitted that she was unaware of any loans made by Grist Mill Trust to anyone until six weeks prior to her deposition. (Docket entry no. 371, Ex. 65, at 109:5-7.)  Ms. Kehoe further testified that she asked certain questions of Ms. Carpenter in preparation of her affidavit.  (Docket entry no. 371, Ex. 65, at 23:1-22.)  Wayne Bursey appointed Ms. Kehoe to sign the affidavit on behalf of GM Trust and

SA-101

to serve as its deposition designee.  Ms. Kehoe's testimony lacks foundation, as she has not demonstrated personal knowledge of the transfers.

As the Court noted in the November Order, Grist Mill appointed Peter A. Goldman, Esq., as its agent to review documents and testify on its behalf in this case.  Mr. Goldman testified in May 2013 that he had been retained in an attempt to "determine what happened to $30 million." (May 9 Tr. at 120:20-22.)  Mr. Goldman further testified that he had reviewed certain records of Grist Mill, and that he had confirmed that there had been transfers totaling about $31 million from the Charter Oak Trust. (May 9, 2013 Tr. at 115:14-24.)  He reported that he could not explain why the Charter Oak Trust had made any of the three transfers to Grist Mill. (May 9, 2013 Tr. at 114:5-25, 115:21-25, 116:1-17.)  As to the $19.8 million that was transferred from Charter Oak Trust to Grist Mill in October 2009, Mr. Goldman reported that it was recorded in the Grist Mill's general ledger as an "unknown deposit." (May 9 Tr. at 118:19-20.)

Based upon its careful review of the entirety of the Record, the Court finds that Mr. Carpenter caused Nova, the Charter Oak Trust, and other affiliated entities, directly or indirectly, to transfer the Insurance Proceeds, to which Petitioner is entitled, to and through entities that he controlled, either directly or indirectly, all for the personal benefit of Mr. Carpenter and his affiliates and without consideration.

The testimony proffered by the Turnover Respondents fails to credibly refute Petitioner's demonstration of their fraudulent intent in engaging in the series of transfers of the Insurance Proceeds.

SA-102

CONCLUSIONS OF LAW

       For the following reasons, the Court concludes that it has jurisdiction over each Turnover Respondent and that each Turnover Respondent is liable, jointly and severally with each other Turnover Respondent, for a sum of money equal to the portion of the Insurance Proceeds of which it was a transferee.

Personal Jurisdiction and Service of Process

       The Turnover Respondents, other than Mr. Carpenter,[3] argue that the Court does not have personal jurisdiction over them because they are not New York domiciliaries and the New York long-arm statute is insufficient to render them subject to the Court's specific jurisdiction or, alternatively, that such exercise of jurisdiction would violate their Due Process rights.  The Turnover Respondents also argue that they were not served in accordance with Federal Rules of Civil Procedure.

       In New York, courts undertake a two part analysis to determine whether the exercise of personal jurisdiction of a defendant is proper: 1) the court must determine whether N.Y. C.P.L.R. sections 301 or 302 provide a basis for personal jurisdiction, and 2) if they do, the court must determine whether the exercise of personal jurisdiction over the defendant would offend the constitutional right to due process under the principles enunciated in International Shoe Company v. Washington, 326 U.S. 310 (1945), and its progeny.  See A.I. Trade Finance, Inc. v. Petra Bank, 989 F.2d 76, 82 (2d Cir. 1993).

       Specific jurisdiction may be exercised over non-domiciliaries who engage certain acts, including the commission of torts outside of New York which cause injury within the state,

---

    [3]     Mr. Carpenter has not challenged the Court's personal jurisdiction over him.

SA-103

so long as the tortfeasor regularly does business within New York or should reasonably expect that the tortious conduct will cause consequences within the New York and the tortfeasor "derives substantial revenue from interstate or international commerce."  N.Y. C.P.L.R. § 302(a)(3).

With respect to the applicability of the N.Y. C.P.L.R. section 302(a)(3) long-arm provision, the Turnover Respondents have only contested whether injury was caused within the state of New York and whether the Turnover Respondents should reasonably have expected their acts to have consequences in New York.

A fraudulent conveyance is a species of tort.  See Bank of Commc'ns v. Ocean Dev. Am., Inc., 07 Civ. 4628, 2010 WL 768881 (S.D.N.Y. Mar. 8, 2010).  Rendering a creditor unable to recover on a defaulted debt in New York through a fraudulent conveyance constitutes injury in New York that is reasonably foreseeable.  See Sunrise Indus. Joint Venture v. Ditric Optics, Inc., 873 F. Supp. 765, 771 (E.D.N.Y. 1995) ("[J]urisdiction under section 302(a)(3)(ii) is appropriate, because [defendant's] actions regarding the sale of [debtor's] assets and the subsequent transfer of the proceeds to [defendant] could reasonably have been expected to have had consequences in New York with respect to [plaintiff's] ability to" recover a debt.).

Here, the situs of the injury is New York, because the fraudulent conveyances impeded Petitioner's ability to enforce its New York judgment.  During the time period in which the conveyances at issue occurred, Mr. Carpenter both controlled the Turnover Respondents and acted as their principal or agent in accomplishing the transfers.  As the Court found in the November Order, the conveyances were accomplished at a time when Mr. Carpenter knew that Petitioner was asserting a right to the proceeds of the insurance policies and was considering

litigation.  (See November Order at 20.)  Mr. Carpenter was also aware that Petitioner would be required to arbitrate any claims arising from a dispute over the Insurance Proceeds in New York, and that any confirmed award would result in a New York judgment.  The conveyances were thus actions taken on behalf of the Turnover Respondents by Mr. Carpenter and designed fraudulently to render the prospective New York judgment unrecoverable, despite the fact that the actions may have been performed in Connecticut.  Therefore, the Turnover Respondents should reasonably have expected their actions to create an injury in New York.  See Bank of Commc'ns, 2010 WL 768881, at * 3 (exercising personal jurisdiction over defendant, in fraudulent conveyance action, that purchased without fair consideration California warehouse from debtor during pendency of New York litigation); Sunrise Indus., 873 F. Supp. at 771.

To comply with the Due Process Clause of the Constitution, a court must only exercise personal jurisdiction over a defendant whose "conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there."  Burger King Corp. v. Rudzewicz, 471 U.S. 462, 474, 105 (1985) (quoting World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297 (1980)).  The conduct of tortious activity targeted at a New York entity and a New York judgment suffices to demonstrate that the Turnover Respondents should reasonably have anticipated being haled into court here.

The Court must go on to consider whether the assertion of jurisdiction "comports with 'traditional notions of fair play and substantial justice' – that is, whether it is reasonable under the circumstances of a particular case."  Metro. Life Ins. Co. v. Robertson-Ceco Corp., 84 F.3d 560, 568 (2d Cir. 1996) (quoting International Shoe, 326 U.S. at 316).  "[I]n assessing whether it may exercise jurisdiction over a particular defendant, a court must weigh the relative

SA-105

strengths and weaknesses of each requirement—that is, depending upon the strength of the defendant's contacts with the forum state, the reasonableness component of the constitutional test may have a greater or lesser effect on the outcome of the due process inquiry." Metro. Life, 84 F.3d at 568.

Five reasonableness factors are relevant to this inquiry: "(1) the burden that the exercise of jurisdiction will impose on the defendant; (2) the interests of the forum state in adjudicating the case; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of the controversy; and (5) the shared interest of the states in furthering substantive social policies." Metro. Life, 84 F.3d at 568 (citing Asahi Metal Indus. Co. v. Superior Court of California, Solano Cnty., 480 U.S. 102, 113 (1987)).

First, the burden on the Turnover Respondents is light. The Turnover Respondents are entities formed in Delaware and Connecticut, with offices in Simsbury, Connecticut, and can easily be represented in New York. Second, New York has a strong interest in protecting people within its borders from fraud and protecting the legitimacy of its court judgments. The third factor is neutral, because Petitioner could have sought relief in nearby Connecticut. Fourth, if the Court were to find that a fraudulent conveyance tortfeasor could be haled into court only where the actions took place, rather than where the harm was focused, a tortfeasor would have ultimate control over where suit might be brought, and might spread suits among a variety of jurisdictions. Fifth, the states have a shared interest in preventing fraudulent conveyances. See 7-Eleven, Inc. v. Upadhyaya, 926 F. Supp. 2d 614, 631 (E.D. Pa. 2013) (holding that fraud prevention is in the public interest). The factors, thus, weigh

SA-106

in favor of the reasonableness of the Court's exercise of jurisdiction over the Turnover Respondents.

The Turnover Respondents' final objection to the exercise of jurisdiction – insufficiency of process – is meritless.  Petitioner filed a certification verifying that each of the Turnover Respondents agreed to accept, and accepted, service by e-mail.  The Turnover Respondents do not contest the veracity of this certification.

The Court thus has personal jurisdiction over the Turnover Respondents pursuant to C.P.L.R. section 302(a)(3), and this exercise of jurisdiction comports with the Due Process Clause of the Fourteenth Amendment to the Constitution.

<u>Necessity of a Special Proceeding</u>

Under New York law, which is made applicable in this Court by Federal Rule of Civil Procedure 69, a judgment creditor may seek the turnover of property not in possession of the judgment debtor, in which the judgment debtor has an interest, through a special proceeding. <u>See</u> N.Y. C.P.L.R. 5225(b) (McKinney 2012).  The Turnover Respondents raise a further procedural objection to Petitioner's instant motion practice against them, arguing that Petitioner was required to commence a separate special proceeding against them, since they were not parties to the underlying litigation, and could not properly initiate this C.P.L.R. 5225(b) turnover proceeding as post-judgment motion practice in the above-captioned actions.

The Court has already held in this case that a judgment debtor in federal court may initiate a turnover proceeding by motion, rather than by initiating a new proceeding.  <u>See</u> November Order, at 13-14.  The Turnover Respondents raise no arguments that the Court has not previously considered.  Furthermore, courts in this Circuit have consistently held that, because

SA-107

there is no provision for a "special proceeding" under the Federal Rules of Civil Procedure, it is appropriate to seek a turnover order against a third-party through motion practice.  See, e.g., N. Mariana Islands v. Millard, 845 F. Supp. 2d 579, 581 (S.D.N.Y. 2012) (noting that "[n]early every court in this Circuit to consider the issue has held that parties can bring a motion under FRCP 69(a), rather than instituting a special proceeding under New York state law.").  Turnover Respondents' objection to the use of the motion procedure is therefore meritless.

<u>Merits of Turnover Motion</u>

Federal Rule of Civil Procedure 69 requires that a money judgment be enforced by a writ of execution and provides that "the procedure on execution . . . must accord with the procedure of the state where the court is located."  Under New York law, "[a] judgment creditor may use Section 5225(b) 'as the means to set aside a transfer made by a judgment debtor to defraud his creditors.'"  <u>Leser v. U.S. Bank Nat. Ass'n</u>, 09 Civ. 2362, 2013 WL 3788877, at *8 (E.D.N.Y. July 18, 2013) (quoting <u>Gelbard v. Esses</u>, 96 A.D. 2d 573, 465 N.Y.S. 2d 264, 267 (N.Y. App. Div. 2d Dep't 1983)).  A judgment creditor may move for turnover of property not in possession of the judgment debtor, in which the judgment debtor has an interest, where "it is shown that the judgment debtor is entitled to the possession of such property or that the judgment creditor's rights to the property are superior to those of the transferee."  N.Y. C.P.L.R. 5225(b) (McKinney 1997).

> [T]he rule provides for a two-step analysis in determining whether property belonging to a judgment-debtor that is in the possession of a third party, should be turned over to a judgment creditor.  First, it must be shown that the judgment debtor has an interest in the property the creditor seeks to reach.  Where this first step is satisfied, the court must then make one of two findings: either that the judgment debtor is entitled to the possession of such property, or that the judgment creditor's rights to the property are superior to those of the party in

possession.  Only after both steps of the analysis are demonstrated may the trial
court order the transferee to turn over the property to the judgment creditor . . . .

Beauvais v. Allegiance Sec., Inc., 942 F.2d 838, 840-41 (2d Cir. 1991) (internal quotation marks

omitted).

As explained infra, New York law permits a judgment creditor to obtain a money

judgment in lieu of turnover of specific property where, as here, recipients of fraudulent

conveyances have dissipated the transferred assets.

Applicable Fraudulent Conveyance Statute

Turnover Respondents contend that the Court should apply Connecticut's

fraudulent transfer statute, rather than New York's, asserting that Connecticut's four-year statute

of repose would bar Petitioner's claims, which arise from transfers that occurred beginning in

May 2009 and were first asserted directly against most of the Turnover Respondents in October

2013.  Connecticut's statute of repose provides in pertinent part that:

> [a] cause of action with respect to a fraudulent transfer or obligation . . . is
> extinguished unless action is brought . . . within four years after the transfer was
> made or the obligation was incurred or, if later, within one year after the transfer
> or obligation was or could reasonably have been discovered by the claimant.

Conn. Gen. Stat. Ann. § 52-552j.  While the Connecticut statute generally imposes a four-year

deadline on the commencement of actions for fraudulent conveyances, it includes a provision

extending the time limit for one year after discovery, where the fraud has been concealed.  The

evidence in this case proves that Mr. Carpenter and his entities actively concealed the fraudulent

conveyances by using shell entities to secretly move the Insurance Proceeds away from the

Charter Oak Trust, and then vigorously resisting efforts to enforce Petitioner's judgment, and

opposing all discovery efforts designed to determine the whereabouts of the Insurance Proceeds.

**SA-109**

<u>See</u>, <u>e.g.</u>, November Order at 4 ("Petitioner has engaged in wide-ranging discovery efforts in aid of execution of the Judgment, which have been met with vigorous opposition by Nova and its affiliates.").  Petitioner was not in a position to understand the nature of the transfers until November 30, 2012, when Petitioner first received a production of bank records related to the transfers.  (<u>See</u> Barnett Decl. Jan. 24, 2014, Ex. 75.)  This turnover proceeding was commenced within a year of that date and thus is timely even under the Connecticut statute.

Petitioner relies on New York fraudulent conveyance law.  The Turnover Respondents raise no objection to the legal principles cited by Petitioner, other than their statute of limitations argument.  For this reason, and because application of Connecticut law would make no material difference in the outcome, the Court applies New York fraudulent conveyance law in resolving the substantive issues presented by Petitioner's turnover motion.

<u>Fraudulent Conveyances to and Among the Turnover Respondents</u>

Under the New York Debtor and Creditor Law, a conveyance may be avoided as actually fraudulent or constructively fraudulent.  <u>See</u> N.Y. Debt. & Cred. Law §§ 273, 275 (McKinney 2012).

A debtor's conveyance made with the "actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud either present or future creditors, is fraudulent as to both present and future creditors."  N.Y. Debt. & Cred. Law § 276 (McKinney 2012).  Under section 276, "[t]he existence of actual intent to defraud is never presumed, and intent to defraud cannot be found 'based merely on suspicion, conjecture, or doubtful inference.'"  <u>Lippe v. Bairnco Corp.</u>, 249 F. Supp. 2d 357, 375 (S.D.N.Y. 2003), <u>aff'd,</u> 99 F. App'x 274 (2d Cir. 2004).

Therefore, "[a]ctual fraudulent intent must be proven by clear and convincing evidence, but it may be inferred from the circumstances surrounding the transaction, including the relationship among the parties and the secrecy, haste, or unusualness of the transaction."  HBE Leasing, 48 F.3d at 639.

Under section 276 of the New York Debtor and Creditor Law, courts have applied "an analysis of 'badges of fraud' associated with the transaction, which are 'circumstances so commonly associated with fraudulent transfers that their presence gives rise to an inference of intent,' to hinder, delay, or defraud a present or future creditor."  See Fed. Nat'l Mortg. Ass'n v. Olympia Mortg. Corp., No 04 Civ. 4971, 2013 WL 417352, at *11 (E.D.N.Y. Jan. 29, 2013) (internal quotation and citation omitted).  These "badges of fraud" include: 1) inside transactions among related entities, 2) hasty transfers made outside of the ordinary course of business, 3) inadequate or absent consideration, 4) secret transfers, 5) retention of control by the transferor, and 6) creation of a shield of property from creditors.  See Lippe, 249 F. Supp. 2d at 375; Lesser, 2013 WL 3788877, at *8.  Absence of these indicators – "evidence that fair consideration was paid, the parties dealt at arm's-length, the transferor was solvent, the transfer was not questionable or suspicious, the transfer was made openly, or the transferor did not retain control" – suggests that no fraudulent intent was present.  Lesser, 2013 WL 3788877, at *8.

In the November Order, the Court held that:

Mr. Carpenter caused Nova, the Charter Oak Trust, and other affiliated entities, directly or indirectly, to transfer the . . . Insurance Proceeds to which Petitioner is entitled. Mr. Carpenter caused the . . . Insurance Proceeds to be transferred to and through entities that he controlled, either directly or indirectly, including Moonstone, for the personal benefit of Mr. Carpenter and his affiliates.

SA-111

(November Order at 13.)  As explained above, the Court, having again considered the legitimacy of these transfers in light of the supplemented record, finds that the evidence is clear and convincing that they were without consideration or proper justification, and were undertaken in order to deprive Petitioner of rightful access to the Insurance Proceeds.

Petitioner has now identified additional transactions that were part of, or related to, the original series of fraudulent conveyances found in the November Order.  The newly identified transactions were conducted with the same intent to defraud as those identified in the November Order.  The additional transfers identified by Petitioner bear similar indicia of fraud, most importantly that the value was retained by Mr. Carpenter, as demonstrated through the transfers to and among the Turnover Respondent entities, each of which was controlled by Mr. Carpenter.  Tellingly, Grist Mill's agent, Mr. Goldman, could not explain the purpose of any of the transfers of the Insurance Proceeds from Charter Oak into Grist Mill.  Credible, legitimate explanations are also entirely lacking for the subsequent transfers to and among the Carpenter-controlled Turnover Respondent entities.  Furthermore, Mr. Carpenter and the Turnover Respondent entities fought to hide the evidence of these transfers well after judgment was entered in favor of Petitioner, as is noted in prior orders, rather than proffering their purported explanations of the transfers in a timely fashion.  (See, e.g., November Order at 2 ("Petitioner has engaged in wide-ranging discovery efforts in aid of execution of the Judgment, which have been met with vigorous opposition by Nova and its affiliates.").)

The Court finds that Petitioner has demonstrated by clear and convincing evidence that each of the identified transfers to the Turnover Respondents was part of, or related to, the series of fraudulent conveyances identified in the November Order.

SA-112

Relief – Money Judgments

The Turnover Respondents deny that they are still in possession of the fraudulently conveyed funds.  Courts in New York are authorized to enter money judgments in favor of a movant for turnover pursuant to N.Y. C.P.L.R. section 5225(b), where the assets have been dissipated.  See F.D.I.C. v. Conte, 204 A.D. 2d 845, 846 (N.Y. App. Div. Dep't 1994) ("[CPLR 5225(b)] furnishes a mechanism for obtaining a money judgment against the recipient of a fraudulent conveyance who has, in the interim, spent or dissipated the property conveyed.") Therefore, money judgments will be awarded to Petitioner against each of the Turnover Respondents in the following amounts, representing the amount of Insurance Proceeds that was fraudulently conveyed, directly or indirectly, to each:

Daniel E. Carpenter- $30,600,000.00;

Grist Mill Capital, LLC - $30,600,000.00[4];

Grist Mill Holdings, LLC - $21,000,000.00;

Carpenter Financial Group - $11,140,000.00;

Avon Capital, LLC - $6,710,065.92;

Phoenix Capital Management, LLC- $5,000,000.00;

Grist Mill Trust Welfare Benefit Plan, and any trustees and plan sponsors thereof

insofar as they hold Grist Mill Trust assets - $4,487,007.81; and

---

[4]     Although Petitioner sought money judgments against Mr. Carpenter and Grist Mill Capital, LLC for $31,263,842.75 each, the record demonstrates that only $30,600,000.00 was fraudulently conveyed from the Charter Oak Trust to Grist Mill Capital, LLC for Mr. Carpenter's benefit.  A movant may only recover by turnover assets in which the judgment debtor has an interest.  See N.Y. C.P.L.R. 5225(b). Thus, the Court awards only the amount found to have been fraudulently conveyed, in which the judgment debtor has an interest.

**SA-113**

Hanover Trust Company - $1,200,000.00.

<u>Requests for Permanent Injunction and Other Equitable Relief</u>

Petitioner also seeks equitable relief in the form of a permanent injunction barring transfers of assets by the Turnover Respondents,[5] an injunction barring the transfer of certain specific insurance policies, an order to "retitle" certain insurance policies that were allegedly transferred out of the Charter Oak Trust, and an order requiring the turnover of any future proceeds of a lawsuit to which one of the Turnover Respondents is a party.  All of the requested relief would remain in place until the entire judgment against Nova has been satisfied.  The injunctive measures Petitioner seeks combine to constitute, in effect, a perpetual, across-the-board limitation, on the Turnover Respondents' use of their general assets, with Petitioner playing a supervisory role with respect to all but the most minor of their business dealings.

Petitioner's motion was brought pursuant to Federal Rule of Civil Procedure 69(a), which provides that "[a] money judgment is enforced by a writ of execution, unless the court directs otherwise.  The procedure on execution – and in proceedings supplementary to and in aid of judgment or execution – must accord with the procedure of the state where the court is located, but a federal statute governs to the extent it applies." Fed. R. Civ. P. 69(a).   There is no applicable federal statute, so the Court looks to New York law to determine whether it provides authority for the extraordinary measures sought here.  The New York Civil Practice

---

[5]     Petitioner's latest iteration of its asset restriction request is set forth in docket entry no. 470.  Petitioner's proposed order would restrict transfers of money for most of the Turnover Respondents until Nova's judgment is satisfied.  It would restrict transfers of insurance policies held by GM Trust except where in "strict compliance" with certain provisions of the GM Trust documents.

Law and Rules authorize the use of certain collection methods in aid of judgment execution.

Petitioner cites no statutory authority for the expansive injunctive relief it now seeks.

The cases upon which Petitioner relies look to other bodies of law or general

powers of the court, and each is materially distinguishable from the instant judgment collection

action.  In Global NAPs, Inc. v. Verizon New England, Inc., 706 F.3d 8, 15 (1st Cir. 2013), the

First Circuit upheld an injunction barring judgment debtors from "interfering with [,] . . .

reducing the value of, or otherwise damaging" specific companies that the individual judgment

debtor owned, while a receiver was placing the companies up for sale to satisfy the judgment.  In

Yukos Capital S.A.R.L. v. OAO Samaraneftegaz, 10 Civ. 6147, 2014 WL 81563 (S.D.N.Y. Jan.

9, 2014), the court granted an injunction barring a judgment debtor from "paying dividends,

making loans, or otherwise making further payments to its shareholder or other corporate

affiliates, until [the judgment debtor] either satisfie[d] the Judgment or post[ed] a bond pending

appeal."  In NML Capital, Ltd. v. Republic of Argentina, 699 F.3d 246, 262 (2d Cir. 2012), cert.

denied, 134 S. Ct. 201 (U.S. 2013), the Second Circuit upheld an order directing specific

performance of payment priorities in a bond indenture, and thereby barring the judgment debtor,

the Republic of Argentina, from making payments to certain bondholders prior to paying others.

Finally, in Jones v. Dana, 06 Civ. 0159, 2006 WL 1153358 (S.D.N.Y. May 2, 2006), the court

declared a constructive trust and enjoined defendants who were found to have fraudulently taken

funds from the plaintiff, from removing or destroying records and accessing, expending, or

dispersing certain fraudulently "converted funds."  In each case, the court granted a very specific

injunction, affecting particular assets or entities, in aid of the preservation of the judgment

creditor's rights as against specific adverse claimants or actors within a specific temporal or

transactional context.  Furthermore, in each case, the injunction was imposed on the original judgment debtor.

Here, by contrast, Petitioner seeks to impose an expansive and permanent restriction on the general financial activities of the Turnover Respondents, none of whom was originally a judgment debtor in this case.  This type of injunction, which is tantamount to a general receivership by a judgment creditor over all assets and interests of a host of individuals and entities that are engaged in business relationships with still other entities and members of the public, is not contemplated by New York's judgment collection statutes, which focus on liens, garnishments, executions, turnovers, and receivership measures targeting specific identified assets.  See generally N.Y. C.P.L.R. Article 52.  Petitioner's request for permanent injunctive relief is denied.

Petitioner's requests for a retitling of insurance policies, prohibition on the transfer of specified insurance policies in which other individuals and entities appear to have interests, and future payment of contingent litigation proceeds are equally unfounded.  Petitioner again points to no authority within the Court's judgment execution powers to grant such relief. These requests are denied, without prejudice to proceedings to execute upon particular assets and the use of other appropriate judgment collection procedures under the laws of relevant jurisdictions.

CONCLUSION

For the foregoing reasons, Petitioner's turnover motion is granted.  Petitioner is hereby granted money judgments as follows: against Daniel E. Carpenter in the amount of $30,600,000.00; against Grist Mill Capital, LLC, in the amount of $30,600,000.00; against Grist

SA-116

Mill Holdings, LLC, in the amount of $21,000,000.00; against Carpenter Financial Group, in the

amount of $11,140,000.00; against Avon Capital, LLC, in the amount of $6,710,065.92; against

Phoenix Capital Management, LLC, in the amount of $5,000,000.00; against Grist Mill Trust

Welfare Benefit Plan, and any trustees and plan sponsors thereto insofar as they hold Grist Mill

Trust assets, in the amount of $4,487,007.81; and against Hanover Trust Company, in the

amount of $1,200,000.00.  The Clerk of the Court is requested to enter judgment against the

Turnover Respondents accordingly.  Liability under the judgments is joint and several.

Petitioner's requests for permanent injunctive and other equitable relief are

denied.

Each of the third-party motions to modify the preliminary injunction, docket entry

numbers 409, 412, and 448, are denied as moot, as the preliminary injunction is hereby

terminated pursuant to the provisions of the January Order, because Petitioner's motion for

turnover has been resolved.  (See January Order at 15.)

The Order resolves docket entry nos. 308, 409, 412, 419, 429, and 448.

SO ORDERED.

Dated: New York, New York
        August 7, 2014

                                     /S/ Laura Taylor Swain
                                    LAURA TAYLOR SWAIN
                                    United States District Judge